1  **BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
2  JONATHAN USLANER (Bar No. 256898)
   jonathanu@blbglaw.com
3  2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Tel:    (310) 819-3470

5  *Counsel for Plaintiff Cement Masons'*
   *and Plasterers' Local No. 502 Pension*
6  *Fund*

7  [Additional counsel appear on signature page]

8

9            **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
10                  **WESTERN DIVISION**

11 | CEMENT MASONS' AND | Case No. 2:24-cv-1219
   | PLASTERERS' LOCAL NO. 502 |
12 | PENSION FUND, on behalf of itself and | CLASS ACTION
   | all others similarly situated, |
13 | | **COMPLAINT FOR VIOLATIONS**
   |            Plaintiff, | **OF THE FEDERAL SECURITIES**
14 | | **LAWS**
   |        v. |
15 | | JURY TRIAL DEMANDED
   | INMODE LTD., MOSHE MIZRAHY, |
16 | YAIR MALCA, SHAKIL LAKHANI, |
   | and SPERO THEODOROU, |
17 | |
   |          Defendants. |
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Cement Masons' and Plasterers' Local No. 502 Pension Fund ("Cement Masons" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, its counsel's investigation, which included review and analysis of: (i) InMode Ltd. ("InMode" or the "Company") regulatory filings with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Company; (iii) analyst and media reports concerning InMode; and (iv) other public information regarding the Company.

## I.    INTRODUCTION

1.    This securities fraud class action is brought on behalf of purchasers of InMode common stock between June 4, 2021, and October 12, 2023, inclusive (the "Class Period"). The claims asserted herein are alleged against InMode, Moshe Mizrahi, Yair Malca, Shakil Lakhani, and Spero Theodorou (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    InMode produces medical equipment, including devices purporting to offer body sculpting and other rejuvenation technologies. InMode's target customers include dermatologists, dentists, obstetricians and gynecologists, and medical spas.

3.    This matter arises from Defendants' material misrepresentations and omissions regarding the price at which InMode sold its devices, as well as InMode's compliance with U.S. Food and Drug Administration ("FDA") regulations.

4.    Specifically, InMode misled investors regarding the pricing of, and demand for, its products. Despite making representations to the contrary throughout the Class Period, InMode heavily discounts almost every device it sells. In fact, the Company expects sales representatives to discount devices anywhere between 16% and 40% off the list price.

5.      In addition, InMode's promotion of the off-label use of its products rendered its statements to investors regarding the Company's compliance with FDA regulations materially false and misleading.

6.      Further, InMode misled investors by failing to submit required malfunction and injury reports to the FDA.  FDA regulations require equipment manufacturers to report when a medical device malfunctions or causes a serious injury or death, within 30 days of becoming aware.  Prior to 2023, InMode had not filed any such reports, despite the fact that dozens of personal injury lawsuits were filed against the Company during that time alleging injuries caused by InMode devices.

7.      The truth began to emerge just before the market closed on February 17, 2023, when an investigative publication revealed that InMode threatened some customers with legal action over complaints made about the Company's devices and sales tactics.  The customers also stated that InMode offered to replace defective products on the condition of signing confidentiality agreements with non-disparagement clauses.  On this news, the price of InMode common stock declined $1.21 per share, from a closing price of $37.02 per share on February 17, 2023, to a closing price of $35.81 per share on February 21, 2023.

8.      On October 12, 2023, before the market opened, InMode lowered its full-year revenue guidance, which the Company blamed on higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing.

9.      Later that same day, an investigative publication announced a forthcoming report on InMode, relating to the Company's statements to investors about pricing flexibility of products and margin consistency.  After the close of trading, the publication released that story, revealing that the Company had routinely and significantly discounted the prices of its devices throughout the Class Period.

10.     In response to these disclosures, the price of InMode common stock declined $7.24 per share, or nearly 26%, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023.

11.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of InMode common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  InMode maintains its U.S. headquarters in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

14.     Plaintiff Cement Masons is a multi-employer pension fund that provides retirement benefits to union cement masons and plasterers in the Chicago area.  As indicated on the Certification submitted herewith, Plaintiff purchased shares of InMode common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Defendant InMode is a global provider of aesthetic medical devices and technologies.  InMode is an Israeli corporation, and maintains its U.S. headquarters at 17 Hughes, Irvine, California.  The Company's common stock trades on the NASDAQ, which is an efficient market, under ticker symbol "INMD."  As of September 30, 2023, InMode had over 83 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

16.     Defendant Moshe Mizrahy ("Mizrahy") co-founded InMode and has served as the Chief Executive Officer and Chairman of the Board of Directors since the Company's founding in 2008.

17.     Defendant Yair Malca ("Malca") has served as the Chief Financial Officer of InMode since 2017.

18.     Defendant Shakil Lakhani ("Lakhani") has served as the President of InMode's North America division since 2017.

19.     Defendant Dr. Spero Theodorou ("Theodorou") has been InMode's Chief Medical Officer since 2017.

20.     Defendants Mizrahy, Malca, Lakhani, and Theodorou are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with InMode, possessed the power and authority to control the contents of InMode's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.   INMODE'S DECEPTIVE PRACTICES

21.   InMode is a global provider of aesthetic medical devices and technology.  Founded in 2008, InMode develops, manufactures, and markets radio-frequency ("RF") based devices that aid in surgical procedures and treatment.  These RF devices are presented as minimally invasive through an array of products for use in various medical aesthetic categories including dermatology, plastic surgery, and gynecology.  According to InMode, its devices offer "noninvasive" or "minimally invasive" treatments and procedures with "little to no downtime."

22.   According to InMode's FDA approvals, these devices use RF technology to relax muscle spasms, increase blood circulation, and treat pain.  However, InMode also markets broader capabilities, including "stimulating new skin cell development" and "melting fat cells."

23.   InMode's misstatements to investors relate to two topics that are of critical importance to the Company: (1) the price at which it sells its devices, which reflects the demand for those products; and (2) its compliance with FDA regulations, including the FDA's prohibition on off-label marketing of devices and the FDA's requirements for the reporting of injuries.

### A.   InMode Secretly Discounted Products And Deceived Customers

24.   Throughout the Class Period, InMode routinely discounted its products, despite telling investors that its products were never sold at a discount.  Indeed, internal documents reflect the amount of commission a sales representative could expect to receive depending on the price at which a device was sold.  In those documents, the first tier begins tens of thousands of dollars below the "list price," with other devices being sold at a 50% discount.

25.   The lenders that provided financing to InMode customers were a critical component of InMode's sales process.  InMode concealed from customers and investors that a favored lender, Financial Partners Group, paid kickbacks to InMode employees.  Indeed, this preferred lender incentivized InMode sales

representatives to finance through them by paying InMode employees a percentage of every dollar sold through financing.

26.     Approximately half of InMode's sales were financed through Financial Partners Group, with many loans brokered using high-pressure sales tactics. Customers were often locked into high-interest loans which could have annual percentage rates between 12% and 20%, without full or accurate disclosure of the rates.

27.     InMode employed deceptive sales practices to get customers to purchase a device.  For example, sales representatives would create fake urgency by telling customers there was a floor model device available at a deep discount, but only if they agreed to buy the product that day.  The discounted price InMode sales representatives would offer was often predetermined between InMode and its lenders.  Indeed, InMode sales representatives would frequently find out how much a customer would be approved to finance, and then offer a discounted model at that price.  As a result, InMode's list prices were not fixed, but rather used as a reference point in order to make customers feel like they were getting a good deal.

**B.    InMode Violated FDA Regulations**

28.     Medical devices, such as those sold by InMode, require approval by the FDA to be sold in the United States.  The FDA gives devices a specific "indication for use" ("IFU") which outlines the approved use for the device.  InMode is limited by FDA regulations to market and promote its products only for the indications for which the FDA approved their use.

29.     Once InMode received approval for one of its devices, it procured additional approvals under the FDA's 510(k) process.  That process permits companies to swiftly bring to market devices that can show a substantial interchangeability to a previously approved medical device.  The 510(k) application requires the applicant to submit an IFU which details the approved uses for the device.

30.    Despite only having FDA approval for limited IFUs, InMode nevertheless uses marketing videos that advertise broader capabilities, such as "stimulating new skin cell development and melting fat cells."  Similarly, other devices sold by InMode that were approved by the FDA for pain management are also advertised for off-label uses including to "melt fat and tighten consumers' skin."

31.    For example, InMode's Evolve device has FDA 510(k) approval with an IFU for relaxation of muscle spasms, increasing blood circulation, and pain treatment as either an electrical muscle stimulator ("EMS") or a transcutaneous electrical nerve stimulator ("TENS") device.  However, InMode promoted applications beyond that IFU, including stimulating new skin cell development (neocollagenesis) and melting fat cells resulting in "tighter skin."

32.    Additionally, InMode's marketing for the Evolve device directly contradicts the language in the IFU of its 510(k) application, which states that "the RF treatment mode and EMS/TENS mode should not be used in combination or sequentially."  Yet the Company's marketing of the Evolve device boasts about the combined use of RF heat and EMS, which InMode touted as enabling a more effective treatment.

33.    Furthermore, InMode encouraged the use of its Morpheus8V device beyond its FDA 510(k) approval.  The Morpheus8V is a restructured version of the Company's previous device, the Morpheus8—a micro needling device that penetrates the skin while transmitting a RF energy through the needles in order to tighten skin.  The Morpheus8V uses the same technique as the previous Morpheus8 but is marketed as part of InMode's Women's Health Division and used for gynecological indications, including stress urinary incontinence.  However, InMode does not have 510(k) approval for that indication for any of its devices.

34.    Even though the Company does not have FDA approval to market the Morpheus8V as a treatment of stress urinary incontinence, Defendant Theodorou pushed InMode sales representatives to market the Morpheus8V device as a

treatment for that ailment.  During a February 2023 non-public Company sales conference, Defendant Theodorou acknowledged that InMode did not have FDA approval to market Morpheus8V for treatment of stress urinary incontinence, but nonetheless advocated the marketing of the device to physicians as a treatment for that condition.  Defendant Theodorou described the Morpheus8V as the "trojan horse" that would help InMode break into the obstetrics industry.  The Company improperly marketed the Morpheus8V as a treatment for urinary stress incontinence and vaginal rejuvenation, despite having been warned by the FDA to stop marketing prior versions of the product, for such uses.

35.   In addition to off-label and improper marketing of its products, InMode also violated FDA regulations by failing to properly report injuries caused by its devices.  InMode is required by law to submit an adverse event report within 30 days of learning about actual injuries and any risk that the product that may cause future death or serious injury.

36.   Despite the Company's internal process to collect, analyze and report injuries resulting from the use of its devices to the FDA, InMode never notified the FDA of an injury caused by its devices until early 2023.  The Company was nonetheless aware of multiple injuries caused by its devices, which it did not timely report to the FDA.  Indeed, once InMode ultimately started notifying the FDA of injuries in February 2023, the reports included injuries that had occurred as far back as 2021.

## V.   DEFENDANTS' MATERIAL MISREPRESENTATIONS

37.   The Class Period begins on June 4, 2021, when Defendant Malca represented InMode at the Jeffries Healthcare Conference.  At that conference, Defendant Malca stated that InMode was "not a razor and razorblade company. When we do have consumables on many of our products, we don't discount our platforms just to jack up the price of the consumables. We set our platform for full price and sell our consumable for very reasonable pricing."

8

38.     On July 28, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the second quarter of 2021.  In that filing, Defendant Lakhani stated, "We have also seen higher overall transaction amounts, which is attributed to the growing demand for our products. . . . We are pleased to see high physician and patient satisfaction with our products and services."

39.     That same day, InMode held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2021.  On that call, Defendant Theodorou was asked by an analyst "How much do you think off-label use will be for other type[s] of rejuvenation procedures, things like that, that we've heard about in the past . . . is this really going to be focused on the therapeutic side only?"  In response, Defendant Theodorou stated "As you know, we have to be very, very careful because of the history and the language that the FDA put out there. . . . At the end of the day, we're an aesthetics company.  And introducing a platform into a segment where they can actually find a medical indication, use a medical indication, and then slowly use them into the cosmetic, that's been always our mantra."

40.     On August 12, 2021, Defendant Mizrahy represented InMode at the UBS Genomics 2.0 and MedTech Innovations Summit.  At that conference, Defendant Mizrahy stated:

>  [W]e're not a razor and razor blade company. We don't give the system for free in order to sell high-priced disposable. We decided that we want to sell the system and to sell disposable as well. By the way, the disposable prices are reasonable to the doctors because we want doctor hate to buy disposable for very high price even if he got the system for very low price. So, we sell disposable in a very reasonable price to encourage the doctor to do more and more treatment.

41.     On October 26, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the third quarter of 2021.  In that filing, InMode touted two "new" platforms, EmpowerRF and EvolveX, and said that the Company will continue to "expand our business by delivering innovative technologies in new medical applications."

42.     On November 18, 2021, Defendant Mizrahy represented InMode at the Canaccord Genuity CG MedTech & Diagnostics Forum.  At that conference, in response to an analyst question regarding InMode's return to the women's health market, Defendant Mizrahy responded "[w]e're riding on the learning curve.  We've trained the doctor properly.  We don't want to [make] the same mistakes as happened [in 2018] because we don't want the FDA to jump on us.  All the applicators and all the modalities are FDA approved already, so we do it step by step."

43.     On February 10, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the fourth quarter of 2021.  In that filing, Defendant Theodorou stated, "We diligently invest resources in developing our clinical studies and are encouraged by the growing number of peer review publications supporting our strong scientific data and achievements."

44.     In that same filing, Defendant Malca stated:

> The last several quarters have exemplified InMode's dedication to maintaining healthy gross margins, where we successfully maintained 85%, despite global supply challenges.  We have integrated this as part of our company target model, ensuring that each additional new product will allow us to support this level of margin.  As we continue to enter new markets and geographies, we'll focus on expanding our marketing capabilities to support our growth trajectory.

45.     That same day, InMode also filed with the SEC on Form 20-F its annual report for its fiscal year ending on December 31, 2021 (the "2021 Annual Report"). In that filing, InMode stated, "We have obtained 510(k) clearance for the current treatments for which we offer our products."  The Company also assured investors that "no third-party claims have been brought against us to date."

46.     In the 2021 Annual Report, InMode also stated:

> Under FDA regulations, for each of our products we must only use labeling, including advertising and promotional materials, that is consistent with the specific indication(s) for use included in the FDA exemption regulation, clearance, or approval, that is applicable to the specific product.  If the FDA or other authorities determine that our promotional or training materials constitute the unlawful promotion of an off-label use, they could request that we modify our training or promotional materials and/or subject us to regulatory or enforcement actions.

47.     In the 2021 Annual Report, InMode went on to state:

Our products may cause or contribute to adverse medical events or other undesirable side effects that we are required to report to the FDA, and if we fail to do so, we would be subject to sanctions that could harm our reputation, business, financial condition and results of operations. . . . We are subject to the FDA's medical device reporting regulations and similar foreign regulations, which require us to report to the FDA when we receive or become aware of information that reasonably suggests that one or more of our products may have caused or contributed to a death or serious injury[.]

48.     The statements set forth in paragraphs 45-47, and similar statements, were made in all of the Company's Annual Reports filed with the SEC during the Class Period.

49.     On May 2, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the first quarter of 2022.  In that filing, Defendant Lakhani stated, "We reported record numbers for consumable sales, a strong indication of the growing utilization rate and demand for our platforms."  Defendant Lakhani further stated that "[w]e are optimistic about the overall demand for our products and anticipate that the North American business will continue to grow and be the main revenue contributor for InMode."

50.     On July 28, 2022, InMode held a conference call with analysts and investors to discuss the Company's earnings and operations for the second quarter of 2022.  During that call, Defendant Mizrahy stated that "[w]e started the process to clear the system for other indication with the FDA.  We are very - investing very heavily - heavily on the Empower, since we believe that we want to be the leader in the women health or the wellness women health in the market."

51.     On that same call, Defendant Lakhani discussed loan financing used by many customers.   Specifically, Defendant Lakhani stated that "in regards to financing . . . [w]e've talked to our brokers and a number of the leasing companies, we haven't seen rate hikes as of yet.  I think they're going to start to kick in slowly.  The nice thing about it is because of the macroeconomic environment right now it's not going to come as a surprise[.]"

52. On October 27, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the third quarter of 2022. In that filing, Defendant Lakhani stated, "Our performance in North America continues to be the major growth engine for the company, with an emphasis on the Morpheus8 becoming one of the most popular minimally invasive procedures." Defendant Theodorou added, "We've seen growing adoption of our EmpowerRF platform by an increased number of women's health and wellness physicians across the U.S. and Canada. The success in improving women's quality of life is meaningful to InMode, and we intend building on its momentum as we capture more share in this important market."

53. The statements set forth in paragraphs 37-47 and 49-52 were materially false and misleading. In reality: (i) the Company heavily discounts almost every device it sells; (ii) demand for the Company's products was driven by InMode's willingness to discount its products; (iii) the Company violated FDA regulations by engaging in off-label marketing and promoting products for treatment of indications for which they lack FDA approval; and (iv) the Company violated FDA regulations by failing to timely report injuries caused by its devices.

## VI.  THE TRUTH EMERGES

54. On February 17, 2023, just before the market closed, an investigative publication revealed that InMode customers were threatened with legal action after filing complaints regarding the Company's devices and sales tactics. As a result of these disclosures, the price of InMode common stock declined $1.21 per share, from a closing price of $37.02 per share on February 17, 2023, to a closing price of $35.81 per share on February 21, 2023.

55. However, despite these disclosures, InMode continued to misrepresent the pricing of, and demand for, its products. For example, on March 15, 2023, Defendant Malca represented InMode at the Barclays Global Healthcare Conference. At that conference, Defendant Malca stated that physicians "don't like the razor and razorblade model. They tend to forget pretty quickly what they paid

12

for the original device.  So, even if you discounted or heavily discounted, as many of the companies do . . . And what we do differently is we charge them the full price on the device and charge a very reasonable price on the consumable."

56.     The statements set forth in paragraph 55 were materially false and misleading.  In reality: (i) the Company heavily discounts almost every device it sells; and (ii) demand for the Company's products was driven by InMode's willingness to discount its products.

57.     On October 12, 2023, before the market opened, InMode lowered its full-year revenue guidance, which the Company blamed on higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing.

58.     Later that same day, an investigative publication announced a forthcoming report on InMode, relating to the Company's statements to investors about pricing flexibility of products and margin consistency.  After the close of trading, the publication released a story revealing that InMode significantly discounted the prices of its devices on a routine basis throughout the Class Period.

59.     As a result of these disclosures, the price of InMode common stock declined $7.24 per share, or nearly 26%, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023.

## VII.  **LOSS CAUSATION**

60.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  These misleading statements and omissions artificially inflated the price of InMode common stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, InMode's stock price fell significantly.  As a result of their purchases of InMode common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## VIII. CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased InMode common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of InMode and their families and affiliates.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of September 30, 2023, InMode had over 83 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

63.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants' statements and/or actions misrepresented material facts;

(c)    Whether Defendants' statements and/or actions omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e)    Whether Defendants' misconduct impacted the price of InMode common stock;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damages sustained by Class members and the appropriate measure of damages.

64.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

65.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

66.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

67.    InMode's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

68.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of InMode who knew that the statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

## X.    PRESUMPTION OF RELIANCE

69.    At all relevant times, the market for InMode common stock was an efficient market for, among others, the following reasons:

(a)     InMode stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, InMode filed periodic public reports with the SEC and the NASDAQ;

(c)     InMode regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     InMode was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for InMode common stock promptly digested current information regarding InMode from all publicly available sources and reflected such information in the price of InMode common stock.  Under these circumstances, all purchasers of InMode common stock during the Class Period suffered similar injury through their purchase of InMode common stock at artificially inflated prices and the presumption of reliance applies.

71.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material misstatements.  Because this action involves Defendants' misrepresenting material information regarding both the price at which InMode sold its devices, as well as InMode's compliance with FDA regulations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the misstatements be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Company's device

pricing, as well as its FDA compliance to investors, as set forth above, that requirement is satisfied here.

## XI.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
(Against InMode and the Individual Defendants)**

72.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.  During the Class Period, InMode and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase InMode common stock at artificially inflated prices.

74.  InMode and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.  InMode and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

76.  During the Class Period, InMode and the Individual Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose

17

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.    InMode and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  InMode and the Individual Defendants engaged in this misconduct to conceal InMode's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

78.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased InMode common stock at artificially inflated prices and were harmed when the truth about InMode negatively impacted the price of the Company's common stock.  Plaintiff and the Class would not have purchased InMode common stock at the prices they paid, or at all, had they been aware that the market prices for InMode common stock had been artificially inflated by InMode's and the Individual Defendants' fraudulent course of conduct.

79.    As a direct and proximate result of InMode's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

80.    By virtue of the foregoing, InMode and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

81.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of InMode within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-

level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about InMode, the Individual Defendants had the power and ability to control the actions of InMode and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 14, 2024                          Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3470

-and-

Avi Josefson
Scott R. Foglietta

1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400
Fax:   (212) 554-1444
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Cement Masons'
and Plasterers' Local No. 502 Pension
Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Kevin J. Farley, on behalf of Cement Masons' and Plasterers' Local No. 502 Pension Fund ("Cement Masons"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am President & Business Manager of Cement Masons. I have reviewed the complaint and authorize its filing.

2. Cement Masons did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Cement Masons is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Cement Masons' transactions in the InMode, Ltd. securities that are the subject of this action are set forth in the chart attached hereto.

5. Cement Masons has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Cement Masons will not accept any payment for serving as a representative party on behalf of the Class beyond Cement Masons' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **8**ᵗʰ day of February, 2024.

Kevin J. Farley
President & Business Manager
*Cement Masons' and Plasterers'*
*Local No. 502 Pension Fund*

**Cement Masons' and Plasterers' Local No. 502**
**Pension Fund**

**Transactions in InMode, Ltd.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 06/30/2023 | 100 | 37.5345 |
| Purchase | 07/03/2023 | 100 | 37.1424 |
| Purchase | 07/05/2023 | 100 | 37.6152 |
| Purchase | 07/06/2023 | 100 | 36.8895 |
| Purchase | 07/10/2023 | 100 | 39.6907 |
| Purchase | 07/11/2023 | 100 | 40.0898 |
| Purchase | 07/20/2023 | 100 | 45.0889 |
| Purchase | 07/21/2023 | 100 | 45.3098 |
| Purchase | 07/24/2023 | 100 | 44.8797 |
| Purchase | 07/25/2023 | 100 | 44.2140 |
| Purchase | 07/27/2023 | 100 | 44.1447 |
| Purchase | 07/31/2023 | 100 | 42.3003 |
| Purchase | 08/02/2023 | 100 | 42.3916 |
| Purchase | 08/04/2023 | 200 | 42.6038 |
| Purchase | 08/07/2023 | 100 | 42.6935 |
| Purchase | 08/09/2023 | 100 | 42.5262 |
| Purchase | 08/10/2023 | 100 | 41.3663 |
| Purchase | 08/14/2023 | 200 | 40.8856 |
| Purchase | 08/16/2023 | 200 | 38.4816 |
| Purchase | 08/29/2023 | 100 | 38.8347 |
| Purchase | 09/05/2023 | 100 | 39.2597 |
| Purchase | 09/07/2023 | 100 | 38.4700 |
| Purchase | 09/08/2023 | 100 | 38.0860 |
| Purchase | 09/12/2023 | 100 | 37.0749 |
| Purchase | 09/13/2023 | 100 | 35.0701 |
| Purchase | 09/18/2023 | 200 | 34.2465 |
| Purchase | 09/25/2023 | 100 | 32.3598 |
| Purchase | 09/26/2023 | 100 | 32.2313 |
| Purchase | 10/05/2023 | 100 | 28.0123 |