POMERANTZ~~BERNSTEIN LITOWITZ BERGER~~

~~& GROSSMANN~~ LLP

Jeremy A. Lieberman (admitted *pro hac vice*)

Emma Gilmore (admitted *pro hac vice*)

Villi Shteyn (admitted *pro hac vice*)

600 Third~~JONATHAN USLANER (Bar No. 256898)~~

~~jonathanu@blbglaw.com~~

~~2121~~ Avenue, 20th Floor~~of the Stars, Suite 2575~~

New York, New York 10016

Telephone: (212) 661-1100

Facsimile: (917) 463-1044

jalieberman@pomlaw.com

egilmore@pomlaw.com

vshteyn@pomlaw.com

~~Los Angeles, CA 90067~~

~~Tel: (310) 819-3470~~

Counsel for *Plaintiffs* ~~*Plaintiff Cement Masons'*~~
*and for the Proposed Class*~~*Plasterers' Local No. 502 Pension*~~
~~*Fund*~~

[Additional *Counsel*~~counsel appear~~ on *Signature Page*~~signature page~~]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE INMODE LTD. SECURITIES LITIGATION<br>~~CEMENT MASONS' AND PLASTERERS' LOCAL NO. 502 PENSION FUND, on behalf of itself and all others similarly situated,~~<br>~~Plaintiff,~~<br>~~v.~~<br>~~INMODE LTD., MOSHE MIZRAHY, YAIR MALCA, SHAKIL LAKHANI, and SPERO THEODOROU,~~<br>~~Defendants.~~ | Case No. 2:24-cv-01219-MEMF-MRW~~1219~~<br><br>~~CLASS ACTION~~<br><br>CLASS ACTION<br><br>**AMENDED** **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

JURY TRIAL DEMANDED

THIS DOCUMENT RELATES TO:
ALL  ACTIONS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 33

JURISDICTION AND VENUE ......................................................................... 77

THE PARTIES .................................................................................................... 7

THE CONFIDENTIAL WITNESSES ............................................................. 1010

SUBSTANTIVE ALLEGATIONS .................................................................. 1313

    A.    Unbeknownst to Investors, InMode Routinely Discounted Its Devices, Jeopardizing Its Future Revenues .............................. 1414

    B.    InMode Improperly Marketed Its Products For Off-Label Uses ... 2828

        (i)    Defendants Improperly Marketed Evolve and Made Misleading Statements to Investors ....................................... 3030

        (ii)    Defendants Improperly Marketed Evoke and Made Misleading Statements to Investors ....................................... 3434

        (iii)   Defendants Improperly Marketed Morpheus8 and Morpheus8V and Made Misleading Statements to Investors ............................................................................................ 3737

        (iv)   Defendants Knew of and Encouraged the Improper Practices .......................................................................... 4545

    C.    InMode Failed to Report Malfunctions and Injuries to the FDA... 5353

MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS .................................................................................................... 6060

DURING THE CLASS PERIOD, THE INDIVIDUAL DEFENDANTS SOLD MASSIVE AMOUNTS OF THEIR INMODE HOLDINGS ................... 8181

THE TRUTH EMERGES ................................................................................. 8282

PRESUMPTION OF RELIANCE ................................................................... 9090

NO SAFE HARBOR ....................................................................................... 9696

PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................... 9797

COUNT I ....................................................................................................... 101101

{00635310;7 }

COUNT II ............................................................................................................. 105~~105~~

PRAYER FOR RELIEF ......................................................................................... 107~~107~~

DEMAND FOR TRIAL BY JURY ..........................................................................85

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{00635310;7 }

Lead Plaintiffs Meitav Provident and Pension Funds Ltd. ("Meitav Provident") and Meitav Mutual Funds Ltd. ("Meitav Mutual" and, collectively with Meitav Provident, the "Meitav Funds"), and Kranot Hishtalmut Le Morim Tichoniim Morey Seminarim Ve Mefakhim Hevra Menahelet Ltd. and Kranot Hishtalmut Le Morim Ve Gananot Hevra Menahelet Ltd. (collectively, the "Teachers Funds" and, together with the Meitav Funds, the "Funds" or the "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding InMode Ltd. ("InMode" or the "Company"), analysts' reports and advisories about the company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

{00635310;7 }

Plaintiff Cement Masons' and Plasterers' Local No. 502 Pension Fund ("Cement Masons" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, its counsel's investigation, which included review and analysis of: (i) InMode Ltd. ("InMode" or the "Company") regulatory filings with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Company; (iii) analyst and media reports concerning InMode; and (iv) other public information regarding the Company.

## INTRODUCTION

1.      This securities fraud class action is brought on behalf of purchasers of InMode common stock between February 18, 2020June 4, 2021, and December 6October 12, 2023, inclusive (the "Class Period"). The claims asserted herein are alleged against InMode, Moshe MizrahyMizrahi, Yair Malca, Shakil Lakhani, and Spero Theodorou, and Michael Kreindel (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

{00635310;7 }

AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 2:24-CV-01219-MEMF-MRW

1

2.    InMode produces medical equipment, including devices purporting to offer body sculpting and other rejuvenation technologies. InMode's target customers include dermatologists, dentists, obstetricians and gynecologists, and medical spas.

3.2.    This matter arises from Defendants' material misrepresentations and omissions regarding the price at which InMode sold its devices, as well as InMode's compliance with U.S. Food and Drug Administration ("FDA") regulations.

4.3.    Specifically, InMode misled investors regarding the pricing of, and demand for, its products. Despite making representations to the contrary ("what we do differently [from competitors] is we charge the full price on the device"), throughout the Class Period, InMode heavily discounteddiscounts almost every device it soldsells. In fact, the Company expectedexpects sales representatives to discount devices anywhere between 16% and 40% off the list price. This undisclosed practice, known to Defendants, threatened InMode's future revenues.

5.    In addition, unbeknownst to investors, Defendants repeatedly promoted InMode's products for off-label uses not approved by the FDA, despite publicly representing that "[w]e have obtained FDA clearance for the current treatments for which we offer our products." Defendants' promotion of its Morpheus8V device, for the treatment of vaginal rejuvenation and urinary retention, was particularly egregious

because ~~the off-label use of its products rendered its statements to investors regarding the Company's compliance with FDA regulations materially false and misleading.~~

~~6.~~4.    ~~Further,~~ InMode had already been warned by the FDA about inappropriately marketing such claims for similar devices, as they posed serious risks of harm. And, while Defendants knew that the improper use of their products harmed patients, they failed to report injuries to the FDA, as ~~misled investors by failing to submit~~ required. Before  ~~malfunction and injury reports to the FDA. FDA regulations require equipment manufacturers to report when a medical device malfunctions or causes a serious injury or death, within 30 days of becoming aware. Prior to~~ 2023, InMode had not filed any such mandatory reports, despite the fact that at least dozens of reports were sent to InMode and various personal injury lawsuits were filed against the Company ~~during that time~~ alleging serious injuries caused by InMode's ~~InMode~~ devices.

5.    Defendants knew of and even encouraged the improper uses of the devices. For example, Defendants internally described the Morpheus8V device as a "Trojan Horse" of revenues to be exploited as OBGYN's "literally have the woman in stirrups. They are a captive audience."

~~7.~~6.    The truth began to emerge ~~just before the market closed~~ on February 17, 2023, when an investigative publication, *Capitol Forum,* revealed that InMode threatened some customers with legal action over complaints made about the Company's

{00635310;7 }

devices and sales tactics. The report~~customers~~ also included accounts of burned patients.~~stated that InMode offered to replace defective products on the condition of signing confidentiality agreements with non-disparagement clauses.~~ On this news, the price of InMode common stock declined 6.73%. Then, on March 10, 2023, *The Capitol Forum* reported that InMode had not been submitting mandatory reports to the FDA regarding injuries and malfunctions stemming~~$1.21 per share,~~ from the use of its devices. This news caused another 4.31% drop in the Company's share~~a closing~~ price. ~~of $37.02 per share on February 17, 2023, to a closing price of $35.81 per share on February 21, 2023.~~

~~8.~~ On October 12, 2023, ~~before the market opened,~~InMode lowered its full-year revenue guidance, which it~~the Company~~ blamed on constraints in financing of medical equipment, marked by higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing. The

~~9.~~ ~~Later that~~ same day, the *Capitol Forum* issued~~an investigative publication announced~~ a ~~forthcoming~~ report titled "~~on~~ *InMode: Pricing Flexibility of Products Raises Questions Regarding Statements*~~, relating~~ *to Investors* ~~the Company's statements to investors about pricing flexibility of products~~ *and Margin Consistency,*"~~margin consistency. After the close of trading, the publication released that story,~~ revealing that InMode ~~the Company had~~ routinely discounted its products ~~and~~ significantly, which may

{00635310;7 }

have affected the Company's revenues and guidance. InMode's revised revenue guidance was also a materialization of the previously undisclosed risk that it was marketing its products beyond the scope permitted by the FDA. On this news, InMode's shares plummeted discounted the prices of its devices throughout the Class Period.

10.7.    10.  In response to these disclosures, the price of InMode common stock declined $7.24 per share, or nearly 26%. %, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023.

8.    Then, on December 6, 2023, InMode again lowered its revenue guidance, causing its shares to plunge another 12.15%.

11.9.    11. As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of InMode common stock, PlaintiffsPlaintiff and other Class members have suffered significant losses and damages.

10.    Meanwhile, during the Class Period, the Individual Defendants enriched themselves by dumping large portions of their holdings at artificially inflated prices. For example, Defendant Mizrahy's holdings decreased substantially, from 10,170,656 shares shortly before the Class Period at year-end 2019, to just 2,005,208 shares shortly

{00635310;7 }

after the Class Period at year-end 2023.[1]  Thus, Mizrahy dumped as much as 80% of his InMode common stock during the Class Period, for total proceeds of approximately $455,050,069.[2]

11.    Similarly, Defendant Malca's holdings decreased substantially, from 147,038 shares at year-end 2020, to just 30,314 shares shortly after the Class Period at year-end 2023.  Thus, Malca disposed of as much as 79% of his InMode common stock during the Class Period, for total proceeds of approximately $6,703,493.

12.    Likewise, Defendant Kreindel's holdings decreased substantially, from 10,376,200 shares shortly before the Class Period at year-end 2019, to just 3,114,762 shares shortly after the Class Period at year-end 2023.  Thus, Kreindel dumped as much as 70% of his InMode common stock during the Class Period, for total proceeds of approximately $309,632,368.

13.    Defendant Lakhani's holdings also decreased substantially, from 20,360 shares at year-end 2022, to zero shares shortly after the Class Period at year-end

---

[1] Share amounts are adjusted to reflect the 2-for-1 stock split executed on September 30, 2021.

[2] Proceeds for Defendants Mizrahy, Malca, Kreindel, and Lakhani are calculated by using the average share price each calendar year during the Class Period (2020, 2021, 2022, and 2023) and multiplying it by the decrease in the amounts of shares held each respective year, where applicable.

{00635310;7 }

2023.  Thus, Lakhani disposed of 100% of his InMode common stock during the Class Period, for total proceeds of approximately $665,976.

## JURISDICTION AND VENUE

12.14.   12.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.15.13.

——Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). InMode maintains its U.S. headquarters in this Judicial District, conducts substantial business in this Judicial District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this Judicial District. In connection with the acts alleged in this complaintComplaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

{00635310;7 }

14.16. Plaintiffs, as set forth14. Plaintiff Cement Masons is a multi-employer pension fund that provides retirement benefits to union cement masons and plasterers in the Certifications previouslyChicago area. As indicated on the Certification submitted to the Court (ECF No. 31-3), acquiredherewith, Plaintiff purchased shares of InMode common stock at artificially inflated prices during the Class Period and were damaged upon the revelationsuffered damages as a result of the violations of the federal securities laws alleged corrective disclosures and when the risks materializedherein.

15.17. Defendant InMode is a global provider of aesthetic medical devices and technologies. InMode is an Israeli corporation, and maintains its U.S. headquarters at 17 Hughes, Irvine, California. The Company's common stock trades on the NASDAQ, which is an efficient market, under the ticker symbol "INMD." As of December 31September 30, 2023, InMode had approximately 84over 83 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.

16.18. Defendant Moshe Mizrahy ("Mizrahy") co-founded InMode and has served as the Chief Executive Officer and onChairman of the Board of Directors since the Company's founding in 2008. He was Chairman of the Board of Directors until July 2024.

{00635310;7 }

17.19. Defendant Yair Malca ("Malca") has served as the Chief Financial Officer of InMode since 2017.

18.20. Defendant Shakil Lakhani ("Lakhani") has served as the President of InMode's North America division fromsince 2017 until October 2024.

21.    Defendant Dr. Spero Theodorou ("Theodorou") washas been InMode's Chief Medical Officer from 2017 until June 2024.

19.22. Defendant Dr. Michael Kreindel ("Kreindel") co-founded InMode and has served as the Chief Technology Officer since the Company's founding in 2008. He has also been on the Board of Directors since August 2019. 2017.

20.23. Defendants Mizrahy, Malca, Lakhani, and Theodorou, and Kreindel are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with InMode, possessed the power and authority to control the contents of InMode's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading beforeprior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed

{00635310;7 }

to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### THE CONFIDENTIAL WITNESSES

24.    Confidential witness ("CW") 1 was a Territory Manager at InMode from February 2022 until April 2024, in the United States. CW1 reported to Austin Giles, the Area Sales Manager. CW1's job was front line sales to doctors' offices and medical spas. CW1 was responsible for developing new customers for InMode. CW1's day-to-day tasks included setting up meetings for sales pitches about InMode's products. CW1 also attended and tried to secure sales at InMode conferences and events where doctors and medical professionals gathered.

25.    CW2 was a Territory Manager for InMode from October 2020 to April 2021, in the United States. CW2 reported to an Area Sales Manager and to District Sales Manager Aaron Ingold. CW2 contacted potential new customers and made sales pitches to them. CW2 also managed sales for existing customer accounts.

26.    CW3 was a Territory Manager for InMode in the United States, from September 2023 to February 2024, facilitating sales for InMode's equipment. S/he reported to Area Sales Manager Kale Pu'uohau, District Sales Manager Amanda Hogan, and Regional Sales Director Brandon Roberts. Roberts reported to Brandon Nye, the Vice

{00635310;7 }

President of Sales for the western U.S., and Nye reported to Defendant Lakhani and the C-Suite.

27.     CW4 was a Territory Manager at InMode from June 2023 until April 2024, in the United States. S/he reported to Jake Alexander, District Sales Manager, who reported to Aaron Ingold, Regional Sales Director. Ingold reported to Nye, who reported to Defendant Lakhani. CW4 reached out to potential clients to sell them InMode equipment. S/he was responsible for selling the entire assortment of equipment available from the Company.

28.     CW5 was a Logistics Coordinator at InMode from October 2022 to March 2024. CW5 was based in the United States and reported to Ron Cohen, Director of Supply Chain. CW5 did inventory control at InMode's Irvine, California warehouse.  S/he said the company's equipment was manufactured in Israel and shipped to Irvine, where it was held until purchased and sent out to customers in the United States. CW5 helped keep track of inventory numbers and communicated with Israel about when the warehouse was running low and needed shipments of specific pieces of equipment.  S/he also assisted with shipping equipment to customers who reported equipment malfunctions.

29.     CW6 worked at InMode from January 2019 until October 2020, first as a Territory Manager and then as an Area Sales Representative, in the United States. CW6's role included identifying and pursuing sales leads for InMode equipment.

{00635310;7 }

30.    CW7 was an Area Sales Manager at InMode from June 2023 until January 2024, in the United States. CW7 reported to District Sales Manager Carlos Gubbins. S/he sold InMode's equipment to doctors.

31.    CW8 was the Vice President of Sales at InMode for the global (non-U.S.) market from early 2019 to August 2021. S/he was based in Israel and worked closely with Defendant Mizrahy, reporting directly to him. CW8 had insight into U.S. operations and Mizrahy's oversight of them.

32.    CW9 was a Territory Manager at InMode from August 2019 until January 2020, in the United States. CW9 reported to Jason Freeland, Area Sales Manager. CW9's duties included locating potential customers to sell them InMode equipment.

33.    CW10 was a Marketing Manager at InMode from early 2018 until February 2023. S/he was based in Israel and worked alongside Defendant Mizrahy, reporting directly to him.

34.    CW11 was an Area Sales Manager at InMode from November 2018 to mid-2019, in the United States. CW11 reported to Aaron Ingold, Regional Sales Director, and Ingold reported to Tyler Lembke, Vice President of Sales. Lembke reported to Shakil Lakhani, InMode's President of North America. CW11 was responsible for securing and negotiating deals with doctors for the purchase of

{00635310;7 }

InMode's equipment. S/he had the authority to discount up to a certain amount, after which s/he needed higher levels of approval.

## SUBSTANTIVE ALLEGATIONS

### ~~INMODE'S DECEPTIVE PRACTICES~~

~~21.~~35. InMode is a global provider of aesthetic medical devices and technology. Founded in 2008 and going public in 2019, InMode develops, manufactures, and markets energy-based devices, such as laser and primarily radio-frequency ("RF") based devices that are designed to aid in non-invasive and minimally-invasive surgical procedures and treatments~~treatment~~. These RF devices are presented ~~as minimally invasive through an array of products~~ for use in various medical aesthetic categories including dermatology, plastic surgery, and gynecology. According to InMode, its devices offer "non-invasive~~noninvasive~~" or "minimally-–invasive" treatments and procedures with "little to no downtime."

~~15.~~ During the Class Period, Defendants made materially false and misleading statements to investors related~~According to InMode's FDA approvals, these devices use RF technology to relax muscle spasms, increase blood circulation, and treat pain. However, InMode also markets broader capabilities, including "stimulating new skin cell development" and "melting fat cells."~~

22.36. ~~InMode's misstatements to investors relate~~ to two topics that are of critical importance to the Company: (1) the price at which it sells its devices, which impacts revenues~~reflects the demand for those products~~; and (2) its compliance with FDA regulations, including the FDA's prohibition of~~on~~ off-label marketing of devices and the FDA's requirements for the reporting of injuries.

**A.    Unbeknownst to Investors, InMode Routinely~~Secretly~~ Discounted Its Devices, Jeopardizing Its Future Revenues~~Products And Deceived Customers~~**

37.    During~~Throughout~~ the Class Period, InMode's executives repeatedly told investors that InMode's competitive edge stemmed at least partly from its ability to sell its devices at full prices. Defendant Malca insisted that "[w]e sell the devices for full price . . . ." Malca emphasized that what differentiated InMode from its competitors was its ability to command a full price: "what we do differently is we charge [customers] the full price on the device . . . ." Mizrahy also boasted that "[b]ut again, I would like to say it again, we are not razor and razorblade company. We do not sell the system for less . . . ."[3]

38.    In truth, however, throughout the Class Period, InMode heavily ~~routinely~~ discounted almost every product it~~its products, despite telling investors that its products~~

[3] During the Class Period, InMode had at most 8-10 systems or platforms.

{00635310;7 }

were never sold, with discounts routinely granted anywhere between 16% and 40% off of the "list price."

23.39.    Internal InMode at a discount. Indeed, internal documents reflectedreflect the amount of commission a sales representative could expect to receive at each tier of pricing depending on the price at which theya device was sold a device. In those documents, the first tier begins tens of thousands of dollars *below* the "list price":," with other devices being sold at a 50% discount.



Source: InMode Compensation Plan, February 2019

{00635310;7 }

16.    While the compensation list above is from 2019, ~~The lenders that provided financing to~~ InMode ~~customers were a critical component of InMode's~~ sales ~~process. InMode concealed from customers and investors that a favored lender, Financial Partners Group, paid kickbacks to InMode employees. Indeed, this preferred lender incentivized InMode sales~~ representatives have told investigators that the structure of the discounts remains in effect. In fact, some ~~to finance through them by paying InMode employees a percentage~~ of the discounts currently given may be even greater than those given in 2019, largely as a result ~~every dollar sold through financing.~~

17.    Approximately half of higher ~~InMode's sales were financed through Financial Partners Group, with many loans brokered using high-pressure sales tactics. Customers were often locked into high-~~interest ~~loans which could have annual percentage~~ rates, according to former ~~between 12% and 20%, without full or accurate disclosure of the rates.~~

40.    ~~InMode employed deceptive sales practices to get customers to purchase a device. For example,~~ sales representatives.

41.    CW1 confirmed that InMode had a tiered system for commission rates, which CW1 called a "commission matrix." The matrix was a Companywide commission rate structure that clearly laid out how much salespeople earned for the sale of specific

{00635310;7 }

pieces of equipment at different prices. CW1 explained that the matrix was a tiered system, where commission rates dropped as the price customers paid for a piece of equipment dropped. The matrix was prepared by InMode and disseminated to its entire sales force. The matrix indicated the Company expected discounts and laid out a structure for commission rates, with corresponding price discounts.

24.42.    Several InMode sales representatives described how the discounts worked. Sales employees would create "fake urgency" by telling customers there was a floor model device available at a deep discount, but only if they agreed to buy the product that day. Another common sales directive was to falsely tell doctors that a sale fell through so a discount was being offered on the device if they closed the sale within a short period of time, such as 72 hours. The discounted price InMode sales representatives would offer was often predetermined between InMode and its lenders. Indeed, InMode sales representatives would frequently find out how much a customer would be approved to finance, and then offer a discounted model at that price. According to one former salesperson at InMode, "the price is basically whatever the customer can get financing for." A former InMode area sales manager also explained that the actual sale price was whatever a customer could get financing forAs a result, InMode's list prices were not fixed, but rather used as a reference point in order to make customers feel like they were getting a good deal.

{00635310;7 }

43.     Confidential witnesses described the discounting practices routinely employed at InMode. For example, CW1 stated that InMode used discounts to motivate customers to buy equipment. S/he explained that using discounts to create a fake urgency in a potential buyer was a core sales strategy at InMode. CW1 recalled that the list price for Morpheus8 was about $150,000 but the average purchase price for the device was roughly $100,000.

44.     Similarly, CW3 recalled selling Envision devices at steep discounts. The target price for the platform was between $179,000 to $200,000 but on average the device would sell for $135,000 to $145,000, and as low as $105,000. CW3 explained that InMode falsely tried to create a sense of urgency and scarcity in customers in order to secure sales, with steep discounts offered at demo events, as well as outside those events. S/he recounted that the Vice President of Sales for the western U.S. region, Brandon Nye, hosted frequent training sessions for salespeople on Zoom. During those sessions, Nye provided the team with sales tactics, including how to create a sense of urgency in customers to motivate them to purchase the discounted devices promptly. According to CW3, InMode's sales strategy was to motivate customers to buy quickly to take advantage of steep discounts that salespeople falsely claimed were rare and/or only briefly available. CW3 recalled that Nye reported to at least Defendants Lakhani and Mizrahy.

{00635310;7 }

45.    CW2 also negotiated prices for equipment with customers. The Company had a "target" price for each piece of equipment as well as a "floor price," but they could go below the floor price. CW2 said that most devices were sold below the target price.[4] CW2 noted that InMode prepared "pricing sheets" for each machine that showed a tiered commission rate structure for salespeople based on the sale price of the device. The pricing sheets documented InMode's companywide pricing strategy and its expectation that the devices would be sold at a discount.

46.    Similarly, CW4 stated they were instructed to tell customers a limited number of units were available at a discount in order to secure a sale. In reality, however, there was no limit to discounted units and such discounted prices were always offered. According to CW4, all units were generally discounted by 35 to 50 percent (sometimes more) off the list price. For example, the Optima platform was priced at $300,000 but was discounted to around $200,000. The Morpheus8, listed for $190,000, was often sold for just $70,000, and he once sold one as low as $65,000. CW4 also recalled that Area Sales Managers and District Sales Managers liked to use a few specific financing companies that made approvals very easy. One of those companies was the Financial

---

[4] The "floor price" was the lowest price InMode sales representatives could offer without the authorization of higher ups, and the floor price was only slightly more than what it cost InMode to produce the device.

{00635310;7 }

Partners Group ("FPG"). CW4 said that his/her District Sales Manager Jake Alexander earned more based on the financing company used, and Alexander earned more if he used FPG. CW4 added that the price for the equipment was set after InMode determined what the customer qualified for in financing. CW4 explained that customers would fill out credit applications, the lender would come back with the amount they were approved for, and the price InMode charged for the device was set based on that amount. CW4 learned of this practice as s/he was copied on the relevant emails.

47.     According to CW4, Nye hosted weekly Zoom training sessions with the sales team to talk about how to create fake urgency and other sales tactics for selling InMode devices. The calls included sales training during which Nye provided tips and tactics for closing sales. Nye highlighted salespeople who were doing well, and those salespeople were asked to share their own tips and tactics. The group also practiced using the tactics with role playing. Nye also informed salespeople about recent lawsuits and/or complaints and gave them information and language for how to "combat" any negative news. The Zoom sessions often focused on how to create a false sense of urgency in customers to motivate a purchase. CW4 noted that InMode's sales leadership team not only knew about the sales tactics described above, they were directing them.

48.     CW4 further described a national sales conference InMode hosted in the Bahamas in early 2024, which CW4 attended, during which salespeople competed in

{00635310;7 }

role playing exercises that encouraged misleading customers to secure a quick purchase. The first day of the conference was for employees only and included competitions during which salespeople role played sales interactions with customers (played by other InMode employees). The role-playing competition included salespeople using a host of tactics to create a false sense of urgency in customers. CW4 recalled that Company leaders, including Defendant Mizrahy, also played the role of customers in the competitions, which were conducted on a stage in front of all the other salespeople in attendance. The Company's leaders picked the winners of the contest, who received a cash prize and a crown (as a joke).

49.    CW7 likewise recounted that the InMode devices had "list prices" but explained that s/he could drop the price significantly. For example, CW7 could tell customers InMode had a floor model from a show that had only been used a few times and can be discounted by 40 percent, when in reality the equipment was brand new. Salespeople were encouraged by InMode to make up scenarios for why a piece of equipment was available at a discount to create urgency and prompt a sale. CW7 also confirmed that FPG offered a commission on the amount financed to purchase InMode equipment and that InMode's sales leadership were highly motivated to use FPG to finance sales. CW7 noted that Defendant Lakhani was aware of the commissions offered by FPG.

{00635310;7 }

50.    CW9 also recounted that the equipment systems at InMode, such as Morpheus and Evoke, had list prices between $150,000 to $200,000, but that the equipment never sold at that price. According to CW9, approximately one percent actually sold at that price and everything else generally sold for at least $50,000 less than the listed price. Like other CWs, CW9 stated that salespeople would make up reasons for why a unit was discounted to prompt a sale, for example by representing that they had a few leftover units from a symposium or a demo.

51.    CW9 also explained that FPG paid InMode salespeople points based on the amount of financing for the purchase of equipment. CW9 said that InMode steered its customers to borrowing from FPG, often by making it appear that FPG was in-house financing. "I mean, (FPG) was like the only option," s/he said. "The games they would play. They would introduce them (a FPG rep) as this is our finance director. The customer would think they are talking to someone from the company, but it was a third party." CW9 would get a credit application from potential customers and once the credit report came back and InMode was able to determine what the customer was eligible to borrow, that amount was used to tailor the price of the equipment for that customer. "That was the whole point," s/he said. "They start out with the list price, get their credit, and come in with an offer based on what they qualified for."

{00635310;7 }

52.    Consistent with the corroborating accounts of the CWs, medical professionals confirmed to investigators that they were offered steep discounts for InMode's products.

53.    In the United States, 95% of InMode's device sale deals are financed. More than half of InMode's sales were financed through FPG, with many loans brokered using high-pressure sales tactics.[5] Customers were often locked into high-interest-rate loans, with annual percentage rates between 12% and 20%, without full or accurate disclosure of the rates. InMode would also market the devices as far more lucrative than they actually were.

54.    Former sales representatives described the arrangement between InMode and FPG as akin to "a pyramid scheme," where the higher ups, including regional sales directors and vice presidents, get a cut of the commission of the people under them. "At least nine percent of the overall interest rate had to be built in for commissions to InMode and FPG," a former sales manager estimated, "the area manager got a piece, regional

---

[5] Indeed, in an audio recording of a February 2023 InMode sales conference obtained by an investigator, an InMode district sales manager introduced executives from FPG for a presentation on the benefits of directing customers to the lender. The executive noted that "over 80% of our providers elect to finance on these [FPG] systems on these investments . . . They have helped close so much business for us . . . ."

{00635310;7 }

manager got a piece, district manager got a piece, all the way up." A former sales manager said that they were forced to use FPG exclusively by the time he left the Company because "[FPG] is paying everyone points, from the rep to the president of sales."

55.     The Individual Defendants were well aware of the discounts. CW3, CW4, CW8, CW11, as well as CW1, each confirmed that InMode used Salesforce. Salesforce is a cloud-based customer relationship management (CRM) platform that helps businesses manage customer data, sales, and marketing. CW4 explained that all discounts were documented in the Salesforce.com entry for each specific sale. The sale price (list price) for every deal was recorded in Salesforce.com, and the discount given on every deal was recorded in for every deal in Salesforce.com.

56.     CW4 participated in regular meetings with the Vice President of Sales for the Western U.S. region, Brandon Nye, who instructed the sales team to offer steep discounts on the systems. CW4 recalled that Nye reported to the C-Suite, specifically to Defendants Mizrahy, Malca, and Lakhani. CW4 noted that the Companywide instructions to offer deep discounts, such as those that came from Nye, were common practice at InMode. Salespeople were frequently taught by Nye and other sales leaders to use the enticement of discounts to motivate customers to close deals. CW4 noted that Nye often approved discounts that cut the list price on machines by more than 30 percent, an amount

{00635310;7 }

he said would not go unnoticed by Mizrahy, Malca, and Lakhani. Nye pushed the sales team to hit sales targets set by the C-Suite by using steep discounts to entice customers to buy the machines.

57.    According to CW4, Nye met weekly with Malca and Lakhani, and once a month with Mizrahy, to update them on sales. CW4 was aware of the meetings Nye had with his superiors because during meetings with his sales team, Nye spoke about his meetings with the Company leadership and provided leadership's feedback to his team, which included CW4. CW4 recalled Nye telling the sales team during meetings that his superiors—Mizrahy, Malca, and Lakhani—were looking at the team's sales numbers in Salesforce.com and paying attention to the team's performance. CW4 also noted that Mizrahy, Malca, and Lakhani used Salesforce.com to keep tabs on Nye's performance.

58.    CW8, who worked alongside and reported to Mizrahy, also noted that everything was transparent to Mizrahy. CW8 said that through Salesforce.com, Mizrahy could see the scope of sales and the full pipeline.

59.    CW3 likewise explained that all discounts on the equipment were recorded in Salesforce.com. Discounts above 15% required the approved of the Vice Presidents of Sales, Dan Wilson and Brandon Nye, who reported to the C-suite. CW3 noted that selling products at discounts was common practice at InMode. CW1 also

confirmed that Salesforce reflected the actual prices and the discounted prices for InMode's equipment, as the sales details were recorded in that system.

60.    CW11 attended InMode's annual sales conference in the Bahamas in January 2019, where discounts were discussed. Defendants Mizrahy, Malca, Lakhani, and Theodorou were also in attendance. While s/he was at the conference, Defendant Mizrahy asked CW11 to sell InMode's products at a discount. For example, CW11 recalled specifically that Mizrahy asked CW11 to sell BodyTite at a big discount, for $145,000 instead of its list price of $195,000, and to throw in a Morpheus for free to close the deal quickly. During CW11's conversation with Mizrahy, CW11 got a clear understanding of Mizrahy's strategy for InMode, which was heavy discounting. CW11 recalled Mizrahy telling him/her: "You're trying to be Neiman Marcus. Just be Walmart. Get Walmart money. Wouldn't you'd rather get Walmart money 10 times versus Neiman Marcus money once?"

61.    At the same conference, CW11 recounted that a slide was presented that described a program designed to offer heavy discounts on InMode's systems. The slide noted that the program was created by Defendant Mizrahy.

62.    Moreover, CW11 recalled that InMode often hosted what it called "training" or demo events for doctors on weekends. These weekend events were nothing more than sales events. Malca and Theodorou often attended these weekend events,

{00635310;7 }

along with Lakhani and the Vice President of Sales, Tyler Lembke.  At these events, the leadership were highly involved in the negotiations with doctors, regularly undermining the lower-level sales reps by offering to sell equipment at much lower prices. CW11 recounted one event in May or June of 2019, where CW11 was working with a potential customer interested in buying a BodyTite machine, priced around $180,000 to $190,000. Malca intervened in the purchase process and agreed to sell the doctor the equipment for only $99,000.

63.     CW11 also noted that InMode had a commission matrix for sales employees, which laid out a list price for different pieces of equipment and different tiers of prices, along with the commission rate for each of those tiers. The commission matrix specifically contemplated heavy discounts for InMode's products, and included five Tiers. CW11 said that selling equipment at Tier 1 and 2 was at the Area Sales Manager's discretion. But selling at Tier 3 required the Regional Manager's approval, selling at Tier 4 required the Vice President of Sales' approval, and Tier 5 required Lakhani and/or Malca's approval.

64.     CW11 also explained that Company leadership, including Mizrahy and Malca, had access to Saleforce.com and were monitoring the deals submitted to the Salesforce.com database. The leadership, including Mizrahy, Malca, and Lakhani made notes in the system about particular deals as a way to communicate with salespeople

{00635310;7 }

working on the deals. Malca regularly made notes in deal entries, such as asking about the progress of a deal or making suggestions for closing deals. CW11 specifically recalled seeing notes from Mizrahy in CW11's own deals in Salesforce.com.

65.    Accordingly, Defendants knew but concealed from investors that InMode routinely discounted their systems, which posed a significant threat to InMode's future revenues.

**B.    InMode Improperly Marketed Its Products For Off-Label Uses**

~~25.~~66.    Moreover, during the Class Period, Defendants promoted several of InMode's key devices for medical uses beyond those approved by the FDA, while repeatedly misrepresenting to investors that they had obtained such clearance.~~InMode Violated FDA Regulations~~

~~26.~~67.    Medical devices, such as those sold by InMode, require approval by the FDA to be sold in the United States. The FDA gives devices a specific "indication for use" ("IFU"),") which outlines the approved use for the device. InMode is limited by FDA regulations to market and promote its products only for the indications ~~for which~~ the FDA has approved.  Defendants were acutely familiar with these critical requirements and restrictions~~their use~~.

68.    In multiple company filings with the SEC, the Company told investors that "[u]nder FDA regulations, for each of our products we must only use labeling, including

{00635310;7 }

advertising and promotional materials, that is consistent with the specific indication(s) for use included in the FDA exemption regulation, clearance, or approval, that is applicable to the specific product." [6]    In these filings, ~~Once~~ InMode acknowledged the important implications from failing to comply with FDA's requirements. The Company understood that "[t]he use, misuse or off-label use of our products may harm our reputation or the image of our products in the marketplace, result in injuries that lead to product liability suits, which could be costly to our business, or result in legal sanctions if we are deemed or alleged to have engaged in off-label promotion."

69.    Defendant Mizrahy himself openly acknowledged in calls with investors and analysts that InMode cannot market its products without approval for the specific medical indications requested. He told the market that "we are not launching any product before we complete a full study to prove safety and efficacy, before we file submission with the FDA and the CE in Europe in order to get clearance. This is a medical equipment. We cannot market them without approval for the specific medical indication that we request. Sometime [sic] it takes a little bit longer than what we estimate in the beginning because

[6] *See, e.g.*, 2019 Form 20-F at 21.
{00635310;7 }

the FDA might have more question [sic] or they ask us to do a little bit more clinical work in order to ensure that this is safe and efficacy—high efficacy for what we want to claim."[7]

27.70.    InMode received approval to sell some~~for one~~ of its devices through~~, it procured additional approvals under~~ the FDA's 510(k) process, which~~. That process~~ permits companies to quickly~~swiftly~~ bring to market devices showing~~that can show~~ a substantial equivalence~~interchangeability~~ to a previously approved medical device. A~~The~~ 510(k) application requires ~~the applicant to submit~~ an IFU for the device, which specifically describes~~details~~ the approved uses for the device.

71.    During the Class Period, however, Defendants marketed key devices as providing treatments far beyond those approved by the FDA, and misleadingly told investors in public filings with the SEC that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products."

18.    (i)    Defendants Improperly Marketed~~Despite only having FDA approval for limited IFUs, InMode nevertheless uses marketing videos that advertise broader capabilities, such as "stimulating new skin cell development and melting fat cells." Similarly, other devices sold by InMode that were approved by the FDA for pain management are also advertised for off-label uses including to "melt fat and tighten consumers' skin."~~

[7] *See* InMode Q3 2020 Earnings Call Transcript, November 12, 2020.
{00635310;7 }

**For example, InMode's** **Evolve** **and Made Misleading Statements to Investors**

28.72.    InMode had secured 501device has FDA 510(k) approval with an IFU for its Evolve platform to market and use the device for relaxation of muscle spasms, increasedincreasing blood circulation, and pain treatment as either an electrical muscle stimulator ("EMS") or a transcutaneous electrical nerve stimulator ("TENS") device. During the Class Period, however, Defendants repeatedly marketed Evolve beyond the FDA clearance, including for the stimulation of new skin cell development (neocollagenesis) and melting fat cells, as shown in the video below posted by InMode to YouTube:[8]

electrical        nerve        stimulator        ("TENS")        device.



---

[8] Video posted to YouTube.com by InMode on October 7, 2021 (https://www.youtube.com/watch?v=XEOhLrcaetA&t=1s).

{00635310;7 }

73.    Brochures for Evolve treatments widely distributed in the market during the Class Period, including on information and belief posted by InMode on the Company's website, also represented that the device can treat fat and transform the skin. However, InMode promoted applications beyond that IFU, including stimulating new skin cell development (neocollagenesis) and melting fat cells resulting in "tighter skin."

29. 74.    Additionally, InMode's marketing for the Evolve device directly contradicted contradicts the language in the IFU of its 510(k) application, which states that "the RF treatment mode and EMS/TENS mode should not be used in combination or sequentially." [9] Yet, the Company claimed Evolve's combination Company's

---

[9] https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210877.pdf

{00635310;7 }

~~marketing of the Evolve device boasts about the combined use~~ of RF heat and EMS ~~contributed to, which InMode touted as enabling~~ a more effective treatment.[10]



75.    According to the marketing video posted on YouTube, "EMS optimizes cellular metabolism and REGENERATION of muscle fibers while RADIOFREQUENCY ENERGY distributes HEAT to the SKIN and underlying FAT." (emphasis in original). The claim was followed by before and after photos showing patients with an improved physique supposedly following~~Furthermore, InMode encouraged~~ the use of the device.

[10] Video posted to YouTube.com by InMode on October 7, 2021 (https://www.youtube.com/watch?v=XEOhLrcaetA&t=1s).

{00635310;7 }

76.    These representations, made by Defendants on YouTube and/or posted on InMode's official website, were circulated in a medium easily accessible to investors, and were part of the total mix of information publicly available.

77.    These or similar representations were also made by the Individual Defendants during earnings calls with market analysts. For example, during an earnings call to discuss the Company's results for the fourth quarter of 2019, Defendant Mizrahy boasted about the advantages of Evolve, with its "three modalities" over competitors, which offered "single-function platforms" for fat freezing. Likewise, at an earnings call to discuss InMode's results for the first quarter of 2020, Defendant Lakhani touted Evolve as "the only hands-free device for the treatment of skin, subdermal fat and muscle toning," while Mizrahy underscored that "it is the only device that addresses skin, it addresses fat, and then it tones the muscle, all-in-one device."

78.    Confidential witnesses also recalled Evolve being marketed for those improper indications during the relevant time. For example, CW1 explained that s/he was trained to market Evolve to "tighten skin, melt the fat, as well as tone muscles." CW1 said s/he was under the impression that Evolve was FDA-approved for these uses based on the guidance received from InMode. Similarly, CW4 stated that Evolve was marketed as the only device on the market that destroys fat, tightens skin, and builds muscle all in one.

**(ii) Defendants Improperly Marketed Evoke and Made Misleading Statements to Investors**

{00635310;7 }

79.     Defendants marketed and sold other devices for unapproved indications, such as melting fat and tightening the skin. InMode had received 510(k) approval to market and sell its Evoke device "for the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm, and temporary improvement of local blood circulation."[11] But during the Class Period Defendants marketed the device as a "facial remodeling device cleared by the FDA" that provides uniform and volumetric heating to the face in order to create new skin cells and remodel fat. Far from showing patients cured of their pain, before and after photos instead showed patients with thinner necklines and smaller jowls. Images from a 2020 InMode promotional video posted on YouTube are replicated below: [12]

---

[11] https://www.accessdata.fda.gov/cdrh_docs/pdf19/K191855.pdf

[12] Video posted to YouTube.com by InMode on September 3, 2020 (https://www.youtube.com/watch?v=EXtBgYW9GQ8).

{00635310;7 }



80.    Confidential witnesses also recalled promoting Evoke for such uses. For example, CW2 recalled Evoke being marketed for tightening skin and melting fat, and stated that marketing included promoting the combined use of radio frequency with other electrical stimulator treatments (such as EMS and TENS) as a way to enhance treatments.

81.    Defendants also misleadingly promoted Evoke for non-approved uses during conference calls with analysts. For example, while presenting the Company's results for the first quarter of 2020, Defendant Lakhani stated that "Evoke is the first Hands-Free device for treating skin laxity on both the face and the submental area." Defendant Mizrahy repeated that point, telling investors that Evoke "is the only device as I mentioned earlier that's able to do facial reshaping but from a hands-free standpoint."

{00635310;7 }

82.    Defendants doubled down on those claims during the Company's second quarter 2020 call with investors, with Lakhani emphasizing that Evoke is "one of a kind, there's nothing really else out there for it, and there are some people that want to handle that lower 1/3 of the face." Defendant Theodorou jumped in, remarking that Evoke "is not just a face tightening device" as "you can actually remodel the fat and position it the way you want," which he claimed was a "big, big deal differentiator" from competition.

### (iii) Defendants Improperly Marketed Morpheus8 and Morpheus8V and Made Misleading Statements to Investors

83.    Evolve and Evoke were not the only products promoted for improper uses. InMode also marketed Morpheus8 outside the bounds of its FDA approval, which was limited to electrocoagulation (removal of skin blemishes) and hemostasis (preventing and stopping bleeding). [13] Yet Morpheus8 was also marketed for the reduction of fat and/or cellulite, and Defendants insisted in public filings with the SEC that the Company had clearance for the treatments.

---

[13] https://www.accessdata.fda.gov/cdrh_docs/pdf18/K180189.pdf; https://www.accessdata.fda.gov/cdrh_docs/pdf19/K192695.pdf.

{00635310;7 }

84.     A Morpheus8 brochure disseminated publicly depicted apparent reductions of fat and cellulite:



85.     The Morpehus8 brochure also claimed that the device's "triple action of fat coagulation, **_connective tissue contraction_**, and sub-necrotic bulk heating provides practices with maximum results - minimal downtime procedures." "Physicians now have the versatility to treat both small and large areas of concern with one platform, providing patients with customized solutions to remodel collagen and subdermal adipose tissue."

86.     But in a press release issued years later on July 17, 2024, InMode announced that Morpheus8 just received 510(k) clearance for "contraction of soft



{00635310;7 }

tissue," which includes connective tissue.[14]  The press release quoted Defendant Mizrahy stating that "[t]he **_new indication_** for soft tissue contraction enhances the product's intended use, helping Morpheus8 practitioners expand their patient base." Thus, InMode admitted that it did not have clearance to market or sell Morpheus8 for connective tissue contraction before July 2024.

87.    During the Class Period, InMode promoted another device, ~~device beyond its FDA 510(k) approval. The~~ Morpheus8V, for vaginal rejuvenation and tightening, as well as for urinary incontinence, without FDA approval. ~~is a restructured version of the Company's previous device, the Morpheus8 – a micro needling device that penetrates the skin while transmitting a RF energy through the needles in order to tighten skin.~~ The Morpheus8V uses dozens of microneedles to penetrate the tissue of the vaginal canal and delivers a burst of radiofrequency energy to damage the tissue and promote new cell growth. Notably, the Morheus8V device falls into the same category of devices that InMode likewise promoted improperly in 2018. More specifically, as InMode announced in their 2019 annual report filed publicly with the SEC on February 18, 2020, in 2018 the

---

[14] https://www.prnewswire.com/news-releases/morpheus8-secures-first-and-only-fda-clearance-for-soft-tissue-contraction-for-fractional-radiofrequency-microneedling-302198891.html

{00635310;7 }

Company received a letter from the FDA "seeking information as to the regulatory bases for marketing of our FormaV and FractoraV handpieces based on our promotion and labeling of these devices for use in certain women's health conditions and procedures."[15] FractoraV was the precursor to Morpheus and was only approved by the FDA for "use in dermatologic and General Surgical procedures for Electrocoagulation and Hemostasis," and only for use on the face and torso rather than the vaginal canal. FormaV was only approved for "the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm, and temporary improvement of local blood circulation."

88.    The 2018 letter was part of a campaign by the FDA to deter "bad actors" like InMode from making unsupported and dangerous marketing claims about the supposed benefits of laser or energy-based devices for "vaginal rejuvenation" or "urinary stress incontinence." Then FDA Commissioner Scott Gottlieb warned that these "bad actors" "unfortunately take advantage of unsuspecting consumers by marketing unapproved, deceptive products that may pose safety risks and violate the trust of American consumers." The Commissioner underscored that "[t]hese products have

---

[15] During InMode's earnings call held on November 5, 2019, attended by Defendants Mizrahy and Malca, Mizrahy also acknowledged receiving the 2018 letter from the FDA.

{00635310;7 }

serious risks and don't have adequate evidence to support their use for these purposes. We are deeply concerned women are being harmed."

89.    As the Commissioner noted, "[i]n reviewing adverse event reports and published literature, we have found numerous cases of vaginal burns, scarring, pain during sexual intercourse, and recurring or chronic pain." He therefore "warn[ed] women and their healthcare providers that the FDA has serious concerns about the use of these devices to treat ~~technique as the previous Morpheus8 but is marketed as part of InMode's Women's Health Division and used for~~ gynecological conditions beyond those for which the devices have been approved or cleared."

90.    Responding to the 2018 FDA letter, InMode claimed that both the FormaV and FractoraV devices had 510(k) clearance but agreed to "remove statements using the terms 'sexual dysfunction,' 'vaginal rejuvenation,' or 'urinary stress incontinence'" from its marketing of the devices.

91.     Incredibly, three years later, in 2021, InMode started promoting Morpheus8V for the same exact indications the FDA expressly warned against in 2018: "urinary incontinence," "intravaginal remodeling," and "vaginal lubrication."[16]



92.     Meanwhile, in public filings with the SEC, Defendants insisted that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products." And in earnings calls with analysts, Defendant Theodorou assured the market that "instead of running for the gates" after receiving the 2018 FDA letter, "Moshe

_____

[16] *See, e.g.*, identical marketing videos prepared by InMode and posted by InMode's customers to Facebook on, for example, December 23, 2021 (https://www.facebook.com/watch/?v=339652747627597); January 13, 2022 (https://www.facebook.com/watch/?v=1237571153419027); and April 2, 2023 (https://www.facebook.com/skinfirmllcjp/videos/3291148697863872/).

{00635310;7 }

[Mizrahy] and the whole team doubled down on their studies" to prove that their products (*i.e.*, Morpheus8V) benefitted women's health.

93.    Confidential witnesses also recalled marketing the Morpheus8V as FDA-cleared for stress urinary incontinence during the Class Period. For example, CW1 stated that s/he was trained to market Morpheus8V for stress urinary incontinence in women. CW1 said that salespeople at InMode were trained to market Morpheus8V as "FDA-cleared." Likewise, CW4 explained that during his/her tenure, InMode employees were instructed to tell customers that InMode was the only one in the space that was FDA-indicated to treat stress urinary incontinence. CW4 added "they would try to get us to tell people we were the only ones who didn't have to shut down" for improperly marketing the device and that "all we had to do was change what we called it."

94.    In an audio recording of an InMode sales meeting held on February 2023, obtained by investigative reporters for the *Capital Forum* and published in a September 18, 2023 article, Defendant Theodorou is heard telling the Company's sales representatives to sell the Morpheus8V for stress urinary incontinence to OBGYNs. Theodorou admittedly made that push because Morpheus8V was a "Trojan Horse" to break into the obstetrics industry and expand the Company's customer base, appeasing Wall Street's expectations. Theodorou was quoted making the following statements about the importance of Morpheus8V's off-label use to InMode's revenues:

{00635310;7 }

Remember this because this is huge. We always tell them on Wall Street, we always tell them yeah, this is the way we increase TAM. You know, total addressable market. Which means how do we get bigger past half a billion? We go to gynecologists. How do [sic] sell to gynecologist? Right? Oh we teach them about scope of practice, you have stress urinary incontinence. And we tell them, by the way, let's teach you aesthetics.

After a year of this device out there. We look at the numbers . . . For every Morpheus vaginal tip used, six Morpheus aesthetics tips are being used. One to six, and we keep that number across the board. That is 123. So yes, guys, it's a Trojan horse.

95.     Theodorou cavalierly stressed that OBGYNs are the right customers for InMode's vaginal devices because "they literally have the woman in stirrups. They are a captive audience. Stress urinary incontinence, it's shocking gynecologists haven't taken advantage of this."

96.     During the February 2023 sales meeting, which was also attended by Defendants Mizrahy, Theodorou expressly acknowledged that InMode lacked FDA approval to market the Morpheus8V for stress urinary incontinence, "but we are in the process of getting one," which would allow "us to market the device for SUI." Theodorou added that InMode was in the process of funding studies to prove the safety and efficacy of the Morpheus8V for treatment of SUI.

97.     As explained below, the vast majority of studies funded by InMode are performed by doctors who are conflicted because they have a financial interest in the Company and are required to "participate in clinical studies designed and initiated by/with

{00635310;7 }

the Company to further clinical understanding and support for Company products and procedures," according to one contract with a doctor, which the *Capitol Forum* reviewed.

98.    A meta-analysis of InMode's studies, which was uncovered by the *Capitol Forum*'s investigation, found that the Company frequently manipulated results and failed to disclose that some patient results were actually attributable to other forms of plastic surgery. "Little evidence supports the efficacy and safety of subcutaneous RF [radiofrequency treatments] as an improvement over results that may be obtained using traditional surgical methods such as submental lipectomy, liposuction, and abdominoplasty," one study concluded. "Photographic integrity is often lacking. Financial conflict of interest is pervasive. Marketing precedes science. Plastic surgeons need to be aware of these serious limitations and the off-label regulatory status of these devices, before purchasing expensive equipment and recommending subsurface RF treatments to patients." According to the study, "[m]ost articles (77%) were published by authors with known financial conflicts . . . Many of the authors were paid consultants. Some also held ownership positions in the form of stock options. Two authors also served as chairmen of the medical advisory board of InMode. Investigators were often allowed to keep their InMode BodyTite devices (US $205,000) after their study without paying for the device."

**(iv)  Defendants Knew of and Encouraged the Improper Practices**

99.     Other facts show that the Individual Defendants knew of, supported and even urged the promotion of InMode's devices for indications lacking FDA approval. For example, CW8 stated that InMode marketed its products for off-label uses~~indications~~, including through pamphlets, videos, social media, emails, salespeople, and through product literature. CW8 recalled that Evolve was marketed for indications not approved by the FDA, such as for body sculpting, firming, cellulite and fat dissolving. Similarly, Evoke was marketed for indication beyond those approved by the FDA, for facial sculpting (firming) and collagen stimulation. CW8, who worked closely with Mizrahy, said Mizrahy knew that these products were marketed for off-label purposes.

100.     Indeed, Mizrahy himself signed Truthful and Accuracy Statements in connection with InMode's 510(k) submissions to the FDA, so he was fully aware of the IFUs sought by the Company and granted by the FDA. As just one example, in connection with InMode's 510(k) submission for the InMode System with the Morpheus8 Applicators that were to be used for electrocoagulation and hemostasis, Mizrahy executed a Premarket Notification Truthful and Accuracy Statement, as required by 21 CFR 807.87(k). The Statement signed by Mizrahy read:

> I certify that, in my capacity as CEO of InMode MD Ltd., I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.

{00635310;7 }

101.    Like CW8, CW9 confirmed Defendants' knowledge of the improper practices. CW9 recounted attending an InMode national sales conference in Mexico in 2020, where Defendants Mizrahy, Lakhani, Theodorou, and Kreindel were also present. During the conference, the Company's leadership spoke from the stage about how to talk to potential customers about the various products. CW9 recalls Theodorou being the key person speaking to the sales team about the devices and how to market them. Theodorou described Evoke as a non-invasive device used for skin tightening that could reach temperatures that obliterate fat.

102.    Similarly, CW7 recalled attending an InMode sales event for customers in Chicago, where Mizrahy and Theodorou were also present. At that meeting, InMode's senior leadership used the terms "tightens skin" and "melts fat" while on stage talking to potential customers about the benefits of InMode's devices. CW7 specifically remembered Theodorou touting those features. CW7 also stated that InMode and its salespeople used the terms "tightens skin" and "melts fat" when marketing its equipment. "That was a big part of the non-formal training," s/he said.

103.    CW7 added that there was no formalized training for salespeople, and that hand-in-hand with the lack of training was a lack of emphasis from the Company on complying with FDA regulations about marketing equipment on and off label. CW7 could not recall any formal training sessions where the Company differentiated between

{00635310;7 }

off label uses and proper uses for InMode's equipment. Nor could CW7 recall the Company ever providing a stern warning to salespeople about improper uses.

104.    CW10, who worked closely with and reported directly to Defendant Mizrahy, recounted that the FDA audited InMode in late 2021 and that, in advance of that audit, InMode "made all the brochures disappear" that featured non-approved uses, such as those for the Morpheus device. CW10 also recalled that s/he had to delete information from the Company's website regarding references to unapproved uses, including references to scientific articles. As explained herein, the Individual Defendants continued pushing their salesforce to promote the devices for unapproved indications throughout the Class Period, including through pitches pushed by Theodorou himself.

105.    Other confidential witnesses describe Defendants' awareness of the improper practices. For example, CW6 explained that sales leaders set up sales team calls so that the leaders could introduce a new sales pitch for a product. CW6 said Defendant Lakhani was typically on the calls as well as Tyler Lembke, the Vice President of Commercial Strategy, and Dan Wilson, the Vice President of Sales. The sales pitches included discussions of indications that were not cleared by the FDA. CW6 added that on these sales team meetings, the leadership discussed how salespeople could imply or describe off-label use. Asked if InMode was OK with salespeople marketing

{00635310;7 }

the equipment for off-label use, CW6 said, "InMode was OK with everything as long as you sold the product."

106.     Likewise, CW1 explained that for training of what was on-label and what was off-label, "there wasn't much of a compliance piece that we had to adhere to." CW1 said that s/he received no training on what the devices were FDA-approved for, and when speaking to customers CW1 simply read off of InMode's brochures and the marketing information on the iPad provided by the Company. CW1 added that the Vice President of Sales, Dan Wilson, hosted weekly zoom meetings for the sales team, where they discussed the marketing language for InMode devices, including the marketing language for the Evolve and Morpheus8V devices.

107.     According to CW4, the marketing language for InMode's devices, including language in pamphlets or brochures, came directly from Defendants Mizrahy and Theodorou.

108.     InMode even paid doctors to promote its products for off-label uses. More specifically, InMode had a "Luminary" program, a network of paid and therefore conflicted doctors, who the Company used to promote its products to other doctors and to author favorable clinical studies about the products. The Luminaries were also permitted to promote off-label uses of InMode's products. This process was a key component of Defendants' marketing plan. Indeed, at a Barclays Global Healthcare

{00635310;7 }

Conference held in 2022, Defendant Malca remarked that "the way we market to the doctor is, first of all, we engage with key opinion leaders and luminaries in the space. These are some of the big names in aesthetics, plastic surgeons in the U.S. So, we engage with them, they publish many clinical studies in the most prestige [sic] journals and magazines in the medical field. And that, we believe, helps us selling [sic] to doctor better than any brochure or any marketing activities. Clinically [sic] studies usually [are] much more effective in this regard." Most clinical studies showing the purported safety and efficacy of InMode's products, however, were rife with conflicts of interest because their authors had a financial incentive to promote the devices.

109.    The *Capitol Forum* obtained a Luminary agreement from 2015 (reproduced below) detailing the payments InMode offered to the participating doctors and the doctors' responsibilities in return. These types of agreements were in place throughout the Class Period.

{00635310;7 }

**Compensation and Company's Commitment:**

For the Services rendered under this Program, the Luminary and the Company jointly agree to the following:

Compensation – The Company will compensate Luminary:

$2500 for a local weekday dinner event
$3500 for Saturday workshop
$1000 for podium events at trade shows/Regional and National
(2 or more presentations if addressed prior to each show)
*All podium events require pre-approval by the President of InMode and must be requested with a topic that will be addressed on the podium
$500 for in-booth presentation/representation- 1 hour per day
$1500 for in-office workshop
$1000 for an e-seminar (beyond ½ hour $1500)
*Presentations must be completed by the physician using their own before and after pictures; topic will be provided by InMode
$500 for site-visit (per practice/Max 3 people- 4 hours maximum)
$250 for each set of before and after pictures (must be approved by InMode and accepted into InMode portfolio)

*Phone calls: If a phone call leads to a sale within 90 days; Luminary will be compensated 2 boxes of Fractoa tips

Company will reimburse Luminary for all reasonable expenses associated with Company-scheduled workshops and conferences. Air travel reimbursement will based on coach class domestically unless otherwise agreed to in writing, in advance, by authorized Company personnel. Luminary recognizes and agrees that the Luminary shall be responsible for payment of all out-of-pocket travel expenses, overhead and all other expenses incurred by the Luminary in performing the Services under this Program.

All such expenses shall be subject to InMode's prior written approval. InMode will have no obligation to reimburse Luminary for any expenses that the Luminary incurs if InMode has not given its express prior approval for such expense. Such prior approval may be provided in the form of general authorization to incur the expense (*e.g.*, InMode may approve "three meals not to exceed a total of $100.00").

Note: If an event is canceled less than five (5) business days before its scheduled date, ½ of the applicable fees and any expenses already approved pursuant to the terms hereof and incurred by Luminary will be paid.

Luminary is being paid to speak regarding FDA indications; any broadening of the discussions for non-FDA applications is the decision of the luminary. InMode expressly does not warrant any use of its products in any manner other than explicitly indicated in FDA's 510(k) certification. These discussions should be prompted by questions from the audience.

110. Luminaries were also given a cut from sales. According to CW7, the doctors who promoted InMode equipment at sales events received a cut of all commissions made at the event. The doctors were given a percentage of every piece of equipment sold during the event. CW7 estimated their cut to be around $10,000 for each sale. The Luminary Agreement itself corroborates that Luminaries received a portion of the profits in some form or another. For example, it provides that "[i]f a phone call leads to a sale within 90 days, Luminary will be compensated 2 boxes of Fractoa [sic] tips."

{00635310;7 }

111.     According to customers who attended some of InMode's seminars, the Luminary speakers did not disclose their financial relationships with the Company. The Luminaries included Dr. Stephen Mulholland, who owns roughly 10% of InMode and co-developed some of the technology. What's more, some luminaries, including Dr. Mulholland, with at least some of the Individual Defendants' full knowledge—Lakhani, Kreindel, and Malca—pushed dangerously aggressive device settings against the Company's protocols that resulted in severe injuries to patients.

30.112. At the seminars, as memorialized internally at InMode, Luminaries were able to discuss off-label uses for InMode's devices, as long as the discussion originated from the audience: "Luminary is being paid to speak regarding FDA indications; any broadening of the discussions for non-FDA applications is the decision of the luminary. InMode expressly stress urinary incontinence. However, InMode does not warrant any use of its products in any manner other than explicitly indicated in FDA's 510(k) certification. These discussions should be prompted by questions from the audience." This language demonstrates Defendants' awareness that the Company was not permitted to promote its products for off-label purposes. have 510(k) approval for that indication for any of its devices.

113.     When asked about InMode's arrangement with the Luminaries, Dr. Arthur Caplan, a professor and founding head of the Division of Medical Ethics at

{00635310;7 }

NYU's Grossman School of Medicine, said it represents "a rather sleazy attempt to encourage off-label use or non-standard use. Even if the audience proposes questions, you shouldn't promote off-label uses. This could be brought up in court in a personal injury lawsuit with huge liability implications and might also trigger FDA action."

### C.    InMode Failed to Report Malfunctions and Injuries to the FDA

19.    Even though the Company does not have FDA approval to market the Morpheus8V as a treatment of stress urinary incontinence, Defendant Theodorou pushed InMode sales representatives to market the Morpheus8V device as a treatment for that ailment. During a February 2023 non-public Company sales conference, Defendant Theodorou acknowledged that InMode did not have FDA approval to market Morpheus8V for treatment of stress urinary incontinence, but nonetheless advocated the marketing of the device to physicians as a treatment for that condition. Defendant Theodorou described the Morpheus8V as the "trojan horse" that would help InMode break into the obstetrics industry. The Company improperly marketed the Morpheus8V as a treatment for urinary stress incontinence and vaginal rejuvenation, despite having been warned by the FDA to stop marketing prior versions of the product, for such uses.

{00635310;7 }

20.    In addition to the misleadingoff-label and improper promotionmarketing of its products, InMode failed to also violated FDA regulations by failing to properly report injuries caused by its devices to the FDA. InMode is required by law to submit a medical device an adverse event report ("MDR") to the FDA's Manufacturer and User Facility Device Experience's ("MAUDE") database within 30 days of becoming aware that learning about actual injuries and any risk that the product that may cause future death or serious injury.

31.114.  Despite the Company's internal process to collect, analyze and report injuries resulting from the use of its device "may have devices to the FDA, InMode never notified the FDA of an injury caused or contributed to a . . . serious injury, or has malfunctioned . . ." Code of Federal Regulations, Title 21, Chapter I, Subchapter H, Part 803. The regulations define a serious injury as one that is either "life-threatening, results in permanent impairment of a body function or permanent damage to a body structure, or necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure. Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage."by its devices until early 2023. The Company was nonetheless aware of multiple injuries caused by its devices, which it did not timely report to the FDA. Indeed,

{00635310;7 }

once InMode ultimately started notifying the FDA of injuries in February 2023, the
reports included injuries that had occurred as far back as 2021.

115.    Defendants were unquestionably aware of this requirement and its
importance, acknowledging this in filings with the SEC. In its annual reports, InMode
affirmed that "the timing of our obligation to report is triggered by the date we become
aware of the adverse events as well as the nature of the event." It recognized that "[i]f
we fail to comply with our reporting obligations, the FDA could take action, including
warning letters, untitled letters, administrative actions, criminal prosecution, imposition
of civil monetary penalties, revocation of our device clearance, seizure of our products
or delay in clearance of future products."

116.    According to CW2, some injuries were caused by aggressive device
settings, and CW6 remembered receiving a report of a customer badly burned by the
Evolve system in 2020. CW1 said s/he would hear complaints from customers about
patients being burned by InMode equipment.

117.    Indeed, InMode's Luminaries themselves pushed aggressive power
settings, such as 40 degrees and 70 degrees Celsius temperatures for the outer and inner
layers of the skin, to supposedly increase results. But far from producing improved
outcomes, these aggressive settings burned patients. Internal Company emails show that
InMode's leadership knew these temperatures were dangerously high and that

{00635310;7 }

inexperienced doctors improperly used the devices. In an email dated October 30, 2017, Janet Handley, InMode's Vice President of Clinical Operations, wrote to Defendants Lakhani, Kreindel, and Malca that "[p]hysicians who received training from [Luminary] doctor Mulholland [who co-founded InMode and developed non-surgical lifting and tightening technologies] were taught to use temp cutoffs of 40/70C. The company protocol was to use lower energies. Dr. Mulholland also teaches all doctors to use Stamping technique and we train them to reserve Stamping until they are experienced." Defendants knew that these improper applications resulted in injuries. As just one example highlighted in the email chain, a "super affluent client . . . wealthy enough to buy Inmode ended up with no results & 12 burns on her breasts at the insertion site."

118.    CW5 stated that InMode had an Enterprise Resource Planning system that tracked equipment malfunctions. The system was called QAD and employees from different departments could access it to view reports of malfunction and add their own updates and notes. CW5 explained that the system contained monthly reports of equipment malfunction. The logistics team created these monthly reports and CW5's team provided them to Ron Cohen, the Director of Supply Chain, who then presented them up the chain to InMode's executives.

119.    For his part, CW4 recounted that every Thursday, Nye held a zoom call with the salesforce. These meetings included reports of patients being burned and

{00635310;7 }

directed salespeople to say, in response to these reports, "it was the users' fault, or they cranked it too high." Likewise, CW1 recalled that the internal mindset at InMode was to blame all patient injuries on user error, despite the fact that the devices were used with the settings recommended by the Company's Luminaries. CW1 said that s/he was told that "we always have to preface this by saying, it's based on the operation (of the equipment) – it's not the tech."

120.    Several confidential witnesses described how complaints of injuries were routed inside InMode. CW1, CW2, CW5 and CW6 noted that reports of "adverse events," such as burns, were transmitted to the Company's clinical department. CW10 explained that all the reports related to product issues, regardless of which country they arise in, go to Israel, because that is where InMode's regulatory and clinical departments are located. CW10, who worked alongside with and reported directly to Defendant Mizrahy in Israel, explained that Mizrahy had knowledge of all serious incidents related to the use of InMode's products defects in part because the departments lacked manpower. CW10 added "I literally know that for years they didn't report anything because there was no one to handle reporting. No one took this seriously." "There were many, many, many regulatory issues, that were reported in hindsight, or were not reported and only later handled, and [Mizrahy] knows everything."

{00635310;7 }

121.    CW8, who worked closely with Defendant Mizrahy, explained that when complaints were received by him/her or others at InMode, they were forwarded to the clinical team in Israel, and also to the regulatory team in Israel, which consisted of 3-4 people. CW8 said that the regulatory department, alongside the clinical department, documented adverse events occurring globally. CW8 was aware that InMode had a responsibility to report adverse events to the FDA. CW8 stated that Mizrahy was aware of complaints from customers injured by InMode's products, and he was very heavily involved in regulatory issues, a very unusual involvement for a CEO.

122.    Likewise, CW11 explained that InMode provided its sales representatives with an internal Company group email for purposes of reporting injuries, including serious injuries such as burns. The recipients of the group email included Mizrahy, Theodorou, Lakhani, and the V.P. of Sales Tyler Lembke.

123.    Despite having knowledge of adverse events requiring prompt reporting to the FDA, InMode failed to submit any reports before February 2023, and did so only after learning that the *Capital Forum* began investigating the issue. Thereafter, InMode submitted seven MDRs to the FDA between February 15 and February 20, 2023. InMode's submissions show that it learned of at least three of the seven reports *more than a year* before reporting them (in 2021), and five tried to shift the blame on the users (despite the fact that InMode failed to properly train the users). According to Madris

{00635310;7 }

Kinard, the former adverse event subject matter expert at the FDA, even if the adverse events resulted from user error, InMode still had a duty to report them to the FDA.

124.    Moreover, before February 2023, MAUDE had 27 reports for InMode products, none of which were reported by the Company.

125.    After February 2023, InMode submitted additional reports to the FDA. InMode knew about the injuries submitted in five of those reports in 2022 or earlier.

126.    *The Capital Forum*'s investigation uncovered that InMode knew of dozens more serious injuries it failed to report, including unwanted permanent fat loss, changes in face structure, and face indentations requiring surgical repair; facial nerve damage resulting in sagging mouth and other deformities; nerve damage causing facial paralysis; burns and tissue necrosis; and scarring. In some cases, InMode's President himself, Brian Lodwig, referred to the injuries as "adverse events" but InMode failed to report them to the FDA.

127.    Madris Kinard said the types of injuries described above "would absolutely be MDR-reportable." Kinard also noted that reports submitted by doctors or patients to the FDA do not satisfy *InMode's* reporting requirements.

128.    Defendant Mizrahy acknowledged that he is familiar with the FDA website for adverse events and that he personally checks for adverse event reports on the FDA database. Yet, he failed to ensure their submission to the FDA. For example, at the

{00635310;7 }

April 14, 2022 Needham Virtual Healthcare Conference, Mizrahy was asked about an InMode competitor who received an FDA warning, and said he believed it was prompted by safety concerns about the competitor's products. He clarified the reason for his belief by stating that he personally checked the FDA website for reported adverse events stemming from the use of the competitors' products.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS

129.    The Class Period begins on February 18, 2020, when InMode filed its 2019 Form 20-F annual report with the SEC for its fiscal year ending on December 31, 2019. Appended to the 2019 20-F as exhibits were signed Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Mizrahy and Malca, attesting that "I have reviewed this annual report on Form 20-F of InMode Ltd." and that "based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

130.   In the 2019 Form 20-F, InMode, Mizrahy and Malca stated that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products."

131.   The same representations in the paragraph above were made by InMode, Mizrahy, and Malca in: (i) InMode's 2020 Form 20-F annual report for the fiscal year

{00635310;7 }

ending on December 31, 2020, filed with the SEC on February 10, 2021, which contained SOX Certifications by Defendants Mizrahy and Malca; (ii) InMode's 2021 Form 20-F annual report for the fiscal year ending December 31, 2021, filed with the SEC on February 10, 2022, which contained SOX certifications by Defendants Mizrahy and Malca; and (iii) InMode's 2022 Form 20-F annual report for the fiscal year ending December 31, 2022, filed with the SEC on February 14, 2023, which contained SOX certifications by Defendants Mizrahy and Malca.

132.   The representations that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products" were false and misleading when made because InMode was marketing its products for off-label uses for which it had no FDA clearance. For example, while Evolve was FDA-approved for the relaxation of muscle spasms, increased blood circulation, and pain treatment, Defendants were improperly marketing it for the stimulation of new skin cell development and melting fat cells. Likewise, while Evoke was only FDA-approved for the temporary relief of minor muscle aches and pain, muscle spasms, and improvement of local blood circulation," Defendants falsely claimed it was a "facial remodeling device cleared by the FDA" that creates new skin cells and remodels fat. Moreover, after the Empower platform was launched in August 2021, Defendants marketed Morpheus8 and 8V for off-label uses, such as marketing Morpheus8

{00635310;7 }

for connective tissue contraction and Morpheus8V for vaginal rejuvenation and tightening, and for urinary incontinence, none of which were approved by the FDA.

133.    On February 18, 2020, InMode held an earnings call with analysts to discuss the Company's results for the fourth quarter of 2019. Defendants Mizrahy and Malca participated on behalf of InMode. During that call, Mizrahy made the following representations about Evolve and Evoke, which he stated were "expected to be [part of] the main growth engine for InMode in the coming year and to position InMode as [sic] the front and as leading innovative aesthetic company":

> InMode has developed two FDA-cleared unique hands-free platforms; the Evolve for body and the Evoke for face . . . Utilizing this Bipolar RF [radiofrequency] technology for delivering RF energy and electromagnetic pulses made Evolve as the only device for treatment of skin, subdermal fat and muscle tone improvement, while Evoke is the first hands-free device for the face and submental area.

>              *                                    *                                    *

> We have -- we have basically two platforms. The Evoke, which is for the face, we don't have any competition because there is not even one platform similar to that in the market today. Okay. On the Evolve side, there are some companies who are offering hands-free devices like Zeltiq with the fat freezing and like BTL with the EMS and some others with EMS. But these are single-function platforms. The beauty of Evolve is that Evolve has three modalities. It can compete with BTL and all the other EMS because we have one of the modality is EMS, it's [sic] can compete with Zeltiq and all the CoolSculpture from Cynosure and others on the (inaudible) and but also we have additional modality, which is the thigh for skin tightening. Also, the three modality in the Evolve is doing a fat treatment but also skin tightening.

{00635310;7 }

134.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, the FDA had not cleared Evoke and Evolve for those indications, and Mizrahy was marketing Evoke and Evolve for improper, off-label purposes.

135.    On May 6, 2020, InMode filed with the SEC on Form 6-K its quarterly report for the first quarter of 2020. The Form 6-K was signed by Defendant Mizrahy. In that filing, Defendant Lakhani stated: "We believe that our breakthrough devices, Evolve and Evoke, are well-positioned to attract both physicians and patients post-crisis, as the demand for minimally invasive and hands-free alternatives will grow, opposed to historic post-crisis declines seen with invasive surgical procedures. Therefore, we believe that these technologies will be significant growth drivers in the future and will become the standard of care for facial and body reshaping in the future[.]"

136.    The representations that the "breakthrough devices, Evolve and Evoke" were "well-positioned" and "significant growth drivers" that will "become the standard of care for facial and body reshaping in the future" were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to disclose that Evolve and Evoke were marketed by Defendants and used by InMode's customers for improper uses, rendering those

{00635310;7 }

representations unrealistic at the time they were made. Moreover, far from becoming "the standard of care for facial and body reshaping," InMode products were severely harming patients. InMode failed to report those adverse events to the FDA, as required.

137.   Also on May 6, 2020, InMode held an earnings call with analysts to discuss the Company's results for the first quarter of 2020. Defendants Kreindel, Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode. During that call, Lakhani touted the benefits of Evolve and Evoke, claiming that Evolve is "the only hands-free device for the treatment of skin, subdermal fat and muscle toning. While Evoke is the first Hands-Free device for treating skin laxity on both the face and the submental area."

138.   During the call, Defendant Mizrahy made similar comments about the benefits of Evolve and Evoke, stating that "[s]o EVOLVE, we obviously launched last year in the latter part of 2019 and we had some tremendous success. As I mentioned earlier, it is the only device that addresses skin, it addresses fat, and then it tones the muscle, all-in-one device." He added that "[w]ith EVOKE, EVOKE is the only device as I mentioned earlier that's able to do facial reshaping but from a hands-free standpoint."

139.   The statements in the two preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the

{00635310;7 }

statements not misleading because, while touting the benefits of Evolve and Evoke, Lakhani and Mizrahy failed to disclose that the products did not receive FDA approval for those indications. Evolve and Evoke lacked adequate scientific studies supporting the purported indications.

140.    On August 5, 2020, InMode held a conference call with analysts to discuss the Company's earnings and operations for the second quarter of 2020. Defendants Kreindel, Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode. During that call, Lakhani and Theodorou touted the benefits of Evolve and Evoke. Lakhani claimed that "when it comes to the Evolve where we've seen a lot of traction as well as because we're able to trim, tighten and tone all on one modality rather than a physician having to go out and spend $300,000, $500,000 on multiple pieces of equipment . . . ."

141.    Theodoro added that as to Evoke, "this is not just a face tightening device. Depending on your specialty, whether you're plastic surgeon or dermatologist or hard res if you want to get, you can actually remodel the fat and position it the way you want. So in the lower 1/3 of the face depending on the number of treatments, you're able to remodel that fat, remove the fat and tightening the skin, that's something that CoolSculpting has not been able to do. So that's like a big, big deal differentiator . . . So this is not a one-size fits all, and that's a big differentiator when it comes to the

{00635310;7 }

competition and what's been in the past. So you can melt that, you can tighten skin, you can preserve fat, you can tighten skin, depending on what you're trying to do."

142.   The statements in the two preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, while touting the benefits of Evolve and Evoke, Lakhani and Theodorou failed to disclose that the products did not receive FDA approval for those indications. Evolve and Evoke lacked adequate scientific studies supporting the purported indications.

143.   On the August 5, 2020 call, Defendant Mizrahy also stated:

> We decided not to market these two platforms [Evoke and Evolve] outside U.S. to spa market, but only to doctors to keep it in a high-price and with high value. And that's exactly what we will do in the next six months and also '21.

> \* \* \*

> Just -- for example, in China, one of the procedures which are very attractive to doctors is to do drug delivery, and we're developing procedures like using Fractora to create some tunnels into the epidermis and to deliver drug into it, dry device combination. It's not a very expensive to produce machine, but there was a big market for it in China for whitening the skin and et cetera. And therefore, I don't – I'm not afraid that the gross margin will go down, because we will not sell our – *we'll not sell our product[s] in a cheap price*. There are many cheap product[s] in China . . .

144.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the

{00635310;7 }

statements not misleading because, in truth, the Company heavily discounted almost every device it sold.

145.   On February 10, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the fourth quarter of 2020. The Form 6-K was signed by Defendant Mizrahy. In that filing, Defendant Kreindel stated: "Our innovative hands-free and minimally invasive technology gained significant traction this year, driven by new product launches such as Evolve, Evoke and Morpheus8[.]" "These unique platforms offer effective full-body and facial aesthetic solutions for patients who want to avoid hospitalization and invasive procedures, which are required for traditional plastic surgery."

146.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, Evolve, Evoke and Morheus8 did not offer "effective full-body and facial aesthetic solutions" because they were used for melting fat, facial remodeling, and the reduction of cellulite through connective tissue contraction, which were impermissible uses unauthorized by the FDA. Accordingly, Defendants lacked any basis for making the statements because there were no studies considered or approved by the FDA that supported the indications Defendants pushed for the devices, let alone the representation that those uses were "effective." Moreover,

{00635310;7 }

far from providing "effective" "solutions," InMode's products were severely harming patients. InMode failed to report those adverse events to the FDA, as required.

**On June 4, 2021, Defendant Malca represented InMode at the Jefferies Healthcare Conference. At that conference,** ~~DEFENDANTS' MATERIAL~~

~~MISREPRESENTATIONS~~

~~32.~~147.    ~~he Class Period begins on June 4, 2021, when Defendant Malca represented InMode at the Jeffries Healthcare Conference. At that conference, Defendant~~ Malca stated that InMode was "not a razor and razorblade company. When we do have consumables on many of our products, we don't discount our platforms just to jack up the price of the consumables. We set our platform for full price and sell our consumable for very reasonable pricing."

~~21.    On July 28, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the second quarter of 2021. In that filing, Defendant Lakhani stated, "We have also seen higher overall transaction amounts, which is attributed to the growing demand for our products. . . . We~~The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, the Company heavily discounted almost

every device or platform it sold. ~~are pleased to see high physician and patient satisfaction with our products and services."~~

148.

149.   On October 26, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the third quarter of 2021. That same day, InMode held a conference call with analysts ~~and investors~~ to discuss the Company's earnings and operations for the third~~second~~ quarter of 2021. Defendants Mizrahy, Lakhani, Theodorou and Malca attended for InMode. On that call, Defendant Mizrahy discussed the launch of the Empower platform—on which the Morpheus8V ~~Theodorou~~ was placed—into the gynecology field, stating the following: "this gynecology market is new to us and just because we want to be very careful with what we claim and indication to the doctors. And this is according to what Spero said, we're spending a lot of money on studies and all kind of checking ~~asked by an analyst "How much do you think off-label use will be~~ for every indication that we claim. By the way, this is the only system on the market that has a very broad indication approval from the FDA."

~~33.~~150.

he statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, Defendants were not, in fact, conducting "all kind [sic] of checking for

{00635310;7 }

every indication that [they were] claim[ing]." Instead, Defendants were marketing Morpheus8V for vaginal ~~other type[s] of~~ rejuvenation and tightening, and for urinary incontinence, without any adequate checking or support for those uses, and without the permission of the FDA, as required. Moreover, Mizrahy failed to disclose~~procedures, things like that, that we've heard about in the past . . . is this really going to be focused on the therapeutic side only?" In response, Defendant Theodorou stated "As you know, we have to be very, very careful because of the history and the language~~ that the "studies" InMode was "spending~~FDA put out there. . . . At the end of the day, we're an aesthetics company. And introducing a platform into a segment where they can actually find~~ a lot of money on" were biased because InMode was paying Luminaries to author favorable clinical studies. Additionally, Mizrahy's representation that the Empower platform was "the only system on the market that has~~medical indication, use~~ a very broad indication approval from the FDA" was false and misleading because it signified that Morpheus8V—which was used on the Empower platform—was approved by the FDA for the indications for which it was marketed when, in fact, it did not secure such approval. If anything, as the FDA had previously noted in 2018, prior reports indicated that devices claiming uses for stress urinary incontinence and vaginal rejuvenation could cause serious harm to women.~~medical indication, and then slowly use them into the cosmetic, that's been always our mantra."~~

22.    On August 12, 2021, Defendant Mizrahy represented InMode at the UBS Genomics 2.0 and MedTech Innovations Summit. At that conference, Defendant Mizrahy stated:

> [W]e're not a razor and razor blade company. We don't give the system for free in order to sell high-priced disposable. We decided that we want to sell the system and to sell disposable as well. By the way, the disposable prices are reasonable to the doctors because we want doctor hate to buy disposable for very high price even if he got the system for very low price. So, we sell disposable in a very reasonable price to encourage the doctor to do more and more treatment.

34.1.

23.    On October 26, 2021, InMode filed with the SEC on Form 6-K its quarterly report for the third quarter of 2021. In that filing, InMode touted two "new" platforms, EmpowerRF and EvolveX, and said that the Company will continue to "expand our business by delivering innovative technologies in new medical applications."

35.151.

n November 18, 2021, Defendant Mizrahy represented InMode at the Canaccord Genuity CG MedTech, & Diagnostics and Digital Health & Services Forum. At that conference, in response to an analyst question regarding InMode's return to the women's health market, Defendant Mizrahy responded "[w]e're riding on the learning curve. We've trained the doctor properly. We don't want to [make] the same mistakes as happened [in 2018] because we don't want the FDA to jump on us. ***All the applicators and all the modalities are FDA approved already***, so we do it step by step."

{00635310;7 }

152.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, Morpheus8V lacked FDA approval for the uses Defendants were marketing the device.

~~36.~~153.

n February 10, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the fourth quarter of 2021. The Form 6-K was signed by Defendant Mizrahy. In that filing, Defendant Theodorou stated in connection with the Company's latest platform, EmpowerRF, for use in "the women's health space":~~,~~ "We diligently invest resources in developing our clinical studies and are encouraged by the growing number of peer review publications supporting our strong scientific data and achievements."

154.   The statements in the preceding paragraph were materially false and misleading because they provided a deceptive message that InMode's clinical studies related to the application of the Empower platform—to which Morpheus8V attached—supported the improper uses for which the device was marketed. Far from having "a growing number of peer review publications supporting [InMode's] strong scientific data and achievements," the Company was marketing (and InMode's customers were using) EmpowerRF with its Morpheus8V applicator in a way that posed significant harm to women and without any adequate or strong scientific evidence to support the

{00635310;7 }

indications for which it was marketed and used. Moreover, Theodorou failed to disclose that the clinical studies in which InMode was "diligently invest[ing]" were biased because InMode was paying Luminaries to author favorable studies.

24. Also on February 10In that same filing, Defendant Malca stated:

The last several quarters have exemplified InMode's dedication to maintaining healthy gross margins, where we successfully maintained 85%, despite global supply challenges. We have integrated this as part of our company target model, ensuring that each additional new product will allow us to support this level of margin. As we continue to enter new markets and geographies, we'll focus on expanding our marketing capabilities to support our growth trajectory.

25. That same day, InMode also filed with the SEC on Form 20-F its annual report for its fiscal year ending on December 31, 2021 (the "2021 Annual Report"). In that filing, InMode stated, "We have obtained 510(k) clearance for the current treatments for which we offer our products." The Company also assured investors that "no third-party claims have been brought against us to date."

26. In the 2021 Annual Report, InMode also stated:

Under FDA regulations, for each of our products we must only use labeling, including advertising and promotional materials, that is consistent with the specific indication(s) for use included in the FDA exemption regulation, clearance, or approval, that is applicable to the specific product. If the FDA or other authorities determine that our promotional or training materials constitute the unlawful promotion of an off-label use, they could request that we modify our training or promotional materials and/or subject us to regulatory or enforcement actions.

27. In the 2021 Annual Report, InMode went on to state:

{00635310;7 }

Our products may cause or contribute to adverse medical events or other undesirable side effects that we are required to report to the FDA, and if we fail to do so, we would be subject to sanctions that could harm our reputation, business, financial condition and results of operations. . . . We are subject to the FDA's medical device reporting regulations and similar foreign regulations, which require us to report to the FDA when we receive or become aware of information that reasonably suggests that one or more of our products may have caused or contributed to a death or serious injury[.]

28.    The statements set forth in paragraphs 45-47, and similar statements, were made in all of the Company's Annual Reports filed with the SEC during the Class Period.

29.    On May 2, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the first quarter of 2022. In that filing, Defendant Lakhani stated, "We reported record numbers for consumable sales, a strong indication of the growing utilization rate and demand for our platforms." Defendant Lakhani further stated that "[w]e are optimistic about the overall demand for our products and anticipate that the North American business will continue to grow and be the main revenue contributor for InMode."

155.    On July 28, 2022, InMode held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourthsecond quarter and full year of 2021. On2022. During that call, Defendant Mizrahy emphasized:

But again, I would like to say it again, we are not razor and razorblade company. *We do not sell*stated that "[w]e started the process to clear *the system for less* or would [sic] do not give the system for free, just to charge high price for disposable. We know that some companies in the medical esthetic [sic] did in the past and they failed. ***And therefore, we charge for the system***, and we price the disposable in a reasonable price in order to encourage

{00635310;7 }

doctor [sic] to use more and more, and to have more treatment. ~~other indication with the FDA. We are very investing very heavily heavily on the Empower, since we believe that we want to be the leader in the women health or the wellness women health in the market.~~"

156.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, the Company heavily discounted almost every device or system it sold.

~~30.   On that same call, Defendant Lakhani discussed loan financing used by many customers. Specifically, Defendant Lakhani stated that "in regards to financing . . . [w]e've talked to our brokers and a number of the leasing companies, we haven't seen rate hikes as of yet. I think they're going to start to kick in slowly. The nice thing about it is because of the macroeconomic environment right now it's not going to come as a surprise[.]"~~

~~37.~~157.   

~~O~~n October 27, 2022, InMode filed with the SEC on Form 6-K its quarterly report for the third quarter of 2022. The Form 6-K was signed by Defendant Mizrahy. In that filing, Defendant Theodorou stated~~In that filing, Defendant Lakhani stated, "Our performance in North America continues to be the major growth engine for the company, with an emphasis on the Morpheus8 becoming one of the most popular minimally invasive procedures." Defendant Theodorou added~~, "We've seen growing adoption of our EmpowerRF platform by an increased number of women's health and wellness physicians across the U.S. and

{00635310;7 }

Canada. The success in improving women's quality of life is meaningful to InMode, and we intend building on its momentum as we capture more share in this important market."

158.   The statements in the preceding paragraph that InMode was experiencing a "momentum" with its "meaningful" "success in improving women's quality of life" with the EmpowerRF platform, which boded well for the Company's ability to "capture more share in this important market," set forth in paragraphs 37-47 and 49-52 were materially false and misleading when made. In truth, the Company's ability to capture share in the women's market with its EmpowerRF platform was severely constrained because InMode was reality: (i) the Company heavily discounts almost every device it sells; (ii) demand for the Company's products was driven by InMode's willingness to discount its products; (iii) the Company violated FDA regulations by engaging in off-label marketing (and its customers were using) the EmpowerRF platform with its Morpheus8V applicator in an impermissible way that posed harm to women's health.

159.   Also on October 27, 2022, InMode held an earnings call with analysts to discuss the Company's results and promoting products for the third quarter of 2022. Defendants Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode. During that call, Theodorou touted the benefits of Empower (to which the Morpheus8V applicator attached), stating that it is a solution for stress urinary incontinence:

Here's how we look at Empower, when we enter these practices, for example, gynecologists, right, they're not used to marketing. They don't know how to do

{00635310;7 }

cash-based procedures. So going to these practices with *a solution that's within their scope of practice, such as stress urinary incontinence and mixed urinary incontinence* and so forth is very, very important, because at that point, we're able to tell gynecologist, look, you already have these patients in your office. They're already coming in. The solutions out there are not great, so we have solution for these patients that you don't have to go out there and market. These are existing patient population.

160.   Mizrahy amplified those statements, stressing that "[t]he only platforms today that enable us to get into the [medical] wellness and improve quality of life is [sic] the Empower, because the Empower is not pure aesthetic. It's some aesthetic, of course, an aesthetic gynecology, *but also* treatment *which are like treating SUI, vaginal contraction*, OBA, OEB, et cetera."

38.161.

outing the benefits of Empower as a solution for stress urinary incontinence, mixed urinary incontinence, and vaginal contraction was false and misleading when made because it failed disclose that Empower (to which the Morpheus8V attached) did not receive~~of indications for which they lack~~ FDA approval for those indications. Thus, the device lacked adequate scientific studies supporting the purported indications. If anything, as the FDA noted in 2018, prior reports indicated that similar ~~; and (iv) the Company violated FDA regulations by failing to timely report injuries caused by its~~ devices claiming uses for stress urinary incontinence and vaginal rejuvenation could cause serious harm to women. ~~.~~

{00635310;7 }

On

**THE TRUTH EMERGES**

31.    On February 17, 2023, just before the market closed, an investigative publication revealed that InMode customers were threatened with legal action after filing complaints regarding the Company's devices and sales tactics. As a result of these disclosures, the price of InMode common stock declined $1.21 per share, from a closing price of $37.02 per share on February 17, 2023, to a closing price of $35.81 per share on February 21, 2023.

32.    However, despite these disclosures, InMode continued to misrepresent the pricing of, and demand for, its products. For example, on March 15, 2023, Defendant Malca represented InMode at the Barclays Global Healthcare Conference. At that conference, ~~Defendant~~ Malca stated that physicians "don't like the razor~~ and~~ razorblade model. They tend to forget pretty quickly what they paid

~~39.~~162.

or the original device. So, even if you discounted or heavily discounted, as many of the companies do . . . A*nd what we do differently is we charge them the full price on the device* and charge a very reasonable price on the consumable."

{00635310;7 }

163.   The statements ~~set forth~~ in the preceding paragraph ~~55~~ were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth~~, In reality: (i)~~ the Company heavily discounted~~discounts~~ almost every device it sold.

164.   At the same conference, Defendant Theodorou said:

We have a very large training force,~~sells;~~ and we have a lot of things in place to be able to educate and train these practitioners so we keep things safe, which is also a big deal, right?

165.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, far from training the practitioners to "keep things safe," Defendants were marketing their products—and the practitioners were using them—in an unsafe manner,~~(ii) demand~~ for indications that were not FDA-approved. Moreover, InMode products were severely harming patients. InMode failed to report those adverse events to the FDA, as required.

166.   On May 2, 2023, InMode held a conference call with analysts to discuss the ~~the~~ Company's earnings and operations for the first quarter of 2023. On that call, Defendant Mizrahy represented the following:

I would like to take the moment to recognize that 15 years ago, we started this company with a small investment of just $3.5 million and in an idea that with bipolar RF technology, our expertise and knowledge of the aesthetic industry, we can disrupt the industry and help close the treatment gap. We

have been accomplishing this by providing patient, remarkable and lasting results. ***We are working closely with leading plastic surgeons that have been endorse[ph] our safe FDA approved technology***.

167.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, in truth, ~~products was driven by~~ InMode's technology was not "safe" or "FDA approved." For example, InMode was marketing (and its customers were using) the Evoke, Evolve, Morpheus8 and Morpheus8V platforms and devices in a manner that was unsafe and beyond the scope of the indications approved by the FDA. Moreover, InMode products were severely harming patients. Defendants' own Luminaries applied dangerously aggressive settings and trained doctors to apply the same modalities, resulting in serious injuries to patients. InMode failed to report those adverse events to the FDA, as required. The statements also failed to disclose that the "leading surgeons" endorsing InMode's "safe FDA approved technology" were conflicted because they were paid by InMode to make the endorsements.

168.    On August 15, 2023, Defendant Malca attended the UBS MedTech, Tools and Genomics Summit, where he made the following comments:

What would he feel more comfortable to recommend, and they tend to forget that ***for our product platforms, they paid full price***, and the competitor, maybe they get a ~~willingness to~~ discount because they have the razor blade model. So they tend to forget what was the initial cost for them, but they just look at this

{00635310;7 }

procedure. And then they don't like the fact they see it like the greedy manufacturer and this is his patient. This is his – he's doing the walk. And then again, the manufacturer is coming, putting his hand into his pocket and like take yourself or sometimes even half of what they're able to charge and physicians don't like it~~its products~~.

169.   The statement in the preceding paragraph that InMode sold its platforms for full price was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading because, in truth, the Company heavily discounted almost every device or platform it sold.

## DURING THE CLASS PERIOD, THE INDIVIDUAL DEFENDANTS SOLD MASSIVE AMOUNTS OF THEIR INMODE HOLDINGS

170.   During the Class Period, the Individual Defendants enriched themselves by dumping large portions of their holdings at artificially inflated prices. For example, Defendant Mizrahy's holdings decreased substantially, from 10,170,656 shares shortly before the Class Period at year-end 2019, to just 2,005,208 shares shortly after the Class Period at year-end 2023. Thus, Mizrahy dumped as much as 80% of his InMode common stock during the Class Period, for total proceeds of approximately $455,050,069.

171.   Similarly, Defendant Malca's holdings decreased substantially, from 147,038 shares at year-end 2020, to just 30,314 shares shortly after the Class Period at year-end 2023.  Thus, Malca sold 79% of his InMode common stock during the Class Period, for total proceeds of approximately $6,703,493.

172.    Likewise, Defendant Kreindel's holdings decreased substantially, from 10,376,200 shares shortly before the Class Period at year-end 2019, to just 3,114,762 shares shortly after the Class Period at year-end 2023.  Thus, Kreindel dumped as much as 70% of his InMode common stock during the Class Period, for total proceeds of approximately $309,632,368.

173.    Defendant Lakhani's holdings also decreased substantially, from 20,360 shares at year-end 2022, to zero shares shortly after the Class Period at year-end 2023.  Thus, Lakhani disposed of 100% of his InMode common stock during the Class Period, for total proceeds of approximately $665,976.

## THE TRUTH EMERGES

33.    On October 12, 2023, before the market opened, InMode lowered its full-year revenue guidance, which the Company blamed on higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing.

34.    Later that same day, an investigative publication announced a forthcoming report on InMode, relating to the Company's statements to investors about pricing flexibility of products and margin consistency. After the close of trading, the publication released a story revealing that InMode significantly discounted the prices of its devices on a routine basis throughout the Class Period.

{00635310;7 }

35.    As a result of these disclosures, the price of InMode common stock declined $7.24 per share, or nearly 26%, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023.

## LOSS CAUSATION

40.174.

uring the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These misleading statements and omissions artificially inflated the price of InMode common stock and operated as a fraud or deceit on the Class. (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, through corrective disclosures and/or through materializations of the risks, InMode's stock price fell significantly. As a result of their purchases of InMode common stock during the Class Period, PlaintiffsPlaintiff and other members of the Class suffered economic lossesloss, *i.e.,* damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased InMode common stock during the Class Period (the "Class"). Excluded from the Class are

{00635310;7 }

~~Defendants and their families, directors, and officers of InMode and their families and~~

~~affiliates.~~

175.   ~~The members of the Class are so numerous that joinder of all members is~~

~~impracticable. The disposition of their claims in a class action will provide substantial~~

~~benefits to the parties and the Court.~~ On February 17, 2023, an investigative publication

by *Capitol Forum* published before the market closed revealed that InMode customers

were threatened with legal action after filing complaints about the Company's devices

and sales tactics. According to the report, InMode offered to replace defective products

on the condition that customers sign confidentiality agreements with non-disparagement

clauses. The report also included accounts of onerous high interest loans and patients

injured by InMode's products.

176.   On this news, the price of InMode common stock declined $2.67 per

share, or 6.73%, from a closing price of $39.69 per share on February 16, 2023, to a

closing price of $37.02 per share on February 17, 2023.

~~37.~~  Then, on March 10, 2023, before the market opened, *The Capitol*

*Forum* reported that InMode had not been submitting mandatory reports to the FDA

regarding injuries and malfunctions stemming from ~~As of September 30, 2023, InMode~~

~~had over 83 million shares of stock outstanding, owned by at least hundreds or thousands~~

~~of investors.~~

177. There is a well-defined community of interest in the usequestions of its devices.

178. Onlaw and fact involved in this news, the priceease. Questions of InModelaw and fact common stock declined $1.40 per share per share, or 4.31%, from a closing price of $32.51 per share on March 9, 2023, to a closing price of $31.11 per share on March 10, 2023.

179. On October 12, 2023, before to the members of the market opened, InMode lowered its full-year revenue guidanceClass, which the Company blamed on constraints in financing of medical equipment, marked by higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing. The Company stated: "Revenue for the full year of 2023 to be in the range of $500 million to $510 million vs. previous estimates of revenue between $530 million and $540 million."

180. Also on October 12, 2023, before the market closed, the *Capitol Forum* published an investigative report titled "*InMode: Pricing Flexibility of Products Raises Questions Regarding Statements to Investors and Margin Consistency.*" The publication revealed that, unbeknownst to investors, InMode significantly discounted the prices of its devices on a routine basis throughout the Class Period. The report disclosed that "far from charging full price for its products, InMode heavily discounts almost every device it sells and expects sales representatives to discount devices anywhere between 16% and 40%

{00635310;7 }

off of the 'list price[].'" In support of these revelations, the report reproduced an internal InMode compensation sheet from 2019, reflecting the amount of commission the sales team could expect to receive at each tier of pricing at ~~predominate over questions~~ which they sold a device. The first tier begin tens of thousands of dollars below the "list price":

**INMODE COMPENSATION PLAN**

INMODE
aesthetic solutions

2.15.19

| Tiers | BodyTite | | | | | List: $205,900 |
|---|---|---|---|---|---|---|
| 1 | 175,000 - | 170,000 @ | 16% = | 28,000 - | 27,200 | |
| 2 | 169,999 - | 160,000 @ | 14% = | 23,800 - | 22,400 | |
| 3 | 159,999 - | 150,000 @ | 12% = | 19,200 - | 18,000 | 2 year warranty |
| 4 | 149,999 - | 140,000 @ | 10% = | 15,000 - | 14,000 | |
| 5 | 139,999 - | 130,000 @ | 8% = | 11,200 - | 10,400 | |

| Tiers | BodyTite + Morpheus 8 + AccuTite (20w Unit) | | | | | List: $249,900 |
|---|---|---|---|---|---|---|
| 1 | 225,000 - | 215,000 @ | 16% = | 36,000 - | 34,400 | |
| 2 | 214,999 - | 205,000 @ | 14% = | 30,100 - | 28,700 | |
| 3 | 204,999 - | 195,000 @ | 12% = | 24,600 - | 23,400 | 2 year warranty |
| 4 | 194,999 - | 185,000 @ | 10% = | 19,500 - | 18,500 | |
| 5 | 184,999 - | 175,000 @ | 8% = | 14,800 - | 14,000 | |

| Tiers | BodyTite Pro | | | | | List: $219,900 |
|---|---|---|---|---|---|---|
| 1 | 175,000 - | 170,000 @ | 16% = | 28,000 - | 27,200 | |
| 2 | 169,999 - | 160,000 @ | 14% = | 23,800 - | 22,400 | |
| 3 | 159,999 - | 150,000 @ | 12% = | 19,200 - | 18,000 | 2 year warranty |
| 4 | 149,999 - | 140,000 @ | 10% = | 15,000 - | 14,000 | |
| 5 | 139,999 - | 130,000 @ | 8% = | 11,200 - | 10,400 | |

| Tiers | BodyTite Pro + Morpheus 8 + AccuTite | | | | | List: $249,900 |
|---|---|---|---|---|---|---|
| 1 | 225,000 - | 215,000 @ | 16% = | 36,000 - | 34,400 | |
| 2 | 214,999 - | 205,000 @ | 14% = | 30,100 - | 28,700 | |
| 3 | 204,999 - | 195,000 @ | 12% = | 24,600 - | 23,400 | 2 year warranty |
| 4 | 194,999 - | 185,000 @ | 10% = | 19,500 - | 18,500 | |
| 5 | 184,999 - | 175,000 @ | 8% = | 14,800 - | 14,000 | |

| Tiers | EmbraceRF [FaceTite or AccuTite + Morpheus 8] | | | | | List: $179,900 |
|---|---|---|---|---|---|---|
| 1 | 150,000 - | 140,000 @ | 16% = | 24,000 - | 22,400 | |
| 2 | 139,999 - | 130,000 @ | 14% = | 19,600 - | 18,200 | |
| 3 | 129,999 - | 120,000 @ | 12% = | 15,600 - | 14,400 | |
| 4 | 119,999 - | 110,000 @ | 10% = | 12,000 - | 11,000 | |
| 5 | 109,999 - | 100,000 @ | 8% = | 8,800 - | 8,000 | |

| Tiers | Optimas (Lumecca/Morpheus 8/Forma/Diolaze/Vasculaze) | | | | | List: $234,900 |
|---|---|---|---|---|---|---|
| 1 | 205,000 - | 195,000 @ | 16% = | 32,800 - | 31,200 | |
| 2 | 194,999 - | 180,000 @ | 14% = | 27,300 - | 25,200 | |
| 3 | 179,999 - | 165,000 @ | 12% = | 21,600 - | 19,800 | |
| 4 | 164,999 - | 155,000 @ | 10% = | 16,500 - | 15,500 | |
| 5 | 154,999 - | 145,000 @ | 8% = | 12,400 - | 11,600 | |

| Tiers | Optimas (Lumecca/Morpheus 8/Forma/Diolaze) | | | | | List: $209,900 |
|---|---|---|---|---|---|---|
| 1 | 195,000 - | 185,000 @ | 16% = | 31,200 - | 29,600 | |
| 2 | 184,999 - | 170,000 @ | 14% = | 25,900 - | 23,800 | |
| 3 | 169,999 - | 155,000 @ | 12% = | 20,400 - | 18,600 | |
| 4 | 154,999 - | 145,000 @ | 10% = | 15,500 - | 14,500 | |
| 5 | 144,999 - | 135,000 @ | 8% = | 11,600 - | 10,800 | |

| Tiers | Morpheus 8 (Optimas with Morpheus 8 only) | | | | | List: $149,900 |
|---|---|---|---|---|---|---|
| 1 | 110,000 - | 105,000 @ | 16% = | 17,600 - | 16,800 | |
| 2 | 104,999 - | 100,000 @ | 14% = | 14,700 - | 14,000 | |
| 3 | 99,999 - | 95,000 @ | 12% = | 12,000 - | 11,400 | 2 year warranty |
| 4 | 94,999 - | 90,000 @ | 10% = | 9,500 - | 9,000 | |
| 5 | 89,999 - | 85,000 @ | 8% = | 7,200 - | 6,800 | |

Add Vasculaze hand piece for 30,000 @ 8% commission
Add any additional hand piece for 30,000 @ 12% commission

| Tiers | Votiva (Merpheus 8/FormaV) | | | | | List: $169,900 |
|---|---|---|---|---|---|---|
| 1 | 140,000 - | 130,000 @ | 16% = | 22,400 - | 20,800 | |
| 2 | 129,999 - | 120,000 @ | 14% = | 18,200 - | 16,800 | |
| 3 | 119,999 - | 110,000 @ | 12% = | 14,400 - | 13,200 | 2 year warranty |
| 4 | 109,999 - | 100,000 @ | 10% = | 11,000 - | 10,000 | |
| 5 | 99,999 - | 90,000 @ | 8% = | 8,000 - | 7,200 | |

| Tiers | Contoura (BodyFX/MiniFX/Plus) | | | | | List: $149,900 |
|---|---|---|---|---|---|---|
| 1 | 110,000 - | 100,000 @ | 16% = | 17,600 - | 16,000 | |
| 2 | 99,999 - | 95,000 @ | 14% = | 14,000 - | 13,300 | |
| 3 | 94,999 - | 90,000 @ | 12% = | 11,400 - | 10,800 | |
| 4 | 89,999 - | 85,000 @ | 10% = | 9,000 - | 8,500 | |
| 5 | 84,999 - | 80,000 @ | 8% = | 6,800 - | 6,400 | |

| Tiers | Triton (Duo Light 755/810; Duo Dark 810/1064) | | | | | List: $144,900 |
|---|---|---|---|---|---|---|
| 1 | 125,000 - | 115,000 @ | 16% = | 20,000 - | 18,400 | |
| 2 | 114,999 - | 105,000 @ | 14% = | 16,100 - | 14,700 | |
| 3 | 104,999 - | 95,000 @ | 12% = | 12,600 - | 11,400 | |
| 4 | 94,999 - | 85,000 @ | 10% = | 9,500 - | 8,500 | |
| 5 | 84,999 - | 75,000 @ | 8% = | 6,800 - | 6,000 | |

| Tiers | Triton Diolaze Trade In Program | | | | | List: $90,000 |
|---|---|---|---|---|---|---|
| 1 | 90,000 - | 80,000 @ | 9% = | 8,100 - | 7,200 | |
| 2 | 79,999 - | 70,000 @ | 8% = | 6,400 - | 5,600 | |
| 3 | 69,999 - | 60,000 @ | 7% = | 4,900 - | 4,200 | |

| Tiers | Morpheus 8 Upgrade | | | | | List: $89,000 |
|---|---|---|---|---|---|---|
| 1 | 70,000 - | 60,000 @ | 12% = | 8,400 - | 7,200 | |
| 2 | 59,999 - | 50,000 @ | 10% = | 6,000 - | 5,000 | |
| 3 | 49,999 - | 40,000 @ | 8% = | 4,000 - | 3,200 | 6 Month Warranty Q1 & Q2 Promo (RF System Only) |

| Tiers | AccuTite Upgrade | | | | | List: $89,000 |
|---|---|---|---|---|---|---|
| 1 | 70,000 - | 60,000 @ | 12% = | 8,400 - | 7,200 | |
| 2 | 59,999 - | 50,000 @ | 10% = | 6,000 - | 5,000 | |
| 3 | 49,999 - | 40,000 @ | 8% = | 4,000 - | 3,200 | 6 Month Warranty Q1 & Q2 Promo (RF System Only) |

| Tiers | Morpheus 8 & AccuTite Upgrade | | | | | List: $139,000 |
|---|---|---|---|---|---|---|
| 1 | 100,000 - | 90,000 @ | 12% = | 12,000 - | 10,800 | |
| 2 | 89,999 - | 80,000 @ | 10% = | 9,000 - | 8,000 | |
| 3 | 79,999 - | 70,000 @ | 8% = | 6,400 - | 5,600 | 1 Year Warranty Q1 & Q2 Promo (RF System Only) |

**System Upgrade Promotions**
Old InMode to new InMode Pro with Vasculaze for $45,000 @5% commission
Old InMode to new InMode Pro with Diolaze for $45,000 @5% commission
Old InMode to New InMode Pro with Vasculaze & DielazeXL for $60,900 @5% commission

**Standalone Hand Piece Promotions**
Add Vasculaze hand piece to users of Optimas platform for $30,000 + @ 8%

**Bundle Incentive**
2% additional bundle commission on 250k total bundle deal
3% additional bundle commission on 300k total bundle deal
4% additional bundle commission on 350k total bundle deal

* some numbers have been rounded

{00635310;7 }

41. 181.

ormer InMode sales representatives who recently left the Company explained to the *Capitol Forum* investigators that the structure of the discounts continues. Sales representatives noted that the discounts are likely even higher now as a result of the higher interest rates compared to those in 2019.[17] The report also noted that the recent and large discounts may have affected InMode's revenues, with the Company announcing that it was lowering its guidance for 2023 by roughly $30 million. affect individual Class members, include:

182.  The undisclosed practice of heavily discounting its products, particularly in an environment marked by high interest rates, contributed to InMode's revenue decline.

183.  InMode's downward revenue guidance was also a materialization of the risks that InMode was marketing several of its products for improper purposes and without the permission of the FDA.

184.  On this news, the price of InMode common stock declined $7.24 per share over two trading days, or nearly 26%, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023.

---

[17] Prime rates increased from an average of 5.28% in 2019 to an average of 8.20% in 2023. Likewise, federal fund rates increased from an average of 2.16% in 2019 to an average of 5.03% in 2023.

{00635310;7 }

185.   On December 6, 2023, before the market opened, InMode again lowered its revenue guidance, stating the revision was "primarily due to stronger-than-expected headwinds from the current macroeconomic environment, resulting in a slowdown in platform sales, mainly in North America."  InMode guided revenue for the full year 2023 to be in the range of $485 million to $495 million, as compared to the prior estimated range of $500 million to $510 million.

186.   This announcement was a further materialization of the risks resulting from the Company's practice of heavily discounting its products in North America, as well as a further materialization of the risks that InMode was marketing several of its products for improper purposes and without the permission of the FDA.

187.   On this news, the price of InMode common stock declined $ 2.87 per share over two trading days, or 12.15%, from a closing price of $23.62 per share on December 5, 2023, to a closing price of $20.75 per share on December 7, 2023.

## PRESUMPTION OF RELIANCE

188.   Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998), and the presumption of reliance for omissions set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

189.   The presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    the Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b)    the misrepresentations and/or omissions were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(a)    Plaintiffs and other members of the Class purchased InMode common stock between the time Defendants ~~Whether Defendants violated the Exchange Act;~~

(b)    ~~Whether Defendants' statements and/or actions~~ misrepresented or failed to disclose ~~material facts;~~

(c)    ~~Whether Defendants' statements and/or actions omitted~~ material facts necessary ~~in order~~ to make the statements ~~made, in light of the circumstances under which they were made, not misleading;~~

(d)    ~~Whether Defendants knew or recklessly disregarded~~ that were ~~their statements, actions, and/or omissions were false and misleading;~~

{00635310;7 }

(e)    Whether Defendants' misconduct impacted the price of InMode common stock;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damages sustained by Class members and the appropriate measure of damages.

64.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

65.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

66.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

67. InMode's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

{00635310;7 }

(a)(e)  68.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made not , the speaker knew the statement was false or misleading and the time the true facts were disclosed, or the risks materialized, without knowledge of the misrepresentedstatement was authorized and/or omitted factsapproved by an executive officer of InMode who knew that the statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

## PRESUMPTION OF RELIANCE

42.190.

9.At all relevant times, the market for InMode'sInMode common stock was an efficient market for, among others, the following reasons, among others:

(a)    InMode's commonInMode stock met the requirements for listing , and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    asAs a regulated issuer, InMode filed periodic public reports with the SEC and the NASDAQ;

(c)    throughout the Class Period, InMode's common stock was highly liquid, with an average daily trading volume of 1.71 million shares.

(c)(d) InMode regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(e)    InMode was followed by numerousseveral securities analysts employed by major brokerage firm(s) who wrote reports thatwhich were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were). Each of these reports was publicly available and entered the public marketplace; and

(d)(f)   unexpected   company-specific   news   was   reflected   and incorporated into the stock price for InMode's common stock.

43.191.

s a result of the foregoing, the market for InMode common stock promptly digested current information regarding InMode from all publicly available sources and reflected such information in InMode'sthe price of InMode common stock price. . Under these circumstances, all purchasers of InMode common stock during the Class Period suffered similar injuriesinjury through their purchase of InMode common stock at artificially inflated prices, and the presumption of reliance applies.

192.   In addition, aA Class-wide presumption of reliance is also appropriate under *Affiliated Ute* because the claims asserted herein are grounded in material omissions. Asin this action involves Defendants' failure to disclose material adverse information regarding InMode's business operations—information that the Defendants were obligated to discloseunder the Supreme Court's holding in light*Affiliated Ute Citizens* of the statements they made on these very topics and/or applicable SEC rules and regulations—*Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material misstatements. Because this action involves Defendants' misrepresenting material information regarding both the price at which InMode sold its

{00635310;7 }

~~devices, as well as InMode's compliance with FDA regulations,~~ positive proof of reliance is not a prerequisite to recovery.

### NO SAFE HARBOR

193.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

194.   None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made.  None of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

195.  To the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying

{00635310;7 }

important factors  ~~All that is necessary is~~ that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Indeed, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.  In addition, the safe harbor does not apply because, at the time each purportedly "forward looking statement" was made, the speaker knew that the forward-looking statement was false or misleading when made, and/or the forward-looking statement was authorized or approved by an executive officer of InMode who knew that the statement was materially false or misleading when made.

196.  Moreover, to the extent Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaged in the very actions about which they purportedly warned and/or had actual knowledge of ~~the misstatements be~~ material adverse facts undermining the hypothetical nature of such disclosures.  In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

{00635310;7 }

197.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of InMode during the period between February 18, 2020 and December 6, 2023, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

198.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of December 31, 2023, the Company had approximately 84 million shares of common stock outstanding.  Common stock was actively trading on the NASDAQ throughout the Class Period.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer

{00635310;7 }

agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

199.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

200.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and ~~in the sense that a reasonable investor might~~ have retained counsel competent and experienced in class and securities litigation.

201.    Common questions of law and fact that exist as to all members of the Class predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether and to what extent the market price of InMode's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

{00635310;7 }

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants were controlling persons of InMode;

(f)    Whether reliance may be presumed; and

(g)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

44.202.    class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to~~considered~~ them individually.  There will be no difficulty in the management of this action as a class action.~~important in making investment decisions. Given the importance of the Company's device pricing, as well as its FDA compliance to investors, as set forth above, that requirement is satisfied here.~~

~~**CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**~~

{00635310;7 }

# COUNT I

### (For Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### (Against AllInMode and the Individual Defendants)

45.203.  laintiffs repeatPlaintiff repeats and reallegerealleges each and every allegation in the foregoing paragraphscontained above as if fully set forth herein.

204.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of the Class against During the Class Period, InMode and the Individual Defendants.

205.  As alleged herein carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, the Defendants, individually and in concert, disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

206.  The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

{00635310;7 }

70.    did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase InMode common stock at artificially inflated prices.

(a)    InMode and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud;

(b)    (ii) made untrue statements of material facts~~fact~~ and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(a)(c) and (iii) engaged in acts, practices, and a course of business that~~which~~ operated as a fraud or~~and~~ deceit upon Plaintiffs and others similarly situated in connection with their purchases of InMode common stock during the Class Period~~the purchasers of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder~~.

71.    As set forth ~~InMode and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.~~

{00635310;7 }

72.   During the Class Period, InMode and the Individual Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose

46.1.   material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.207.   InMode and the Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or acted with reckless disregard for the truth when they failed to ascertain and disclosemisrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts in the statements made by that were available to them or other InMode personnel to members of. InMode and the Individual Defendants engaged in this misconduct to conceal InMode's true condition from the investing public, including Plaintiffs and to support the other membersartificially inflated prices of the ClassCompany's common stock.

208.   InMode is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

{00635310;7 }

48.209.

s a result of the foregoing, the market price of InMode common stock was artificially inflated during the Class Period.  Plaintiffs and Class members relied~~Plaintiff and the Class have suffered damages in that, in reliance~~ on the integrity of the market price for, ~~they purchased~~ InMode common stock during the Class Period and paid prices for InMode ~~at artificially inflated prices and were harmed when the truth about InMode negatively impacted the price of the Company's~~ common stock that were artificially inflated as a result of the false and misleading statements described herein.  Plaintiffs and the Class members . ~~Plaintiff and the Class~~ would not have purchased InMode common stock at the prices they paid, or at all, if~~had~~ they had been aware that the market prices ~~for InMode common stock~~ had been artificially and falsely inflated by the misleading statements and/or the material adverse information which the Defendants did not disclose~~InMode's and the Individual Defendants' fraudulent course of conduct~~.

49.210.

s a direct and proximate result of ~~InMode's and the Individual~~ Defendants' wrongful conduct, Plaintiffs~~Plaintiff~~ and the other members of the Class suffered damages in connection with their ~~respective~~ purchases of InMode~~the Company's~~ common stock during the Class Period.

50.211.

y reasonvirtue of the foregoing, Defendants InMode, Mizrahy, Malca, Lakhani, Theodorou, and Kreindel are liable to Plaintiffs and members of the Class for violations ofIndividual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

51.212.

laintiffs repeatPlaintiff repeats, incorporates, and reallegerealleges each and every allegation in the foregoing paragraphsset forth above as if fully set forth herein.

213.   This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants. During the Class Period, the Individual Defendants directed involvement in the day-to-day operations of InMode, and conducted and participated, directly and indirectly, in the conduct of InMode's business affairs.  Because of their positions of power and control, they knew of or recklessly disregarded the adverse non-public information about InMode's business practices.

214.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

{00635310;7 }

alleged herein to be false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.   By virtue of their positions of control and authority as senior officers and/or directors, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of InMode, including the contents of public statements during the Class Period.

52.216.

he Individual Defendants, therefore, were "controlling persons" The Individual Defendants acted as controlling persons of InMode within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of InMode's common stock.By virtue of their high-

53.217.

evel positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about InMode, the Individual Defendants had the power and ability to control the actions of InMode and its employees. By reason of such conduct, the Individual Defendants are

liable to Plaintiffs and members of the Class for violations of ~~pursuant to~~ Section 20(a) of the Exchange Act.

**_____PRAYER FOR RELIEF_____**

**WHEREFORE**, Plaintiffs pray~~Plaintiff prays~~ for judgment against Defendants as follows:

A. Declaring~~Determining~~ that this action may be maintained as a~~is a proper~~ class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiffs~~compensation to Plaintiff~~ and the~~other~~ Class compensatory damages~~members~~ against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment~~including~~ interest thereon;

C. Awarding Plaintiffs~~Plaintiff~~ and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses~~fees~~; and

D. Granting~~Awarding~~ such ~~equitable/injunctive or~~ other and further relief as the Court may deem just and proper.

**~~JURY~~ DEMAND FOR TRIAL BY JURY**

{00635310;7 }

Plaintiffs hereby demandPlaintiff demands a trial by jury of all issues so triable.

Dated: February 14, 2024                                Respectfully submitted,

January 31, 2025

                    POMERANTZBERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

                    /s/ *Jeremy A. Lieberman*Jonathan D. Uslaner

                    Jeremy A. Lieberman (admitted *pro hac vice*)
                    Emma Gilmore (admitted *pro hac vice*)
                    Villi Shteyn (admitted *pro hac vice*)
600 ThirdJonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
          2121 Avenue, 20th Floor of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

        -and-

Avi Josefson
Scott R. Foglietta
1251 Avenue of the Americas
          New York, New York 10016NY 10020
          TelephoneTel: (212) 661-1100554-

{00635310;7 }

~~1400~~
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw~~Fax: (212) 554-1444~~
~~avi@blbglaw~~.com
vshteyn@pomlaw~~scott.foglietta@blbg~~
~~law~~.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Plaintiffs and for the*
*Proposed Class*~~Plaintiff Cement~~
~~Masons'~~

## PROOF OF SERVICE

I hereby certify that on January 31, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as

{00635310;7 }

indicated on the Notice of Electronic Filing.  Parties may access this filing through

the Court's CM/ECF System.


_____    */s/ Emma Gilmore*
Emma Gilmore
*and Plasterers' Local No. 502 Pension
Fund*

{00635310;7 }