POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE INMODE LTD. SECURITIES LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No. 2:24-cv-01219-MEMF-MRW<br><br>CLASS ACTION |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................ 1

II.    SUBSTANTIVE ALLEGATIONS ........................................................................... 2

    A.   Unbeknownst To Investors, Inmode Routinely Discounted Its Devices, Jeopardizing Its Future Revenues ........................................................................................... 2

    B.   Unbeknownst To Investors, Inmode Improperly Marketed Its Products For Off-Label Uses ................................................................................................................ 4

III.   ARGUMENT ............................................................................................................. 5

    A.   The Complaint Pleads Section 10(b) And Rule 10(b)(5) Claims ....................... 5

        1. The Complaint Pleads Actionable Misstatements Or Omissions ................ 5

           a.   Defendants Falsely Represented That InMode Does Not Discount Its Devices .... 5

           b.   Unbeknownst To Investors, Defendants Improperly Marketed InMode's Products For Unapproved Uses And Claimed FDA Clearance For Those Uses .... 8

        2. The Scienter Allegations Are Compelling ................................................... 15

           a.   The Complaint Pleads Conscious Misbehavior or Recklessness ........................ 15

               (i)  The Individual Defendants Knew That The Systems Were Offered At Steep Discounts and Even Directed That Practice ........................................... 16

               (ii) The Individual Defendants Knew Of And Even Encouraged The Off-Label Marketing ................................................................................. 22

           b.   The Complaint Presents Overwhelming Allegations of Motive ......................... 26

        3. The Complaint Adequately Pleads Loss Causation ..................................... 28

           a.   The Capitol Forum Articles Corrected Defendants' Misrepresentations ............ 28

           b.   The Complaint Adequately Alleges A Materialization of Risk Theory ............... 33

    B.   The Complaint Adequately Pleads Control Person Liability .......................... 34

IV.    CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024)......................................................................................7

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)...................................................................13, 28

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ..........................................................................5

*Chabot v. Walgreens Boots All., Inc.*,
2023 WL 2908827 (M.D. Pa. Mar. 31, 2023)........................................................................30

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) .....................................................................................27

*City of Dearborn Heights v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................................18

*Cullen v. RYVYL Inc.*,
2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ...........................................................................20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................................28

*E. Ohman J:Or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .........................................................................17, 19, 20, 21

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*,
709 F. Supp. 3d 1296 (D. Colo. 2023)...................................................................................30

*Emps' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)...................................................................................................20

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ..................................................................................................20

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ........................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..................................................................................................15

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) ........................................................................21

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................................15

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..............................................................8, 14, 35

*In re Amgen Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................15, 33, 34

*In re: Bofi Holding, Inc. Sec. Litig.*,
  2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ......................................................20, 22

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................29, 30, 31, 32

*In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*,
  2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) ........................................................26

*In re China Educ. All., Inc. Sec. Litig.*,
  2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ............................................................24

*In re Cisco Sys. Inc. Sec. Litig.*,
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ......................................................20, 28

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................26, 28

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................13

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................................26

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) ....................................................................24

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ............................................................21

*In re Facebook, Inc.*,
  87 F.4th 934 (9th Cir. 2023) ..................................................................................15

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) ............................................................................29, 31

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................................24

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................................5, 14, 15

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................................24, 32

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) .............................................................................30, 31, 32, 34

*In re Neustar Sec. Litig.*,
    83 F. Supp. 3d 671 (E.D. Val. 2015) ..............................................................................24, 30

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .......................................................................17, 19, 20, 26

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).............................................................................14, 28

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
    97 F.4th 634 (9th Cir. 2024) ................................................................................14, 27

*In re Thoratec Corp. Sec. Litig.*,
    2006 WL 1305226 (N.D. Cal. May 11, 2006) .................................................................................28

*In re Unisys Corp. Sec. Litig.*,
    2000 WL 1367951 (E.D. Pa. Sept. 21, 2000) ..........................................................................13

*In re Upstart Holdings, Inc. Sec. Litig.*,
    2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ...........................................................................27

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
    2021 WL 3140050 (D.N.J. July 22, 2021)..........................................................................24

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ..........................................................................................28

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................................15

*In re Zynga Inc. Sec. Litig.*,
    2015 WL 1382217 (N.D. Cal. Mar. 25 2015)...............................................................................34

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)............................................................................................7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

iv

*Joyce v. Amazon.com, Inc.*,
2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ........................................................................32

*Joyce v. Amazon.com, Inc.*,
2025 WL 835054 (W.D. Wash. Mar. 17, 2025) .........................................................................27

*Karam v. Corinthian Colls., Inc.*,
2012 WL 8499135 (C.D. Cal. 2012).........................................................................................25

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ..................................................................20, 28, 33

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................................14, 22

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012*)* .............................................................................28, 35

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ................................................................................................18

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................................................21

*Loos v. Immersion Corp.*,
762 F.3d 880,887 (9th Cir. 2014) ...........................................................................................34

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007).....................................................................................................29

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008)...........................................................................35

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...........................................................................................18, 28

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014).......................................................................................................7

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ...................................................................................................14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .................................................................................2, 6, 28, 33

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) .......................................................................................33

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ........................................................................................15

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ................................................................................7, 21

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F. 3d 598 (9th Cir. 2014) ...................................................................................29, 30

*Petrie v. Elec. Game Card, Inc.*,
2015 WL 475958 (C.D. Cal. Feb. 5, 2015)......................................................................35

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ...................................................................................26, 27

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ...........................................................................................21

*Ret. Plan v. Fleetcor Techs., Inc.*,
2018 WL 4293143 (N.D. Ga. May 15, 2018).................................................................30

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) .....................................................................................29, 31

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................................................................20

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)................................................................24

*Schneider v. Natera, Inc.*,
2023 WL 9958265 (W.D. Tex. Sept. 11, 2023)...............................................................30

*Schneider v. Natera, Inc.*,
2025 WL 369243 (W.D. Tex. Jan. 28, 2025) ..................................................................30

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) .............................................................................7

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...........................................................................20

*Shupe v. Rocket Cos.*,
660 F. Supp. 3d 647 (E.D. Mich. 2023)...........................................................................18

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
2025 WL 416872 (E.D.N.Y. Feb. 6, 2025)......................................................................27

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................15

*Thompson v. Paul*,
    547 F.3d 1055 (9th Cir. 2008) ..........................................................................................5

*Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ..................................................................20

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ........................................................................18, 20

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
    2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ...............................................................13

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ....................................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...........................................................................................27

**Rules and Regulations**

17 C.F.R. §240.3a12-3 ............................................................................................................27

17 C.F.R. § 240.10b-5..............................................................................................................5

**Other Authorities**

*Capitol Forum Wins 2024 Loeb Award for Personal Finance & Consumer Reporting*, TCF (Oct. 11,
    2024), https://thecapitolforum.com/in-the-news/the-capitol-forum-wins-2024-loeb-award-for-
    personal-finance-consumer-reporting .............................................................................24

*Razor-Razorblade Model*, Investopedia (Dec. 18, 2022),
    https://www.investopedia.com/terms/r/razor-razorblademodel.asp ...............................5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

## I.    INTRODUCTION

The Complaint (ECF No. 64) pleads a straightforward case of securities fraud. It centers on material misrepresentations that Defendants peppered on the market regarding the price at which InMode, a foreign producer of medical equipment purporting to offer body sculpting and other rejuvenation procedures, sold its devices, as well as its compliance with U.S. Food and Drug Administration ("FDA") regulations. Specifically, despite representing the opposite to investors ("what we do differently [from competitors] is we charge the full price on the device"), throughout the Class Period, InMode heavily discounted almost every device it sold. This practice, known to Defendants but concealed from investors, threatened InMode's future revenues.

Moreover, unbeknownst to investors, Defendants repeatedly promoted InMode's products for off-label uses not approved by the FDA, despite publicly representing that "[w]e have obtained FDA clearance for the current treatments for which we offer our products." Defendants' promotion of its Morpheus8V device, for the treatment of intravaginal remodeling and urinary retention, was all the more jarring as InMode had already been lambasted by the FDA for falsely promoting these or similar uses as FDA-approved for a precursor device. Those uses posed serious risks of harm to women. Undeterred, throughout the Class Period, Defendants continued their chicanery by encouraging off-label uses. For example, at a Company sales event, Defendant Theodorou internally described the Morpheus8V device as a "Trojan Horse" of revenues to be exploited as OBGYN's "literally have the woman in stirrups. They are a captive audience."

When the market finally learned the truth, InMode's shares plummeted, causing investors hundreds of millions in damages. Meanwhile, during the Class Period, the Individual Defendants enriched themselves by dumping large portions of their holdings at prices artificially inflated by their misrepresentations, collectively pocketing ***over $770 million***.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

1

Defendants' specious attacks on the Complaint do not pass muster. Faced with indubitably false statements that "we charge [customers] the full price on the device" and that "for our product platforms, [physicians] paid full price," Defendants make strawman arguments, contending that they did not tell the market that InMode never discounted its devices. But this glaring distraction misses the point, as Defendants' representations were literally false when made because, as confirmed by numerous corroborating confidential witnesses ("CWs") and Defendants' own documents, InMode routinely and aggressively discounted its devices in an attempt to clinch a sale. Likewise, Defendants' contention that InMode received FDA approval for the uses they were touting lacks factual support and is plainly contradicted by the Complaint's allegations. The scienter allegations are equally compelling: Defendants not only knew about the aggressive discounting and the deceptive marketing practices, but actively encouraged them. Nor is loss causation a close call. Only a "causal connection" between the fraud and investors' losses is required, *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation omitted), and the Complaint plausibly alleges that link.

Plaintiffs respectfully submit that Defendants' motion to dismiss should be denied in its entirety.

## II.   SUBSTANTIVE ALLEGATIONS

### A. Unbeknownst To Investors, InMode Routinely Discounted Its Devices, Jeopardizing Its Future Revenues

During the Class Period, InMode's executives repeatedly told investors that InMode's competitive edge stemmed at least partly from its ability to sell its devices (*i.e.*, platforms or systems) at full prices. ¶37.[1] Defendant Malca insisted that "[w]e sell the devices ***for full price*** . . . ." *Id*. Mizrahy also boasted that "[b]ut again, I would like to say it again, we are not razor and razorblade company. ***We do not sell the system for less*** . . . ."[2] *Id*. In truth, however, throughout the Class Period, InMode heavily

[1] All ¶__ references are to the Complaint. "Mot." references are to the Defendants' Motion to Dismiss, filed on April 11, 2025 (ECF No. 77). All emphasis is added unless otherwise noted.
[2] During the Class Period, InMode had at most 8-10 systems or platforms.

discounted almost every device, with discounts routinely granted up to 40% off of the "list price." ¶38. Internal InMode documents reflect the amount of commission a sales representative could expect to receive at each tier of pricing at which they sold a device. Significantly, the first tier begins tens of thousands of dollars *below* the "list price." ¶¶39-40.

Several InMode sales representatives described how the discounts worked. Sales employees would create "fake urgency" by telling customers (*e.g.*, doctors) there was a floor model device available at a deep discount, but only if they agreed to buy the product that day. ¶42. Another common sales directive was to falsely tell doctors that a sale fell through so a discount was being offered on the device if they rapidly closed the sale. *Id*. The discounted price was often predetermined between InMode and its lenders. *Id*. InMode sales representatives would frequently find out how much a customer would be approved to finance, and then offer a discounted model at that price. *Id*. CW1 and CW3 explained that using discounts to create a fake urgency in a potential buyer was a core sales strategy at InMode. ¶¶43-44. CW1 recalled that the list price for Morpheus8 was about $150,000 but the average purchase price for the device was roughly $100,000. ¶43. Similarly, CW3 recalled selling Envision devices at steep discounts. ¶44. The target price for the platform was between $179,000 to $200,000 but on average the device would sell for $135,000 to $145,000, and as low as $105,000. *Id*. CW2 also negotiated prices for equipment with customers and said that most devices were sold below the target price.[3] ¶45. CW2 noted that InMode prepared "pricing sheets" for each machine that showed a tiered commission rate structure, documenting InMode's companywide pricing strategy and its expectation that the devices would be sold at a discount. *Id*.

Similarly, CW4 stated they were instructed to tell customers a limited number of units were available at a discount in order to secure a sale. ¶56. In reality, however, there was no limit to discounted

---

[3] The "floor price" was the lowest price InMode sales representatives could offer without the authorization of higher ups, and the floor price was only slightly more than what it cost InMode to produce the device.

units and such discounted prices were always offered. *Id*. According to CW4, all units were generally discounted by 35 to 50 percent (sometimes more) off the list price. *Id*. For example, the Optima platform was priced at $300,000 but was discounted to around $200,000. *Id*. CW7 likewise recounted that the InMode devices had "list prices" but explained that s/he could drop the price significantly. ¶49. For example, CW7 could tell customers InMode had a floor model from a show that had only been used a few times and can be discounted by 40 percent, when in reality the equipment was brand new. *Id*. CW9 also recounted that the equipment systems at InMode, such as Morpheus and Evoke, had list prices between $150,000 to $200,000, but they never sold at that price. ¶50. According to CW9, approximately one percent actually sold at the list price, with many selling for at least $50,000 less. *Id*.

Consistent with the corroborating accounts of the CWs, medical professionals confirmed to investigators that they were offered steep discounts for InMode's products. ¶52.

As explained *infra* at 16-21, the Individual Defendants were well aware of these discounts.

**B. Unbeknownst To Investors, InMode Improperly Marketed Its Products For Off-Label Uses**

Moreover, during the Class Period, Defendants promoted several of InMode's key devices for medical uses beyond those approved by the FDA, while repeatedly misrepresenting to investors that they had obtained such clearance. ¶66. Medical devices, such as those sold by InMode, require approval by the FDA to be sold in the United States. ¶67. The FDA gives devices a specific "indication for use" ("IFU"), which outlines their approved uses. *Id*. InMode is limited by FDA regulations to market and promote its products only for the indications the FDA has approved. *Id*. Defendants were acutely familiar with these critical requirements and restrictions, as recognized in their SEC filings. ¶68. Mizrahy openly acknowledged in calls with analysts that InMode cannot market its products without approval for the specific medical indications requested. ¶69.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

InMode received approval to sell some of its devices through the FDA's 510(k) process, which permits companies to quickly bring to market devices showing a substantial equivalence to a previously approved medical device. ¶70. A 510(k) application requires an IFU for the device, which specifically describes the approved uses for the device. *Id*. During the Class Period, however, Defendants marketed Evolve, Evoke, Morpheus 8 and Morpheus 8V for treatments far beyond those approved by the FDA, and told investors they received such approvals. ¶71.[4]

## III. ARGUMENT

### A. The Complaint Pleads Section 10(b) And Rule 10(b)(5) Claims

#### 1. The Complaint Pleads Actionable Misstatements Or Omissions

##### a. Defendants Falsely Represented That InMode Does Not Discount Its Devices

A defendant "assumes the duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak." *Thompson v. Paul*, 547 F.3d 1055, 1062 (9th Cir. 2008) (citation omitted). Throughout the Class Period, Defendants claimed that what set InMode apart from its competitors was its ability to command a ***full price for their systems (platforms)***, in stark contrast with its competitors who supposedly employed a razor-razorblade model.[5] The razor-blade model meant that InMode's competitors sold their systems at discounts, generating the majority of their profits from the much cheaper applicators. Defendants' representations were important to investors because they signaled InMode's ability to capture significant revenues from the sale of the systems, whose list prices were usually north of $200,000.

---

[4] The Complaint is not a puzzle-pleading. It painstakingly alleges each misleading statement and/or omission, furnishes the date and the speaker for each such misstatement or omission, and clearly sets forth the reasons for each misrepresentation. ¶¶129-69. Nothing more is required at this stage. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*5 (N.D. Cal. Aug. 7, 2020) (rejecting puzzle pleading argument).

[5] A razor-razorblade model "is a pricing tactic in which a dependent good is sold at a loss (or at cost) and a paired consumable good generates the profits."*Razor-Razorblade Model*, Investopedia (Dec. 18, 2022), https://www.investopedia.com/terms/r/razor-razorblademodel.asp.

For example, during a June 4, 2021 Jefferies Healthcare Conference, Malca told investors that InMode was "not a razor and razorblade company. When we do have consumables on many of our products, *__we don't discount our platforms__* just to jack up the price of the consumables. *__We set our platform for full price__* and sell our consumable for very reasonable pricing." ¶147. Likewise, during a February 10, 2022 conference call with analysts, Defendant Mizrahy emphasized that "*__We do not sell the system for less__* or would [sic] do not give the system for free, just to charge high price for disposable. . . . *__And therefore, we charge for the system__*, and we price the disposable in a reasonable price in order to encourage doctor [sic] to use more and more, and to have more treatment." ¶155. Similarly, while presenting at Barclays Global Healthcare Conference on March 15, 2023, Malca again underscored that physicians "don't like the razor-razorblade model. They tend to forget pretty quickly what they paid for the original device. So, even if you discounted or heavily discounted, as many of the companies do . . . *__And what we do differently is we charge them the full price on the device__* and charge a very reasonable price on the consumable." ¶162. These misrepresentations were repeated by Malca at a UBS MedTech, Tools and Genomics Summit, held on August 15, 2023. ¶168. There, Malca again insisted that "they [physicians] *__tend to forget that for our product platforms, they paid full price, and the competitor, maybe they get a discount because they have the razor blade model__*." ¶168.

But contrary to those representations, InMode was, in fact, routinely discounting its systems, thus jeopardizing its future revenues. Several sources corroborated this practice. *First*, InMode's own compensation plan showed that commissions were doled out with the expectation that the devices would sell tens of thousands of dollars *below* the list price. ¶39 (reflecting commission chart). *Second*, as explained *supra* at 3-4, numerous confidential witnesses who were former InMode employees during the relevant time recounted that InMode heavily discounted its products anywhere up to 40% off (and

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

6

sometimes more) the list price. ¶38.[6] Defendants' statements are actionable because they directly contradicted the reality that InMode *did* discount its systems. *See, e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) (plaintiffs "adequately alleged falsity" because defendants misled investors when they chose to "tout their products' capabilities" but did not disclose "adverse information that cuts against the positive information" (citation omitted)); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131–34 (N.D. Cal. 2020) (statements actionable where Defendants were "secretly designing and implementing . . . aggressive . . . discounts"); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 264 (3d Cir. 2009) ("CW statements identifying deep and unusual discounting, although anecdotal, represent the range of Avaya's U.S. businesses" and "directly conflict with . . . repeated assurances" that the price was "fairly steady").

Indeed, Defendants' representations prevented investors from making a reasonable assessment of the risks associated with investing in InMode, particularly with respect to the Company's ability to maintain robust revenues and profit margins. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (misleadingly incomplete statements would cause a reasonable investor to make an overly optimistic assessment of the risks related to noncompliance); *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 873 (S.D. Cal. 2024) ("by omitting the fact . . . Defendants misrepresented the strength of the studies' data and prompted investors to overlook the fact" that the study wouldn't support a new indication, thus "such allegations support the inference that investors relied on Defendants' omissions regarding the relevance of the . . . Studies' shortcomings in making their investment decisions").[7]

---

[6] Defendants' attacks on the compensation chart as unreliable fall flat because the information in the chart is corroborated by other sources, including several CWs.

[7] Left with little to argue, Defendants advance a strawman: that "none of the challenged statements state or imply that the Company never discounted its devices." (Mot. at 28). But this detracts from the inescapable conclusion that Defendants lied when they told the market they do not discount their systems.

**b. Unbeknownst To Investors, Defendants Improperly Marketed InMode's Products For Unapproved Uses And Claimed FDA Clearance For Those Uses**

Moreover, Defendants promoted Evolve, Evoke, Morpheus8 and Morpheus8V for uses unapproved by the FDA and falsely claimed FDA-clearance. Those representations, too, are actionable. *See Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *18-19, *21 (N.D. Cal. Aug. 24, 2021) (statements describing purported on-label use and compliance with FDA regulation were misleading); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1032–34 (C.D. Cal. 2008) (statements about products being used for "'their approved indications' and in a manner 'consistent with the FDA label' when in reality, [the company] was pushing their off-label uses" were actionable).

**Evolve and Evoke**: InMode secured 501(k) approval to market Evolve [body treatment] for relaxation of muscle spasms, increased blood circulation, and pain treatment as either an electrical muscle stimulator ("EMS") or a transcutaneous electrical nerve stimulator ("TENS") device. ¶72. During the Class Period, however, Defendants repeatedly marketed Evolve (in videos posted on YouTube, brochures posted on the Company's website, and through other widely publicly distributed means) beyond the FDA clearance, including for melting fat. ¶¶72-73, 76.

These and similar representations were repeated by the Individual Defendants during earnings calls with market analysts. ¶77. For example, during an earnings call to discuss the Company's results for the fourth quarter of 2019, Mizrahy characterized Evolve *as "FDA-cleared" and boasted about its supposed advantages over competitors*, with "three modalities" that offered "single-function platforms" for *fat treatment and skin tightening*. ¶¶77, 133. Likewise, during an earnings call to discuss InMode's results for the first quarter of 2020, Lakhani touted Evolve as "the only hands-free device for the treatment of skin, subdermal *fat* and *muscle toning*," while Mizrahy underscored that "it is the only device that addresses skin, it addresses *fat*, and then *it tones the muscle*, all-in-one device." ¶¶77, 137-38. *See similarly* ¶140 (at an August 5, 2020 conference call with analysts, Lakhani touting

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

Evolve as "able to *trim [fat]*, tighten and *tone* all on one modality"). Defendants amplified these points repeatedly in public filings with the SEC, falsely representing that "we have obtained 510(k) clearance for the current treatments for which we offer our products." ¶¶130-31.

Confidential witnesses also recalled Evolve being marketed for those improper indications during the relevant time, with CW1 explaining that s/he was trained to market Evolve to "tighten skin, *melt the fat*, as well as *tone muscles*," and CW4 recalling that Evolve was marketed as the *only device on the market that destroys fat, tightens skin, and builds muscle all in one*. ¶78.

Moreover, InMode's marketing for Evolve *directly contradicted the language in the IFU* of its 510(k) application, which states that "the RF treatment mode and EMS/TENS mode should not be used in combination or sequentially." ¶74. Yet, InMode claimed Evolve's combination of RF heat and EMS contributed to a more effective treatment. ¶¶74-75.

As with Evolve, Defendants improperly marketed Evoke [face treatment] and made misleading statements to investors. InMode received 510(k) approval to market and sell its Evoke device "for the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm, and temporary improvement of local blood circulation." ¶79. But, during the Class Period, Defendants marketed Evoke (in videos posted on YouTube, brochures posted on the Company's website, and through other widely publicly distributed means) as a "*facial remodeling device cleared by the FDA*" that provides uniform and volumetric heating to the face in order *to create new skin cells and remodel fat*. *Id*. Far from showing patients cured of their pain, before and after photos instead showed patients with thinner necklines and smaller jowls. *Id*. Confidential witnesses also recalled promoting Evoke for such uses. For example, CW2 recalled Evoke being marketed for tightening skin and melting fat, and stated that marketing included promoting the combined use of radio frequency with other electrical stimulator treatments (such as EMS and TENS) as a way to enhance treatments. ¶80.

Likewise, Defendants misleadingly promoted Evoke as FDA-cleared for non-approved uses during conference calls with analysts. For example, during an earnings call with analysts reporting the Company's results for the fourth quarter of 2019, Mizrahy spoke about Evolve and Evoke, which he "expected to be [part of] the main growth engine for InMode" and "position InMode as [sic] the front and as [the] leading innovative *aesthetic* company." ¶133. Mizrahy stressed that "InMode has developed *two FDA-cleared unique hands-free platforms . . . Evoke for face . . .*" with Evoke being "the first hands-free device for the face and submental area" that uses "radiofrequency technology for delivering RF energy and electromagnetic pulses," noting that "*Evoke, which is for the face, we don't have any competition because there is not even one platform similar to that in the market today.*" *Id.* But rather than being approved as an "aesthetic" device, Evoke was approved for the temporary relief of pain and temporary improvement of blood circulation.

Similarly, while presenting the Company's results for the first quarter of 2020, Lakhani stated that "Evoke is the first Hands-Free device for *treating skin laxity on both the face and the submental area.*" ¶¶81, 137. Mizrahy repeated that point, telling investors that Evoke "is the only device as I mentioned earlier that's able to do *facial reshaping* but from a hands-free standpoint." ¶81. Defendants doubled down on those claims during the Company's second quarter 2020 call with investors, with Lakhani emphasizing that Evoke is "*one of a kind*, there's *nothing really else out there for it*, and there are some people that *want to handle that lower 1/3 of the face.*" ¶82. Theodorou jumped in, remarking that Evoke "is *not just a face tightening device*" as "*you can actually remodel the fat and position it the way you want*," which he claimed was a "*big, big deal differentiator" from competition*. ¶¶82, 141. Defendants reinforced those lies in public filings with the SEC, insisting that "*we have obtained 510(k) clearance for the current treatments for which we offer our products.*" ¶¶130-31.

**Morpheus8 and Morpheus8V**: InMode also marketed Morpheus8 outside the bounds of its FDA approval, which was limited to electrocoagulation (removal of skin blemishes) and hemostasis (preventing and stopping bleeding). ¶83. Yet Morpheus8 was also marketed for the reduction of fat and cellulite, and Defendants falsely claimed in public filings with the SEC that the Company had obtained FDA clearance for all the treatments for which its products were offered. ¶¶83-84. A Morpheus8 brochure disseminated publicly also claimed that the device's "triple action of fat coagulation, *connective tissue contraction*, and sub-necrotic bulk heating provides practices with maximum results - minimal downtime procedures." ¶85. But in a press release issued years later, on July 17, 2024, InMode announced that Morpheus8 just received 510(k) clearance for "contraction of soft tissue," which includes connective tissue. ¶86. InMode's own press release is a vital concession that lays bare the falsity of Defendants' representations.

During the Class Period, InMode misleadingly promoted another device, Morpheus8V, for "intravaginal remodeling," "vaginal lubrication," and for urinary incontinence, despite lacking FDA approval. ¶¶87-91. The Morpheus8V is harmful because it uses dozens of microneedles to penetrate the tissue of the vaginal canal. *Id*. Notably, Morheus8V falls into the same category of devices (FractoraV) that InMode falsely promoted in 2018 for vaginal rejuvenation and urinary stress incontinence. *Id*. At that time, the FDA excoriated InMode for endangering women with its bogus claims. *Id*. While it agreed to remove statements using the terms "vaginal rejuvenation" and "urinary stress incontinence" from FractoraV marketing materials, InMode deceptively promoted Morpheus8V for similar uses just a few years later.

In earnings calls with analysts during the Class Period, Theodorou assured the market that "instead of running for the gates" after receiving the 2018 FDA letter, "Moshe [Mizrahy] and the whole team doubled down on their studies" to prove that their products (*i.e.*, Morpheus8V) benefitted

women's health. ¶92. During a presentation at the Canaccord Genuity MedTech Forum on November 18, 2021, Mizrahy was specifically probed about InMode's return to the women's health market. ¶151. In response, Mizrahy assured analysts that "[w]e're riding on the learning curve. . . . We don't want to [make] the same mistakes as happened [in 2018] because we don't want the FDA to jump on us. **_All the applicators and all the modalities are FDA approved already_** . . ." *Id*. Theodorou doubled down when he discussed the supposed benefits of Empower (to which the Morpheus8V applicator attached), telling analysts during an October 27, 2022, InMode earnings call that "when we enter these practices, for example, gynecologists," we are going **_"with a solution that's within their scope of practice, such as stress urinary incontinence and mixed urinary incontinence and so forth is very, very important_** . . . ." ¶159. Mizrahy amplified those statements, stressing that "[t]he only platforms today that enable us to get into the [medical] wellness and improve quality of life is [sic] the Empower, because the Empower is not pure aesthetic. It's some aesthetic, of course, an aesthetic gynecology, **_but also treatment which are like treating SUI [stress urinary incontinence], vaginal contraction_** . . . ." ¶160.[8] Likewise, in public filings with the SEC, Defendants falsely insisted that "we have obtained 510(k) clearance for the current treatments for which we offer our products." ¶92.

Faced with these damning allegations, Defendants contend that InMode received FDA approval (Mot. at 29-30) for the uses they were touting. That contention lacks evidentiary support and directly contradicts the Complaint's allegations, which make plain that the Defendants touted Evolve and Evoke for uses that were, in reality, **_not approved_**, such as muscle tone improvement, trimming of fat, facial reshaping, remodeling and repositioning fat, removing fat, and treating skin laxity on the face. ¶¶133, 137-38, 140-41. And while the FDA approved one of Evolve's handpieces for the "**_temporary reduction in_** the **_appearance_** of cellulite," it did **_not_** grant approval for fat trimming or muscle toning

---

[8] Confidential witnesses also recalled marketing the Morpheus8V as FDA-cleared for stress urinary incontinence during the Class Period. ¶93 (CW1, 4).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

12

(uses that Defendants were touting). Defendants' Exhibit 10 reflects an approval granted *a few weeks before* the end of the Class Period, so it is entirely irrelevant. Equally bogus is Defendants' contention that "the challenged statements say nothing about U.S. markets or having FDA approval for those uses" (Mot. at 30). *See supra* at 8-12 (discussing FDA-approval and calls with *U.S. analysts*).

Defendants also seek exculpation by essentially arguing that investors would have figured out each FDA-approved use. ***But a reasonable investor would have no reason to doubt Defendants' own (false) reassurances that the products were FDA approved for the (improper) uses Defendants were touting***. Indeed, during analyst calls Defendants were boasting that no competitor had devices that could do what the "unique" FDA-approved Evolve and Evoke could do. *See*, *e.g.*, ¶¶ 137-38.[9]

Next, Defendants attempt to confuse the Court by claiming that the "Complaint conflates the EmpowerRF platform with the Morpheus8V attachment to try to invent a misstatement" and that the "FDA expressly approved EmpowerRF's application attachment vTone for '…mixed urinary incontinence in women.'" (Mot. at 31). But the FDA did ***not*** approve it for use with the ***EmpowerRF platform***: it approved vTone for use with *another* platform: the InMode Systems platform (Defs' Ex. 16). Even for vTone, the FDA did ***not*** grant approval for "vaginal contraction," "intravaginal remodeling," and "vaginal lubrication"—uses that Defendants were touting. *See* ¶¶91, 160.[10]

Defendants' remaining arguments can be easily dispatched. Mizrahy's representation that "[w]e

[9] In essence, Defendants assert a truth-on-the-market defense that is not only inapplicable in light of Defendants' false reassurances, but also improper at the pleading stage. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008) (rejecting truth-on-the-market defense at pleading stage, finding "it is perfectly reasonable to infer that this complexity [of prospectuses], coupled with Countrywide's alleged public misrepresentations, would blunt the effect of any disclosures in MBS' prospectuses"); *see similarly Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010); *In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, at *4 (E.D. Pa. Sept. 21, 2000). Moreover, "[t]he materiality of a statement is a mixed question of fact and law that requires delicate assessments . . . [that] are peculiarly ones for the trier of fact." *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *22 (C.D. Cal. July 1, 2008) (citation and internal quotation marks omitted).

[10] The Complaint alleges with particularity that InMode marketed Morpheus8V *in the United States* for unapproved uses. *See*, *e.g.*, ¶91 n.16 (identical marketing videos prepared by InMode and posted by U.S. based customers to Facebook); ¶93 (CWs U.S. sales representatives trained to market the product as FDA-approved for stress urinary incontinence); ¶94 (Theodorou, a U.S. plastic surgeon encouraging sales representatives to sell Morpheus8V for stress urinary incontinence while acknowledging lack of FDA-approval, a point entirely irrelevant to non-U.S. markets).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

are working closely with leading plastic surgeons that have been endorse[ph] our safe FDA approved technology" was false and misleading for a number of independent reasons, each sufficient to render the statements false. For example, InMode's technology was not "safe" because Evolve, Evoke, Morheus8 and Morpheus8V were marketed in an unsafe manner beyond the scope of the FDA-approved indications. Claiming that the devices were "safe" and "FDA-approved" goes beyond puffery. *See Intuitive Surgical*, 65 F. Supp. 3d at 833-34; *see also Amgen*, 544 F. Supp. 2d at 1032–34 (securities laws violations sufficiently pled based on improper marketing of drugs for off-label uses).[11] The Complaint goes beyond "anecdotes," alleging that the devices were *marketed broadly to U.S. customers* (via, for example, brochures and calls with U.S. market analysts) for unapproved uses.[12]

Moreover, while boasting that its supposedly "safe" technology was endorsed by "leading plastic surgeons," Defendants failed to disclose the whole truth: that these purported gurus were hopelessly conflicted because InMode paid them to secure their "endorsements." ¶¶108-28, 166-67. Defendants' ***failure to disclose these surgeons were given cuts from sales*** to promote the products—including for off-label uses—renders their statements misleading. ¶¶109-13. *See*, *e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) (if defendant "tout[s] the apparently positive 25 percent interim results," he has "the obligation also to disclose that they were likely unreliable"); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *10-12 (C.D. Cal. Oct. 1, 2013) (statements about the "scientific basis" for a drug were misleading in light of the enlistment of doctors who were paid "substantial consulting fees" to conduct tests to support the "aggressive marketing

[11] *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 642 (9th Cir. 2024) is inapt because it addressed statements that merely conveyed a "developer's initial enthusiasm" of "initially promising discoveries."

[12] Defendants made several misrepresentations replicated at ¶¶149 and 153. Defendants' statements were literally false because InMode was not, in fact, conducting "all kind [sic] of checking for every indication [they were] claiming. For example, Defendants were marketing Morpheus8V for improper uses, without adequate checking or support for those uses, and without the permission of the FDA. ¶150. Defendants claim that certain statements were literally true (Mot. at 32), but even "statements literally true on their face may nonetheless be misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Here, defendants failed to disclose, for example, that the studies were biased because they were authored by paid ***Luminaries***, and these allegations are sufficiently detailed. *See*, *e.g.*, ¶¶108-113.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

strategy" of the company).[13]

## 2. The Scienter Allegations Are Compelling

A plaintiff sufficiently pleads a defendant's scienter if "assess[ing] all the allegations holistically," the plaintiff has created an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 326 (2007). "The inference ... need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citations omitted). Rather, a "tie goes to the Plaintiff." *In re Amgen Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) (citation omitted). "The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Plaintiffs easily meet the standard.

### a. The Complaint Pleads Conscious Misbehavior or Recklessness

The Individual Defendants' scienter is incontrovertible. The "most direct way" to allege scienter is to plead facts showing knowledge of contradictory "[c]ontemporaneous" information. *See Nursing*

---

[13] Defendants falsely claim that certain statements are forward looking and accompanied by "meaningful" cautionary language (Mot. at 26-27). First, the statements are not forward-looking, as evidenced by the use of present tense. *See*, *e.g.*, ¶135 (devices "*are* well-positioned to attract"); ¶145 (describing the body and facial solutions as [being] "effective"; ¶153 (we "are encouraged"); ¶157 ("is meaningful"); ¶164 ("we have," "we keep"). And ***none*** of the alleged forward-looking statements were accompanied by ***meaningful*** cautionary language. Here, the risks factors were hopelessly generic, discussing ***hypotheticals*** that unspecified misuses or off-label uses that the Company ***did not acknowledge were occurring*** generally "may harm our reputation." None warned that the company ***was promoting the use of Evoke, Evolve, and Morpheus for off-label uses that were not approved by the FDA***. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780-81 (9th Cir. 2023) (cautionary language not meaningful if it is a "boilerplate listing of generic risks and does not mention the specific risk to which [the company] has been alerted" and "it discusses as a mere possibility a *risk that has already materialized*"); *In re Facebook, Inc.*, 87 F.4th 934, 951 (9th Cir. 2023) (same); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (warning of uDraw's potential failure to "achieve … sales expectations" not meaningful where Defendants were allegedly aware "that the uDraw would likely fail"). Neither are those statements puffery because they are objectively verifiable and objectively false, *i.e.*, InMode's body and facial solutions were not "effective," they were hardly "breakthrough devices," and InMode was not "keep[ing] things safe." *See*, *e.g.*, *Intuitive Surgical*, 65 F. Supp. 3d at 833-34 (sustaining statements about the efficacy of a medical device); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 335 (D. Mass. 2002) (statement that a product was a "highly effective platform" was actionable).

*Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Here, the Complaint pleads several allegations that, when considered holistically, compellingly reflect the Individual Defendants' knowledge of (i) discounts given on InMode's systems; and (ii) improper marketing of InMode's products for off-label uses.

### (i)    The Individual Defendants Knew That The Systems Were Offered At Steep Discounts and Even Directed That Practice

Confidential witnesses explained that ***Mizrahy, Malca, and Lakhani*** <u>***had access to and monitored the sales of InMode's systems through the use of Salesforce***</u>. <u>***All sales, which included the list price and the discounts provided were documented in Salesforce***</u>.[14] CW1, CW3, CW4, CW8, and CW11 each confirmed that InMode used Salesforce during the Class Period. *Id*. CW4 explained that *all discounts were documented* in the Salesforce.com entry *for each specific sale*. *Id*. The sale price (list price) for every deal was recorded in Salesforce.com, and the discount given on every deal was recorded in for every deal in Salesforce.com. *Id*.

CW4 participated in regular meetings with InMode's Vice President of Sales for the Western U.S. region, Brandon Nye, who instructed the sales team to offer steep discounts on the systems. ¶56. CW4 explained that Nye reported directly to Mizrahy, Malca, and Lakhani. *Id*. CW4 noted that the Companywide instructions to offer deep discounts, such as those that came from Nye, were common practice at InMode. *Id*. Salespeople were frequently taught by Nye and other sales leaders to use the enticement of discounts to motivate customers to close deals. *Id*. CW4 observed that Nye often approved discounts that cut the list price on machines by more than 30 percent, an amount he said would not go unnoticed by Mizrahy, Malca, and Lakhani. *Id*. According to CW4, Nye met weekly with Malca and Lakhani, and once a month with Mizrahy, to update them on sales. ¶57. CW4 was aware of

---

[14] Salesforce is a cloud-based customer relationship management (CRM) platform that helps businesses manage customer data, sales, and marketing. ¶55.

the meetings Nye had with his superiors because during meetings with his sales team, Nye spoke about his meetings with the Company leadership and provided leadership's feedback to his team, which included CW4. *Id*. CW4 recalled Nye telling the sales team during meetings that his superiors—*Mizrahy, Malca, and Lakhani—were looking at the team's sales numbers in Salesforce.com and paying attention to the team's performance*. *Id.* CW4 noted that Mizrahy, Malca, and Lakhani also used Salesforce.com to keep tabs on Nye's performance. *Id*.

Corroborating the accounts of CW4, CW8, who worked alongside and reported to Mizrahy, also noted that everything was transparent to Mizrahy. ¶58. CW8 said that *through Salesforce.com, Mizrahy could see the scope of sales and the full pipeline*. *Id*. CW3 likewise explained that all discounts on the equipment were recorded in Salesforce.com. ¶59. Discounts above 15% required the approval of the Vice Presidents of Sales, Dan Wilson and Brandon Nye, who reported to the C-suite. *Id*. Like CW4, CW3 also noted that selling the systems at discounts was common practice at InMode. *Id*. CW1 also confirmed that Salesforce reflected the actual prices and the discounted prices for InMode's systems, as the sales details were recorded in that system. *Id*. Similarly, CW11 explained that *Mizrahy and Malca had access to Saleforce.com and were monitoring the deals submitted to the Salesforce.com database*. ¶64. The leadership, including *Mizrahy, Malca, and Lakhani made notes in the system about particular deals* as a way to communicate with salespeople working on the deals. *Id*. Malca regularly made notes in deal entries, such as asking about the progress of a deal or making suggestions for closing deals. *Id*. CW11 specifically recalled seeing notes from Mizrahy in CW11's own deals in Salesforce.com. *Id*.[15] These allegations strongly support scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145-46 (9th Cir. 2017) (executives' access to Salesforce supported scienter); *E. Ohman J:Or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) ("Huang's

---

[15] Defendants' contention that the Complaint only "speculates" that that the Individual Defendants "must have known" about discounts (Mot. at 19-20) is directly contradicted by these allegations.

access and review of contemporaneous reports are the most direct way to prove scienter."); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) ("executives' ability to access Salesforce . . . which contained 'all' customer data" supported scienter); *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 680 (E.D. Mich. 2023) (scienter alleged based on allegations about "top people" having access to "the entire pipeline using Salesforce," metrics being "available to all Director-level managers and above, including the Defendants," "what the software reflected [including Salesforce]," and "what would have been obvious to a reasonable person upon examining the software" (citation omitted)).[16]

*Mizrahy himself was the architect of a program designed to offer steep discounts to secure sales and personally facilitated such sales*. ¶61. More specifically, CW11 recalled attending InMode's annual sales conference in the Bahamas in January 2019, where discounts on InMode's systems were discussed. ¶60. CW11 stated that Mizrahy, Malca, Lakhani, and Theodorou were also in attendance, and explained that Mizrahy specifically asked CW11 to sell the BodyTite system at a 26% discount (from its list price of $195,000 to $145,000) to close the deal. CW11 recalled Mizrahy telling him/her: "You're trying to be Neiman Marcus. Just be Walmart. Get Walmart money. Wouldn't you'd rather get Walmart money 10 times versus Neiman Marcus money once?" *Id*. At this conference, CW11 recounted a presentation slide describing a program designed to offer heavy discounts on InMode's systems. ¶61. The slide noted that the program was personally designed by Mizrahy. *Id*.

*Malca, Theodorou, and Lakhani also attended "demo" events where systems were offered to doctors at heavily discounted prices*. CW11 recalled that InMode often hosted sales events disguised as "training" or demos for doctors. ¶62. Malca and Theodorou often attended those sales pitches, along

---

[16] Defendants' cases are inapposite because, unlike here, defendants there were not alleged to have accessed the disputed information, the complaints contained merely allegations of general awareness of the day-to-day workings of the companies, or merely alleged generally and without CW support that defendants had access to data that supposedly informed them of the undisclosed information. *See City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002).

with Lakhani. *Id*. During those events, InMode's leadership was highly involved in the negotiations with the doctors and routinely undermined the sales representatives by pushing significant discounts. *Id*. CW11 recounted one event in May or June of 2019, where s/he was working with a potential customer interested in buying a BodyTite machine, priced around $180,000 to $190,000. *Id*. **Malca intervened in the purchase process** and agreed to sell the doctor the equipment for just $99,000, a discount of at least 45%. *Id.* The Individual Defendants' attendance at events where discounts were discussed, as well as Mizrahy and Malca's personal involvement in securing sales at discounts, strengthen scienter. *See NVIDIA*, 81 F.4th at 939-40 (allegations of defendant's "micromanaging and attention to detail" indicative of scienter).

InMode's commission structure, which specifically contemplated heavy discounts for the systems, contributes to a strong inference of scienter. The plan reflects five tiers of pricing, with the first tier alone beginning tens of thousands of dollars *below* the list price, and discounts increasing in significant amounts from Tier 1 to Tier 5. ¶¶39-40. CW11 explained that selling at Tier 4 required the Vice President of Sale's approval, while **Tier 5 required Malca and/or Lakhani's approval**. ¶63. As an investigation conducted by reporters with The Capitol Forum ("TCF") unveiled, and as CW1 and CW2 observed during their employment at InMode within the Class Period, the structure of the discounts remained in effect after 2019, and CW1, CW2, and CW11 each explained that it was applied *nationwide* because it was a companywide commission plan. ¶¶40-41, 45, 63.

Ignoring many of the Complaint's allegations, Defendants demand that the Court discount the accounts supplied by CWs 1, 2, 3, 4-7, and 9 because they are "multiple levels removed" from the Individual Defendants. (Mot. at 18). But confidential witnesses need not be within any specific proximity or degree of reporting to the Individual Defendants for their statements to support an inference of scienter. *See Quality Sys*, 865 F.3d at 1139, 1145 (finding statements of "five lower-level

[] employees" supported a strong inference of scienter); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020) (crediting allegations from low-level employees); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (rejecting defendants' argument that the confidential witness allegations should not be credited because they lacked direct contact with the defendants); *see similarly Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012).[17]

Moreover, *all* CWs (with the exception of CW9 and CW11) worked at InMode at least at some point during the Class Period, and CW9 and CW11 left InMode not far before the Class Period begins (CW9 left one month before, ¶32; CW11 left six months before, ¶34,), so their accounts ought to be considered. *See*, *e.g.*, *NVIDIA*, 81 F.4th at 937-39 (crediting CW who worked only 7 months of the 18-month class period and another CW who "quit working at [the Company] at the beginning of the Class Period."); *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *15 (S.D. Cal. Mar. 1, 2024) (crediting allegations by CW who worked at the company for two months); *Weston*, 669 F. Supp. at 882 n.7 (crediting CW who remained employed "for at least some part of the month after the class period began"); *Quality Sys.*, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, [she] had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales.").[18]

Next, Defendants assail CW4 because s/he did not personally attend meetings with the

[17] *See also Emps' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (same). *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536-40 (9th Cir. 2024) bears no resemblance to this case. The accounts of the two CWs "simply amount[ed] to criticisms of J2's management practices and compensation structure" and were therefore opinions; the CWs merely described "general awareness of the day-to-day workings of the company's business," not knowledge of "us[ing] consolidated accounting to cover" underperforming acquisitions, and a "strong inference of scienter [was] particularly implausible because even analysts within J2 had difficulty assessing how well individual acquisitions were performing." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *12 (N.D. Cal. Mar. 29, 2013) is distinguishable because the CW could not identify specific individuals, merely "senior executives" and the CW's statements were not inconsistent with any of the alleged misstatements.
[18] *See also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1125 n.8 (N.D. Cal. 2017) ("[T]he timeframe of [CW's] employment has little bearing on whether he can provide relevant testimony about the [company's business practices] as a general matter."); *In re: Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *10 n.5 (S.D. Cal. Sept. 27, 2016).

Individual Defendants but, once again, such proximity is not required. CW4's account is reliable not least because s/he participated in regular meetings with Nye, who conveyed to CW4 that he often approved heavy discounts that would not go unnoticed by Mizrahy, Malca, and Lakhani. ¶56. CW4's account is not unreliable simply because it includes hearsay, and courts routinely hold that allegations relaying information gleaned from others *can* support an inference of scienter. *NVIDIA*, 81 F.4th at 940 (crediting allegation from CW who reported to a vice president who, in turn, reported to the individual defendant); *see similarly LifeLock*, 780 F. App'x at 484-85 n.5; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). CW4's account of **widespread discounting** is corroborated by CW2 (¶45 (describing tiered commission discounts "companywide")); CW3 (¶59 (noting discounts were "common practice")), and CW11 (¶¶60-61 (discounts discussed at annual sales conference); ¶63 (describing commission plan with discounts for the systems)). The CWs' corroboration reinforces the reliability of their accounts, which is cemented by in InMode's own *companywide compensation commission structure*. ¶¶39-41. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) (crediting witnesses who "corroborate each other . . . which further supports the reliability of their statements"); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (same).

Lastly, during the Class Period, Defendants Mizrahy and Malca repeatedly spoke directly and specifically about the topic at issue, *i.e.*, that, unlike its competitors that utilized a razor-blade model, InMode did not discount its systems. They "'bridged the scienter gap' [themselves] by referencing the data directly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (citation omitted).

In sum, when viewed holistically, these allegations compellingly plead Defendants' scienter and defeat Defendants' manufactured "more plausible inference" that the CWs simply were "ineffective salespeople" unable to sell at high prices (Mot. at 21).

### (ii)    The Individual Defendants Knew Of And Even Encouraged The Off-Label Marketing

*Several confidential witnesses confirmed that the Individual Defendants had knowledge that Evolve, Evoke, Morpheus8 and Morpheus8V were improperly marketed for off-label use*. For example, CW8, who worked closely with Mizrahy, explained that InMode marketed its products for off-label uses, including through pamphlets, videos, social media, emails, salespeople, and through product literature. ¶99. CW8 recalled that Evolve was marketed for indications not approved by the FDA, such as for body firming and fat dissolving. *Id*. Similarly, Evoke was marketed for indications beyond those approved by the FDA, for facial sculpting (firming) and collagen stimulation. *Id*. CW8 said Mizrahy knew that these products were improperly marketed for off-label purposes. *Id*. Likewise, CW10, who worked closely with and reported directly to Defendant Mizrahy, recounted that the ***FDA audited InMode in late 2021 and that, in advance of that audit, InMode "made all the brochures disappear" that featured non-approved uses, such as those for the Morpheus device***. ¶104. CW10 also recalled that s/he personally ***had to delete information from the Company's website regarding references to unapproved uses***, including references to scientific articles. *Id*.[19] (According to CW4, the marketing language for InMode's devices, including language in pamphlets and brochures, came directly from Defendants Mizrahy and Theodorou. ¶107.) Defendants' contention that "every indication" is that CW10 must have been speaking about non-U.S. marketing material (Mot. at 24) is farcical. CW10 specifically mentions an ***FDA audit*** that precipitated the destruction of the misleading marketing material and Defendants admit that only U.S. marketing is subject to FDA regulations. (Mot.

[19] As explained herein, the Individual Defendants continued to push the promotion of the devices for unapproved indications throughout the Class Period, including through pitches made by Theodorou himself. *Id*. In response, Defendants make much to do about nothing: that a sales conference where Theodorou allegedly marketed Evoke for off-label uses took place in Mexico (not U.S.) (Mot. at 23). But, as CW9 described, the sales conference was "national" and involved U.S. sales representative (including CW9), so it is more than plausible (it is actually crystal clear) that Theodorou's speech related to *U.S.* sales. In fact, Theodorou made similar representations during an August 5, 2020, InMode conference call with U.S. analysts. ¶¶140-41. To the extent there are any ambiguities, at the pleading stage they must be resolved in Plaintiffs' favor. *See Khoja.*, 899 F.3d at 1014.

at 3). Moreover, other CWs corroborate the Individual Defendants' knowledge of the off-label marketing. *See*, *e.g.*, CW9 (¶101), CW7 (¶102), CW6 (¶105).[20]

Additional allegations contribute to a compelling inference of scienter. The Complaint pleads that ***InMode paid doctors to promote its products for off-label uses***. ¶¶108-12. An audio recording exposes the Individual Defendants' knowledge as well. ***In a recording of an InMode sales meeting held on February 2023, whose participants included Mizrahy, Theodorou is heard encouraging InMode's sales representatives to sell the Morpheus8V for stress urinary incontinence to OBGYNs.*** ¶¶94-96. At that meeting, ***Theodorou expressly acknowledged that InMode lacked FDA approval to market the Morpheus8V for stress urinary incontinence***, "but we are in the process of getting one." ¶96. Theodorou admittedly made the push because the Morpheus8V was a "Trojan Horse" to break into the obstetrics industry and expand the Company's customer base, to meet Wall Street's expectations. ¶94. Theodorou also admitted that InMode was merely in the early process of funding studies seeking to prove the safety of the Morpheus8V for stress urinary incontinence. ¶96.[21]

Defendants bizarrely claim that Theodorou's acknowledgement that InMode lacked FDA approval to market the Morpheus8V for stress urinary incontinence "directly contradicts the Complaint's assertions that Theodorou" encouraged InMode's sales representatives to sell the product for stress urinary incontinence. (Mot. at 23). But that is consistent with the Complaint, which pleads that the Individual Defendants not only knew that InMode was marketing its products for off-label uses, but actually encouraged that practice. Defendants attack the credibility of TCF, the source that reproduced some of the audit recording from the February 2023 sales meeting. But the Court can rely

[20] Contrary to Defendants' contention (Mot. at 22), CW8's account is reliable and supported by the account of CW10, which cements Mizrahy's scienter. Both CW8 and CW10 worked closely with Mizrahy in Israel. As explained herein, their accounts are further corroborated by other allegations in the Complaint.

[21] The vast majority of studies funded by InMode are performed by doctors who are conflicted because they have a financial interest in the Company. ¶97. Moreover, a meta-analysis of InMode's studies found that the Company frequently manipulated results and failed to disclose that some patient results were actually attributable to other forms of plastic surgery. ¶98.

on TCF's investigation. *See*, *e.g.*, *In re China Educ. All., Inc. Sec. Litig.*, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011) (crediting even short seller reports); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 355 n.89 (S.D.N.Y. 2003) (newspapers, magazines, Internet sources, and books, "can plainly form a basis for Plaintiffs' beliefs" to satisfy the PSLRA pleading standard); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) ("News articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations. Therefore, the Court does not discount the allegations based upon these two articles merely because they cite anonymous sources.").[22]

Defendants raise several additional arguments, none of which have merit. They attack the credibility of CW1, CW2, CW4, CW6 and CW7 and baselessly claim these witnesses provide only "vague statements" about Evoke, Evolve or Morpheus8 being marketed for off-label purposes, in unspecified ways, locations, times, and numbers. (Mot. at 21-23). But their accounts are specific and credible, as they explain that the off-label marketing *occurred during their tenure at InMode, i.e.*, *during the Class Period* between February 2020 – December 2023. *See*, *e.g.*, ¶¶24-25, 27, 30 (CW1, Feb. 2022-April 2024; CW2, Oct. 2020-April 2021; CW4, June 2023-April 2024; CW7, June 23-Jan. 2024). The location (where the off-label push occurred) is plainly obvious: the United States, where Evoke, Evolve, and Morpheus8V were not FDA-cleared for those uses (despite Defendants' representations to the contrary). The numbers of the devices marketed for off-label purposes is likewise

[22] Indeed, TCF is an "independent investigative media organization." https://thecapitolforum.com/about-us (last visited June 16, 2025). TCF recently won the 2024 Loeb Award for Personal Finance & Consumer Reporting, which is regarded as the Pulitzer prize of business journalism. *Capitol Forum Wins 2024 Loeb Award for Personal Finance & Consumer Reporting*, TCF (Oct. 11, 2024), https://thecapitolforum.com/in-the-news/the-capitol-forum-wins-2024-loeb-award-for-personal-finance-consumer-reporting. *See also In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 3140050, at *9 (D.N.J. July 22, 2021) (describing the Capitol Forum favorably); *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *11 (N.D. Cal. Mar. 31, 2021) (falsity pled based on allegations from the Capitol Forum). *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 685-86 (E.D. Val. 2015) is inapposite because the timing of the information leaked by the Capitol Forum could not support scienter and, moreover, plaintiff did not undertake *any* independent investigation. Here, Plaintiffs **did** undertake an independent investigation through, *inter alia*, identifying and interviewing numerous confidential witnesses, which corroborate that Defendants knowingly marketed their products without FDA approval (including Theodorou improperly marketing Empower, to which the Morpheus8V applicator attached, for stress urinary incontinence at an October 27, 2022 call with analysts (¶159)). *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (crediting newspaper article combined with Plaintiff's own investigation).

manifest: *the entire line* of Evolve, Evoke, Morpheus8 and Morpheus8V was affected. The reliability of these witnesses cannot be legitimately disputed, as their accounts not only corroborate one another, but also are corroborated by *other* confidential witnesses (CWs 8, 9, 10, *see supra* at 24), the *company's own marketing materials* (¶¶73, 79, 84-85), and *the Individual Defendants' own statements* (*see*, *e.g.*, ¶¶133, 137-38, 140-41, 151, 159-60 (detailing earnings calls with analysts during the Class Period where the Individual Defendants promoted specific uses that were not FDA-approved).[23]

Defendants next claim that CW1 and CW7 "did not understand" FDA regulations (Mot. at 22), but that is not what the Complaint pleads. Rather, CW1 and CW7 were explaining InMode's utter disregard for compliance with FDA regulations, a point evident throughout the Complaint. Instructions to market the devices for improper uses came straight from the mouths of the Individual Defendants. *See*, *e.g.*, ¶¶94-96 (Theodorou, with Mizrahy present); ¶101 (Theodorou, with Mizrahy, Lakhani and Kreindel present); ¶105 (Lakhani); ¶107 (Mizrahy and Theodorou).[24]

While these allegations unassailably plead Defendants' scienter, additional allegations cement that conclusion. The Individual Defendants expressly acknowledged in SEC filings receiving the 2018 FDA letter advising InMode to stop and desist from marketing FractoraV, the precursor to Morpheus, for unapproved uses such as for vaginal rejuvenation and urinary stress incontinence (¶¶87-89). Despite being put directly on notice of their misconduct, Defendants continued the promotion of these or similar unapproved uses with Morpheus8V (¶¶91-92, 159-60). Moreover, Mizrahy and Malca each executed Sarbanes Oxley certifications (¶¶129, 131) attesting they reviewed InMode's annual reports, which set

---

[23] Defendants are wrong when they claim that the ubiquitous off-label marketing involving brochures or YouTube videos did not include the U.S. (Mot. at 23-24). *See*, *e.g.*, ¶79 (YouTube video describing Evoke as a "facial remodeling device *cleared by the FDA*"); ¶84 (brochure describing supposed results from the application of Morpheus8 by *U.S. doctors*).

[24] *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at *7-8, *12-13 (C.D. Cal. 2012) is inapt because the scienter allegations were based solely on *one* CW whose account did not support Defendants' claim and was *uncorroborated*. Even as to falsity, the CWs' statements were "subjective impressions" and none purported to quantify the number of students affected by the allegedly improper practices, which was the sine qua non of Plaintiffs' theory of liability.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

forth allegedly "specific FDA 510(k) clearances" for InMode's devices. Accordingly, at a minimum, they were highly reckless in promoting off-label uses as FDA-approved when the opposite was true. Mizrahy was also intimately involved with InMode's applications for FDA-approval. ¶100.

### b. The Complaint Presents Overwhelming Allegations of Motive

Although "motive is not a required element of scienter,"[25] the Complaint nevertheless contains compelling allegations of motive, strengthening the already strong inference of Defendants' scienter. During the Class Period, the Individual Defendants enriched themselves by dumping massive amounts of their InMode holdings at prices artificially inflated by Defendants' misrepresentations while in possession of material, non-public information. "'Unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." *Quality Sys.*, 865 F.3d at 1130, 1146 (citation omitted). To determine whether stock sales are suspicious, courts consider "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Id.* (citation omitted). The test is in the disjunctive: "[u]nusual trading *or* trading at suspicious times *or* in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (citation omitted). Here, the percentage of shares sold and dollar amounts reaped by each Individual Defendant are astronomical, supporting a strong inference of scienter. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) ("$474.49 million in stock proceeds" supportive of scienter); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sale of 20% of stock supported scienter).

Mizrahy's holdings decreased substantially, from 10,170,656 shares shortly before the Class Period at year-end 2019, to just 2,005,208 shares shortly after the Class Period at year-end 2023. ¶170. Thus, Mizrahy dumped as much as **80%** of his InMode common stock during the Class Period, for total

---

[25] *In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*, 2007 WL 3171435, at *3 (W.D. Wash. Oct. 26, 2007) (citing *Tellabs*, 551 U.S. at 325).

proceeds of approximately *$455,050,069*. *Id*. Similarly, Defendant Kreindel's holdings decreased substantially, from 10,376,200 shares shortly before the Class Period at year-end 2019, to just 3,114,762 shares shortly after the Class Period at year-end 2023. ¶172. Thus, Kreindel dumped as much as *70%* of his InMode common stock during the Class Period, for total proceeds of approximately *$309,632,368*. *Id*. For his part Defendant Malca's holdings decreased substantially, from 147,038 shares at year-end 2020, to just 30,314 shares shortly after the Class Period at year-end 2023. ¶171. Thus, Malca sold *79%* of his InMode common stock during the Class Period, for total proceeds of approximately *$6,703,493*. *Id*. Defendant Lakhani's holdings also decreased substantially, from 20,360 shares at year-end 2022, to zero shares shortly after the Class Period at year-end 2023. ¶173. Thus, Lakhani disposed of *100%* of his InMode common stock during the Class Period, for total proceeds of approximately *$665,976*. *Id*.

Defendants needlessly fault Plaintiffs for failing to plead more details about the Individual Defendants' outrageous stock sales (Mot. at 15-16), but such specifics are not required where, as here, InMode is a *foreign issuer* exempt from the SEC's reporting requirements for insider sales. *See* 17 C.F.R. §240.3a12-3. Thus, "prior to discovery, Plaintiffs have no practical means to identify the sales [details]." *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, 2025 WL 416872, at *10 (E.D.N.Y. Feb. 6, 2025) (motive sufficiently pled despite lack of certain details where the company was a foreign issuer). Likewise, because the insider sales occurred after an IPO, a prior history of sales does not exist, and the Court can examine the level of insider sales *during the Class Period*. *See In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *20-21 n.14 (S.D. Ohio Sept. 29, 2023); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000).[26]

[26] Lacking more precise details, Plaintiffs used the average share price each calendar year during the Class Period, multiplied by the decrease in the amount of shares held each respective year by Mizrahy, Malca, Kreindel, and Lakhani, where applicable, to calculate the proceeds of the insider sales. ¶10 n.2. Defendants' cited cases, *Sorrento Therapeutics*, 97 F.4th at 643, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009), and *Joyce*

And contrary to Defendants' contention, "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012*); see similarly In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008); *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *11 n.9 (N.D. Cal. May 11, 2006). [27] Defendants' speculation that the Individual Defendants may have cashed out literally ***hundreds of millions of dollars*** in stock sales *to diversify their portfolios*, *or to pay for things such as college tuition and family expenses*, while imaginative, is not remotely credible. Moreover, the amount Defendants reaped from these proceeds is ***remarkable*** even for a longer class period. *See Batwin*, 2008 WL 2676364, at *1, *14-15 (sales during 3.5 years class period supported scienter); *see also Karinski*, 2020 WL 281716, at *15–16  (long putative class period does not defeat scienter). [28]

### 3.    The Complaint Adequately Pleads Loss Causation

Loss causation is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Pleading loss causation "should not prove burdensome," *id.* at 347, as the allegations need only meet "the familiar test for proximate cause," which can be met in "an 'infinite variety' of ways," *First Solar*, 881 F.3d at 753 (citation omitted).

### a. The Capitol Forum Articles Corrected Defendants' Misrepresentations

"One way to prove loss causation is to show that the defendant's fraud was revealed to the

---

*v. Amazon.com, Inc.*, 2025 WL 835054, at *8 (W.D. Wash. Mar. 17, 2025) (Mot. at 15) are inapposite because they did not involve IPOs and foreign issuers. That the Complaint lacks allegations about Theodorou's stock sales does not defeat the strong inference of scienter. *See Questcor*, 2013 WL 5486762, at *15*; Batwin*, 2008 WL 2676364, at *1, *14-15; *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000). *Metzler Inv.*, 540 F.3d at 1067, is inapposite because two individual defendants were found to trade in line with prior patterns.

[27] *Cisco*, 2013 WL 1402788, at *8 is easily distinguishable because it involved "long-standing stock repurchase" programs and plaintiffs there tried to plead that the repurchases *helped* contribute to an inference of scienter.

[28] *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-95 (9th Cir. 2002) is inapt as it involved sales of only a quarter of the individual's holdings and here, unlike in *Vantive*, the Complaint alleges misleading statements from the commencement of the Class Period.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

market through one or more 'corrective disclosures' and that the company's stock price declined as a result." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020) ("*BofI*"). Here, the Complaint alleges that Defendants misled investors about InMode's discounting and marketing practices, the latter of which posed safety concerns as InMode improperly used its products for indications unapproved by the FDA. Three articles published by TCF corrected Defendants' misrepresentations, triggering price drops. ¶¶130-69, 173-78, 180-84.

On February 17, 2023, TCF partially corrected Defendants' FDA-compliance related statements, which falsely represented that InMode's devices were approved for the uses touted. The article revealed that InMode's customers were threatened with legal action after patients filed complaints as a result of injuries suffered from InMode's devices. The article *specifically mentioned complaints related to Evoke*, which "burned" patients and "rarely worked," *as well as complaints related to Evolve*, which "just doesn't work." ¶175; Defs' Ex. 32. It attached an example of a threatening letter InMode sent to a doctor in response to her complaints *about Evoke and Morpheus8*. In light of these specifics, involving the very products that are the subject of the Complaint, Defendants wrongly claim that the article does not plead a corrective disclosure because it does not discuss off-label marketing. (Mot. at 11). But to be corrective, a disclosure "need not precisely mirror the earlier misrepresentation. It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024); *BofI*, 977 F.3d at 790.[29] Here, the questionable safety and reliability of Evoke, Evolve, and Morpheus8, were new facts that rendered some aspects (*e.g.*, purported FDA-

---

[29] *See also Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (observing that "to be corrective, a disclosure need only relate back rather than precisely mirror the earlier misrepresentation" (citing *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009))); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428-29 (3d Cir. 2007) (loss causation satisfied "if the misrepresentation touches upon the reasons for the investment's decline in value" (citation omitted)).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

approval for off-label uses) of Defendants' statements false.[30] The injuries stemmed from the unapproved uses of those devices.

Defendants also argue that TCF cannot qualify as corrective. But it is black letter law that "[a] corrective disclosure can . . . come from any source, including knowledgeable third parties such as . . . investigative reporters." *BofI*, 977 F.3d at 790. As explained above, *see supra* at n.22, TCF constitutes a reliable source that courts routinely credit particularly where, as here, its contents are corroborated by Plaintiffs' own investigation. *See, e.g.*, *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *14 (N.D. Ga. May 15, 2018) (crediting two TCF reports); *Chabot v. Walgreens Boots All., Inc.*, 2023 WL 2908827, at *19-21 (M.D. Pa. Mar. 31, 2023) (denying summary judgment on loss causation based on information revealed by TCF). Indeed, Defendants' own authority, *Schneider v. Natera, Inc.*, 2025 WL 369243, at *6, *11 (W.D. Tex. Jan. 28, 2025), treated a report by TCF as a partial corrective disclosure.[31]

**On March 10, 2023**, TCF further reported that InMode had not been submitting mandatory reports to the FDA regarding injuries and malfunctions stemming from the use of its devices, ***including from Morpheus8 treatments***, triggering another plunge in the Company's stock. ¶¶177-78. As with the prior corrective disclosure, the article need not specifically discuss off-label marketing. Defendants'

[30] In *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F. 3d 598, 602, 608 (9th Cir. 2014), unlike here, it was unclear which misstatements were corrected by the purported corrective disclosures.

[31] *Schneider v. Natera, Inc.*, 2025 WL 369243, at *6, *10, (W.D. Tex. Jan. 28, 2025) arose in the context of class certification, and the Court found TCF disclosures, which had notably survived a motion to dismiss, did not pose a bar to certification. Defendants' remaining cases are easily distinguishable. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 832, 839-40 (9th Cir. 2022), unlike here, involved "anonymous and self-interested short-sellers who disavowed any accuracy" of the information in the report. As Defendants concede, TCF, in contrast, is dedicated to "consumer protection." Mot. at 11 (*quoting Sanders*, 2021 WL 1222625, at *2). In *Neustar*, 83 F. Supp. 3d at 686, TCF articles lacked reliability to support *scienter* because they were based on anonymous uncorroborated sources. Here, in contrast, TCF articles specifically named some of their sources, and Plaintiffs undertook an independent investigation corroborating the information supplied by TCF's investigation. *See* ECF Nos. 77-33 (identifying doctor), 77-34 (identifying expert and attorneys), 77-35 (reproducing InMode's compensation plan). *See also El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 709 F. Supp. 3d 1296, 1329 (D. Colo. 2023) (TCF articles were sufficiently reliable where they identified the source of the information). And whether TCF reports were part of the total mix of information publicly available involves questions of fact that cannot be resolved at the pleading stage. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *11 (W.D. Tex. Sept. 11, 2023).

remaining challenge is that the article did not reveal *new* information because it was supposedly based on information that was already publicly available: medical device reports ("MDRs") available on the FDA's Manufacturer and User Facility Device Experience database, personal injury lawsuits filed against InMode over several years in unspecified jurisdictions, and an unspecified "local news station" report from 2015 about two customers' serious injuries from an InMode product. (Mot. at 12). But Defendants "should not escape liability for misrepresentations merely because they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet." *Genius Brands*, 97 F.4th at 1186-87 (finding public information was not "in a 'readily digestible' form" until the corrective disclosure "synthesized it for the marketplace"); *see also BofI*, 977 F.3d at 794-95; *Nektar*, 34 F.4th at 840 (new information where article "pulled together disparate sources and connected data in ways that were not plainly obvious"). Here, the information was, at best, scattered in entirely different places and not readily apparent to the market until TCF located and analyzed it.[32]

Importantly (and ignored by Defendants), the article included expert analysis by the former adverse event subject matter expert at the FDA, Madris Kinard. ¶¶123, 127; Defs' Ex. 33. Mr. Kinard explained that the types of injuries described by InMode's patients, such as burn marks, permanent scarring, and permanent nerve damage caused by the InMode devices used to supposedly melt fat and promote skin cell growth, qualified as "adverse events" that "would absolutely be MDR-reportable." *Id*. at 2. Kinard also explained that "[w]hen they don't report the device, it makes it appear to the FDA that the device is safer than it is." *Id*. at 7. Thus, it was not until TCF synthesized this information and provided expert insight that the market could understand the breadth of the safety concerns and physical injuries associated with the use of the devices. *See, e.g.*, *Amedisys*, 769 F.3d at 323 (plausible that "the efficient market was not aware of the hidden meaning of the . . . data" absent the expert analysis

---

[32] Defendants ask the Court to assume, without an iota of support, that these lawsuits and the local news report were reasonably accessible to the market and already priced into InMode's shares.

contained in the purported corrective disclosure); *accord*, *BofI*, 977 F.3d at 794-95 (quoting *Amedisys*, 769 F.3d at 323).

*On October 12, 2023*, InMode lowered its full-year revenue guidance, which it blamed in part on constraints in financing of medical equipment, marked by higher interest rates. ¶179. That same day, TCF published a report titled "*InMode: Pricing Flexibility of Products Raises Questions Regarding Statements to Investors and Margin Consistency.*" ¶180. The publication revealed that, unbeknownst to investors, InMode **heavily discounted almost every device it sold** (anywhere between 16% and 40% off of the list price) routinely throughout the Class Period. *Id*. TCF also reproduced an internal InMode compensation sheet from 2019, reflecting the amount of commission the sales team could expect to receive at each tier of pricing at which they sold a device, with the first tier alone beginning tens of thousands of dollars below the list price. *Id*. While not required for loss causation, TCF's disclosures were precisely the mirror-image of Defendants' previous misrepresentations. *See*, *e.g.*, ¶147 ("[W]e don't discount our platforms. . . . We set our platform for full price."). The report specifically noted that this practice may have affected InMode's revenues, with the Company announcing that it was lowering its guidance for 2023 by roughly $30 million. ¶181. Following those revelations, InMode's stock tanked nearly 26%. ¶¶176-77, 184.[33] Accordingly, Defendants' claim that the October 12 article did not cause the company's stock drop (Mot. at 12-13) is belied by the Complaint's allegations. As

_____

[33] Defendants' contention that they "never said that InMode does not discount" (Mot. at 12) is demonstrably false. And the Complaint does not have to plead any facts that compare the prices of the devices with attachments or services (*id*), as such comparison is irrelevant for purposes of showing the falsity of Defendants' representations. Equally irrelevant is Defendants' claim that InMode profited off discounted sales. Defendants' argument that one court case mentioned *three instances* where InMode offered discounts does not defeat loss causation. **It was on October 12, 2023 that TCF first reported the results of its investigation, which found that "InMode heavily discounts almost every device it sells."** Defendants also attack TCF article for relying on anonymous sources and public information (*id*), but again ignore that the discounting was corroborated by Plaintiffs' own investigation, rendering the article more than sufficiently reliable. *See McKesson*, 126 F. Supp. 2d at 1272 (article reliable where corroborated by plaintiff's investigation); *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *7 (W.D. Wash. Dec. 4, 2023) ("adequate corroborating information" rendered anonymous sources reliable). Defendants' cited authority, *Nektar*, 34 F. 4th at 840, is inapposite because there the report was authored by "anonymous short-sellers who had a financial incentive to convince others to sell" and who expressly disavowed the article's accuracy.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

the Complaint alleges, InMode's stock price went into a tailspin following the revelations of the revised revenue guidance *and* the related issuance of TCF report. ¶¶179-84.[34]

### b. The Complaint Adequately Alleges A Materialization of Risk Theory

"[N]umerous district courts in the Ninth Circuit . . . have expressly endorsed the [materialization of the risk] approach." (collecting cases). *Amgen*, 2014 WL 12585809, at *20.[35] Here, the Complaint alleges that Defendants concealed the risks associated with InMode's off-label marketing and discounting practices, which materialized in lowered revenue guidance on October 12, 2023 and December 6, 2023, causing InMode's stock to plunge. ¶¶179, 182-85, 187. The revised revenue guidance was precisely within the zone of risk posed by Defendants' misrepresentations claiming InMode sold its systems at full price and encouraging the unapproved use of the devices. The discounts InMode offered to customers were often tied to the amount of financing the customer could obtain (¶¶42, 46) and InMode's off-label promotion raised safety concerns that, when exposed, limited the Company's ability to continue promoting its products for improper uses. Defendants blamed InMode's guidance reductions on a macroeconomic environment plagued with higher interest rates that were contributing to *financing constraints*, as well as a *slowdown in platform sales, mainly in North America* (which is obviously subject to FDA regulations). ¶¶179, 185. Both of these reasons are plausibly related to the Company's inability to continue discounting due to negative scrutiny of such practices, and revelations of off-label marketing, which would plausibly lead customers to question the safety of the Company's products. Thus, Plaintiffs have adequately alleged materialization of the risks. *See First Solar Inc.*, 881 F.3d at 754 ("A plaintiff may also prove loss causation by showing that the

[34] If "there are other reasons the stock price fell, such factual dispute is better suited for at a later stage in the proceedings." *Karinski*, 2020 WL 281716, at *18; *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) ("If, as Miller argues, there are alternative causes for the losses of which Plaintiff complains, that is an issue for resolution in the later stages of this case.").
[35] Defendants are thus incorrect that this theory fails as a matter of law.

stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss" because "it is the underlying facts concealed by fraud that affect the stock price."). In *Amgen*, 2014 WL 12585809, at *20-21, for example, the court found that loss causation was pled under a materialization of risk theory where the complaint alleged that defendants' off-label marketing campaign, as here, was hidden from the market, thus concealing a risk of decreased sales by repeatedly misrepresenting FDA compliance.[36]

Defendants argue, bereft of any legal support, that the Complaint does not quantify how much the off-label promotion and discounting practices contributed to InMode's revenue decline (Mot. at 13-14). But Plaintiffs are not required to undertake this herculean task at the pleading stage and without the benefit of discovery. *See Zynga*, 2015 WL 1382217, at *7-8 (loss causation adequately alleged where plaintiffs did not quantify how much the concealed facts impacted guidance). In any event, the Complaint *does* plead that InMode "heavily discounts almost every device it sells" (¶180) and that it marketed the entire line of Evoke, Evolve, Morpheus8 and Morpheus8V for improper uses throughout the U.S. (¶¶72-98) (with Morpheus8V coined the "[t]rojan [h]orse" for InMode (¶94)). Thus, the Complaint more than plausibly pleads that these practices, when revealed, would have had an appreciable impact on Defendants' revenues.[37]

### B. The Complaint Adequately Pleads Control Person Liability

Because the Complaint states a 10(b) claim, Plaintiffs have pled their control-person claims

[36] *See also In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *4, *8 (N.D. Cal. Mar. 25 2015) (loss causation adequately pled where defendants misrepresented strong bookings and upon the "announcement of the true results and guidance, the stock price fell considerably"). Defendants' authority (Mot. at 13) fails to undercut the Complaint's allegations, as Plaintiffs have alleged that Defendants "lied about 'the very facts' causing . . . [P]laintiffs' losses." *Nektar*, 34 F.4th at 838 n.6 (citation omitted). Further, unlike in *Loos v. Immersion Corp.*, Plaintiffs rely on more than just a revenue reduction to support loss causation, instead tying Defendants' explanation for the lowered guidance to the concealed risks. 762 F.3d 880,887 (9th Cir. 2014).

[37] Defendants quibble that because the Complaint alleges these practices occurred for years, they were reflected in InMode's *existing financials* (Mot. at 14), but they miss the point. The Complaint alleges that the risks associated with Defendants' practices finally materialized when Defendants lowered InMode's revenue *guidance*.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

against Mizrahy and Malca. Furthermore, Lakhani, Theodorou, and Kreindel clearly exercised actual power or control over InMode. *Petrie v. Elec. Game Card, Inc.*, 2015 WL 475958, at *7 (C.D. Cal. Feb. 5, 2015) ("Actually making the statements is analogous to signing financial statements, which is generally held to be sufficient to demonstrate control person status."). Moreover, (i) Lakhani was the president of the North America division, which generated around two-thirds of InMode's revenues,[38] had the ultimate approval power over aggressive discounts, and was at the top of the reporting chain for injures stemming from the use of the devices (¶¶63, 122); (ii) Theodorou was the Chief Medical Officer ultimately responsible for all medical issues (¶21); and (iii) Kreindel was the Chief Technology Officer, the co-founder of InMode, and a member of the board (¶22). "[G]eneral allegations concerning an individual's titles and responsibilities" are sufficient at the pleading stage to establish control. *UCBH*, 890 F. Supp. 2d at 1205-07 (control sufficiently pled where individual had "direct supervisory responsibility over" the functions misrepresented, "spoke on the Company's behalf on [] earnings conference calls," and "exercised supervisory control" over the process that was misrepresented.).[39]

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. If the Court grants Defendants' motion, or any part of it, Plaintiffs respectfully request leave to amend, which should be freely granted.

Dated: June 20, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Emma Gilmore*

Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016

---

[38] InMode Ltd., Annual Report (Form 20-F) at n.15 (Feb. 14, 2023).
[39] *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *11 n.27 (N.D. Cal. July 25, 2008) is inapposite because the court found the Complaint did not plead a primary violation. *Amgen*, 544 F. Supp. 2d at 1037, does not hold that control may only be pleaded through signatures of financial statements.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Orly Guy
Eitan Lavie
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

PROOF OF SERVICE

I hereby certify that on June 20, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Emma Gilmore*
Emma Gilmore

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 2:24-CV-01219-MEMF-MRW

37