UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

CEMENT MASONS AND PLASTERERS LOCAL NO. 502 PENSION FUND,

        Plaintiff,

vs.

INMODE LTD., et al.,

        Defendants.

 ) Case No. LA CV 24-01219-MEMF-
 )            (MBKx)
 )
 )
 ) Los Angeles, California
 )
 ) Thursday, August 14, 2025
 )
 ) (4:34 p.m. to 5:08 p.m.)
 )
 )
 )

TRANSCRIPT OF DEFENDANT'S MOTION TO DISMISS [77]
BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG
UNITED STATES DISTRICT JUDGE

Appearances:                See next page.

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:       Damon Berry

Transcribed by:         Jordan Keilty
                         Echo Reporting, Inc.
                         9711 Cactus Street, Suite B
                         Lakeside, California 92040
                         (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiff:                          EMMA GILMORE, ESQ.
                                            Pomerantz, LLP
                                            600 Third Avenue
                                            20th Floor
                                            New York, New York 10016
                                            (212) 661-1100

For the Defendants:                         GLENN K. VANZURA, ESQ.
                                            AREV HOVSEPIAN, ESQ.
                                            Wilkie Farr & Gallagher, LLP
                                            2029 Century Park East
                                            Suite 2900
                                            Los Angeles, California 90067
                                            (310) 728-3000

                                            JOSHUA S. LEVY, ESQ.
                                            Wilkie Farr & Gallagher, LLP
                                            1875 K Street, NW
                                            Washington, D.C. 20006
                                            (202) 303-1147

3

Los Angeles, California;  Thursday, August 14, 2025 4:34 pm

--o0o--

(Call to Order)

THE CLERK:  Now calling item number seven, Case Number LA CV 24-01219, Cement Masons and Plasterers Local Number 502 Pension Fund versus InMode Ltd., et al.

Counsel, please come forward and state your appearances.

MS. GILMORE:  Good afternoon, your Honor.  Emma Gilmore for the Plaintiffs.

THE COURT:  Thank you.

MR. VANZURA:  Good afternoon, your Honor.  Glenn Vanzura from Wilke Farr and Gallagher for Defendants.

THE COURT:  Thank you.  Okay.

MR. VANZURA:  And I'll note for the record, your Honor -- my apologies -- I also have with me my colleagues Joshua Levy and Arev Hovsepian.

THE COURT:  Thank you.  Okay.

And I trust the parties received the Court's tentative?

MS. GILMORE:  We did, your Honor.

THE COURT:  Okay.  Wonderful.  Well, it's the Defense motion.  So, I will let the Defense be heard.

MR. VANZURA:  Thank you, your Honor.  Again, Glenn Vanzura for the Defendants.  Let me first start by saying I

4

appreciate the Court's tentative, primarily because I think it allows the parties to focus our discussion here today, maybe make things a little bit more efficient.

Obviously --

THE COURT:  Let me -- let me start by saying that we have been in session since 8 a.m. this morning.  And, so, we will need to wrap up by about 5.  So, I -- I will ask the parties to limit their arguments to about 12 to 15 minutes each.  Thank you.

MR. VANZURA:  I -- I appreciate that notice, and while I will try to speak slowly, I'm also going to try to fit this all in then --

THE COURT:  Thank you.

MR. VANZURA:  -- in the 12 to 15 minutes.

So, let me just jump straight to it, your Honor, and address with respect to the injury reports bucket.  I'll say, again, we agree with the Court's determination on the falsity and loss causation elements, but, respectfully, I would suggest to the Court that there is one thing that follows from that determination by the Court, and that is one cannot plead scienter if one has not pled a false or misleading statement.

THE COURT:  I would agree.  You can move on.

MR. VANZURA:  Okay.  Thank you.

Next, your Honor, with respect to what I'll call

the off label marketing bucket and with respect to the alleged misstatement that the Court identifies in its tentative, finding that InMode did, in fact, market this Morpheus 8V attachment for free and approved uses, the Court points in its tentative to two allegations establishing that marketing.

The first is in the complaint at paragraph 91. The problem with the allegation in paragraph 91 is that references only these three Facebook videos that the Court already found on page 24 of its tentative were not sufficient to plead that InMode was, in fact, marketing for unapproved uses or doing so in the United States, and that's because there's no indication either in the complaint or in the videos themselves InMode marketing materials, and there's no indication that even if they were, that InMode intended those materials to be used for marketing purposes in the U.S.  Those were solely posted by third parties over which InMode has no control.  The complaint doesn't allege otherwise.

So, I would respectfully suggest that the Court reconsider whether that can be sufficient to demonstrate unapproved marketing by InMode.

The second allegation on which Defendants relies is at paragraphs 159 to 160.  Those were comments made about the Empower platform, and they were -- there were sort of

6

three unapproved uses that the company allegedly engaged in. One of those, vaginal lubrication, is not mentioned in those comments at all. So, there's, again, no indication that the company was marketing for that unapproved purpose.

The second -- and, as your Honor's aware, there's somewhat of a dispute between the parties on this -- is with respect to this VTone attachment. And I'd like to make two primary points with respect to that. That is, first, that the 510(k) approvals for the VTone do, in fact, approve it for use with respect to vaginal contraction and urinary incontinence. And that's demonstrated in Exhibit 16, the 510(k) approvals for the VTone, and you can see that at pages 11, 16 and 4 of Exhibit 16.

So, Plaintiff's counter-argument is, Well, it may have been approved for VTone, but it wasn't approved for Empower, and these comments relate to Empower. Empower is simply the platform to which VTone attaches, and there's no allegation in the complaint anywhere that VTone was not approved for use with Empower. And, in fact, what -- what's incorporated by reference in the complaint suggests otherwise, and that is the company's Form 20(f), and I'll point as an example our Exhibit 3, which is the 2021 Form 20(f) filed with the Securities and Exchange Commission. At page 16 -- and I -- I believe it's page 43 of the actual SEC filing -- page 16 of the exhibit -- investors were told and

7

the SEC was told VTone is used with Empower.

THE COURT:  Now, Counsel, if the concern is that there is a set of statements regarding off label use of Empower, isn't this allegation at least plausible, which is, you know, we're not at summary judgment stage.  We're not before the -- the jury.  So, why isn't that sufficient at this stage?

MR. VANZURA:  Well, again, and -- and I appreciate that the Court acknowledges this in the tentative, that you have to look at the context in which the statements are made.  These are not prescripted comments where the company is making a presentation and has parsed out every word.  These are executives talking off the cuff, oftentimes in response to questions that are posed to them, and they're discussing the Empower platform, but you -- you could imagine that in an executive's mind, the Empower platform is used --

THE COURT:  No, and I --

MR. VANZURA:   -- with VTone.

THE COURT:  And my question, Counsel, is that's fine, and that may be an argument that you make at summary judgment or you make at trial, but I'm not sure that that is sufficient to say that this allegation is not plausible or doesn't meet the standard for purposes of motion -- the motion to dismiss.

8

MR. VANZURA:  And -- and I -- I think, respectfully, your Honor, I think that, again, the statement, when read in context, is a literally true statement.

THE COURT:  Okay.

MR. VANZURA:  It's talking about an actual use for the product, and that's to be distinguished from the marketing of the product.  They are describing a use of the product that the company is not -- this is not a marketing platform.  The company is not out there promoting that use for, say, in these comments.

I'll also -- and this will now transition into my next point, your Honor, because it also goes to scienter with respect to what is the most plau -- or more plausible inference that can be drawn from these comments.  And, again, given the context, given that there is an approved attachment for Empower that treats these specific uses to which they were directing their comments --

THE COURT:  But, Counsel, I don't think on motion for -- to dismiss I am to be looking for the most plausible inference that's in your favor.

MR. VANZURA:  That's -- so, with respect to scienter, your Honor, the Court is required to consider competing inferences, and the Plaintiffs must plead an inference that is at least as cogent and compelling as any

9

opposing inference.  So, the Court is permitted at the motion to dismiss stage to weigh these competing inferences. And what the Court has to determine then is, based on the Plaintiff's allegations, whether it is more likely than not that they were intending to mislead the investing public when they were talking about a platform that does, in fact, have an approved attachment for these uses.  And there's nothing pled to suggest that any of the executives who were making these comments, in fact, had that in mind, Oh, I'm going to trick investors into believing that Empower is approved for these uses when there's an attachment right there that they've told investors attaches to this platform.

THE COURT:  Thank you.

MR. VANZURA:  Let me say also with respect to scienter, again, the state of mind element, the Court's tentative points to an allegation regarding the Morpheus 8V, and they're citing to paragraph 94 of the complaint, and the complaint characterizes the comments that were made by an individual, and what the complaint says is that the individual was "telling sales representatives to sell the Morpheus 8V for urinary incontinence."

That's not what the comments say.  So, if one reviews what's actually printed in paragraph 94, what the executive was actually saying was not telling sales reps to sell anything.  It was discussing a potential use, and it

10

goes on to discuss, We are seeking approval for this indication, and you may be able to sell it for this use in the future.  But they're not -- there's nothing in there that suggests they were actively encouraging anyone to sell this product.

One other slight point.  The Court's tentative attributes that remark to the CEO, Mr. Mizrahy.  According to the complaint, that comment was actually made by an executive, Spero Theodorou, who's also a Defendant in this action, but that's important here.  That's critically important here because Mr. Theodorou is not alleged to be the maker of the alleged misstatement.  And scienter can be pled with respect to the alleged misstatement only as to the maker of the alleged misstatement.

So, the alleged misstatement here regarding obtaining 510(k) approval was the statement attributed to the company.  Mr. Theodorou had nothing to do with the making of that statement, and he's not alleged to have had anything to do with the making of that statement.  So, that scienter allegation falls apart completely.

And I'll point your Honor to Ninth Circuit case Glazer Capital v. Magistrate, 549 F.3d 736, at page 745, where the Ninth Circuit writes:

"We hold that PSLRA requires" -- in

this case Plaintiff Glazer -- "to plead

11

scienter with respect to those individuals who actually made the false statement."

So, that statement in paragraph 94 doesn't plead scienter as to the alleged maker of the statement.

Lastly, your Honor, and in the little bit of time, I'd like to turn now to the discounting bucket and with respect to the alleged misstatement there. And I -- I appreciate again that the Court recognizes the requirement that we examine the -- the statements in full context. I understand the Court's tentative, but I want to take one moment to try to drill down just a little bit on these statements.

None of these statements were discussing pricing practices or discounting in a vacuum. Every one of the three or four alleged misstatements was made in the context of one or more of three things, the -- the notion of a razor-razorblade model, InMode's pricing practices as compared to its competitors, and the company's pricing practices of its platforms as compared to its consumables.

Now, I'll take just two quick examples. Paragraph 147 with respect to the CFO's comments in June of 2021 at a healthcare conference. The context in which those statements were being made were in his discussion of the company's profitability for its products, and what he

12

specifically says is, We are not a razor-razorblade company.

Now, Plaintiffs have defined that for us, and they've said that is when you sell the platform at a loss or for no profit and you sell the consumables to generate all of your profit, and that's specifically what he was talking about here, and it's apparent from the context, if you look at the full comments, he was talking about profitability, and he was saying, We don't do that.  We make the profit on both the platform and on the consumables.  And that's true.  That's strictly true in the context in which he was making those.

Likewise, the next alleged misstatement in February of 2022 by the CEO, he, again, unscripted comments in response to an analyst's question -- that analyst's question was about the pricing of the consumables.  And, so, he starts again by saying, We are not a razor-razorblade company.  Let me tell you how we price our consumables.  We don't just give away for free, as he says in his comments, the platform to make all of our profit on the consumables.  And, once again, there's no allegation in the complaint that that's untrue because, in fact, the company does make a profit on both its platform and its consumables.

So, I think on its face, those statements do not plead a misstatement by either of the executives in either case.

13

One last point, your Honor, on -- on the discounting, which relates somewhat to -- to loss causation and scienter both.  The first is this corrective disclosure, a TCF article in October of 2023, cites for its claim that the company is in the present tense discounting information from 2019.  And why is that important?  It's important because the alleged misstatements, the first one wasn't even made until June of 2021, two years later.  So, whatever the company may have been doing with respect to its pricing in 2019 tells you nothing about what the company was actually doing in 2021, 2022 or 2023 from which the Court could even draw an inference that those statements were false or misleading or made with scienter.

Very last, very quick point, your Honor, is the tentative did not address the 20(a) claim that's the second cause of action.  And I think, obviously because Plaintiffs, at least according to this tentative, have not pled a primary violation, it would then follow that the 20(a) claim must be dismissed as well.

THE COURT:  Thank you.

MR. VANZURA:  Thank you, your Honor.

(Pause.)

MS. GILMORE:  Thank you, your Honor.  I just wanted to first discuss two points that opposing counsel mentioned.  With respect to Morpheus 8V, we absolutely agree

14

with the Court's decision.  Any ambiguities at this point must be read in Plaintiff's favor.  That's pretty clear under Ninth Circuit precedent.

Defense Counsel also mentioned that it was Theodorou that made some of the statements.  But, importantly, Mr. -- Mr. Mizrahy, who's the CEO, was present. So, he knew about it.

We also pled, very importantly, that CW10, which is the high level representative who worked in Israel very closely with Mr. Mizrahy and had insight into the U.S. operations, said that in 2021, ahead of the FDA audit, she had to delete all the false marketing materials, including for Morpheus 8V.

Let's see what else here.  Again, Defense Counsel keeps pointing to the VTone applicator.  The VTone applicator has never been used with Empower -- with the Empower system.  Therefore, that statement cannot relate to the VTone applicator.  And the approval in -- in any case was for urinary incontinence but not for vaginal contraction, intravaginal remodeling and vaginal lubrication, which is what the company was selling it for. So, again, this was clearly a false and misleading statement.

With respect to discounting, this was the first time that the -- that the capital form or any -- any --

15

anybody reported the widespread practice of discounting. So, there is no new information, which is also clear by the fact that the company stock dropped significantly.  And, again, the -- the test for loss causation in the Ninth Circuit is simply one of plausibility.  Is it plausible that the market knew -- learned new information that contributed to a stock drop.  Of course, it is here, your Honor.

And I want to now raise a few things that I think maybe the Court didn't appreciate because the complaint is very long and also because the 510(k) approvals can be quite -- quite difficult to read for somebody who's not familiar with the FDA regulations.

And I want to start first with the scienter allegations with respect to price discounting.  One of many ways to plead scienter under the Ninth Circuit precedent is access to contemporaneous information that calls into question the reliability and truthfulness of the statements made by Defendants.

Importantly here, your Honor, several corroborating witnesses, CWs, corroborate the individual Defendants not only had access to the sales force database showing the discounts which were side by side with the sales prices but also that they actually accessed that information.  That is critical.  The allegations are there in the complaint from three corroborating confidential

16

witnesses.  Two of each speak from personal knowledge.

So, let's go to number CW1, CW3, and CW4.  All explain that all discounts were documented in Salesforce for each specific sale.  CW4 states that he was told by Nye -- who's Nye?  The VP of sales for the Western Region who reported directly to Mizrahy and Malca and met weekly with Malca and monthly with Mizrahy.  So, CW -- Mr. Nye told CW4 that Mizrahy and Malca were looking at the sales numbers in Salesforce.  They were personally looking at those numbers.  Again, when they're looking at the sales number, they see the discounts.  They see the sales numbers.  They see the list price, and they see the discounts.

CW8, who's a high level employee working very closely with Mizrahy in Israel, who has knowledge of the U.S. operations, said that through Salesforce, Mizrahy could see the Salesforce -- just could see the sales number.  Again, right juxtaposed to those are the discounting prices.  CW11, based on its own -- his or her personal knowledge, said that Mizrahy and Malca had access to Salesforce and, importantly, and were monitoring the sales deals in Salesforce.  Again, obviously they're monitoring.  They're access to Salesforce to monitor the sales then.  So, it's more than just access.  They actually access them.

And how does CW want -- excuse me.  How does CW11, him or herself, have personal knowledge?  Because CW11, him

17

or herself, accessed Salesforce and saw Mizrahy and Malca personally make notes in the system to communicate with the sales team about the -- the sales.

So, again, three separate witnesses corroborating one of -- each other.  Two of them, CW8 and CW10, have personal knowledge.

With respect to CW4, the Ninth Circuit, again, is clear that hearsay information can and should be viewed as reliable at the pleading stage, particularly when hearsay is corroborated by other witnesses.

THE COURT:  And what case would you cite to for that?

MS. GILMORE:  We have the -- just a second, your Honor.  I think it's the NVIDIA case, but I just need to go to my --

THE COURT:  It's cited in your papers?

MS. GILMORE:  It should be, but I just want to make sure the Court has it.  Just a second, your Honor.

(Pause.)

MS. GILMORE:  I can't find it right now, but I can -- I can take a quick look and let you know, but --

THE COURT:  Okay.

MS. GILMORE:  -- the -- there's --

THE COURT:  That's all right.  Go ahead.

MS. GILMORE:  I'm pretty sure we cited it in our

18

paper, and it's actually a very analogous -- oh, I have it here. Sorry. It's NVIDIA, 81 F.4th, 918 at 940, Ninth Circuit 2023. That case is very analogous. In that case, the Ninth Circuit relied on an allegation from a confidential witness who learned from a VP information because the VP -- and the VP learned that information, which he conveyed to CW -- to the CW from the individual Defendants, just like in NVIDIA, here CW4 learned about it from Nye, who's a VP, who reported directly to the individual Defendants. So, the Court should be crediting that allegation.

But, again, access to and actually accessing it is not just one -- it's just a simple way, one of many ways to plead scienter. The Court is compelled to look at all the allegations holistically.

THE COURT: And what would you cite to -- I'm -- I'm sure it's in your papers, but what case would you point the Court to that -- that access can be used to prove scienter?

MS. GILMORE: There are several of them, and it's -- that's not just access here, but it's not just having actual access but --

THE COURT: Right. Actually --

MS. GILMORE: -- actually going into the --

THE COURT: -- accessing, yes.

19

MS. GILMORE:  -- database.  There were two cases, one in which the court said that actual access without even going in is sufficient.  It's a Ninth Circuit case.  And then there is another case that's also Ninth Circuit that says --

THE COURT:  I just need you to give me the names of the cases so that when I review this, I can go back to them.

MS. GILMORE:  Yes, your Honor.  I just -- I -- hold on one second, please.

(Pause.)

MS. GILMORE:  Okay.  So, one of them in In Re Quality System, 865 F.3d 1130.  Page number is 1145 to 46, Ninth Circuit 2017.  And the other case that says access and review -- the first is just access enough -- is sufficient.  The -- the second is access and review, which is the NVIDIA case, 81 F.4th 918, 940, Ninth Circuit 2023.  And, again, in addition to access, we have other compelling allegations of scienter.  One is another very important one, that CW -- CW11 had personal information of this -- for this allegation, and it's that Mizrahy was the architect of InMode's program that was designed to offer discounts, this program that showed that he was the architect -- that Mizrahy was the architect of the discounting program, was shown at a sales conference attended personally by CW11 and

20

where Malca was also in attendance.  Again, compelling allegations that these individuals know what they were doing.

We also have other allegations that -- one second -- Malca also attended demo events that were disguised as training demos for doctors.  So, Malca was aware of -- Malca and Theodorou often attended those sales pitches, and they were highly involved in the sales negotiations and routinely undermined the sales representative by pushing for significant discounts.  Malca personally intervened in the purchase process with respect to CW11, again, allegation -- compelling allegations of scienter based on personal knowledge.

We also have commission -- the commission structure, which was a company-wide commission structure that with -- with the first year alone beginning tens of thousands of dollars below the list price.  CW11 makes clear that selling at tier five required Malca's approval.  And, again, under Ninth Circuit precedent, another allegation when viewed holistically with the rest of the allegations supporting scienter is that Mizrahy and Malca repeatedly spoke about -- and specifically about the topic at issue, therefore, bridging the scienter gap.  That's <u>Reese v. Malone</u>, 747 F.3d 557, 572, Ninth Circuit 2014.

I want to move to Evolve because I seen the Court

21

is very -- was very confused for good reason because the Defendants made it so.  But there is no question -- and I want to guide the Court to Defendants' Exhibit 11.  Evolve did not receive -- did not receive approval to be marketed for fat -- the breakdown of fat or any fat treatment until 1.5 months before the end of the class period in October 13, 2023.  This is -- it's -- the document speaks for itself. And Defendants made many false and misleading statements years before then where they marketed Evolve for fat treatments.  Again, unquestionably, there was no approval during that time, and I want to point the Court to those because they are very important.

And Mizrahy, in February 18, 2020, so, more than three years before Evolve received approval for fat treatment, said that Evolve was FDA cleared for fat treatment, complete lie.  Lakhani, again, 2020, three years before the approval, said that Evolve was the only hands-free treatment for subdermal fat, a complete lie.  Mizrahy in Q1 2020 again lied that Evolve addresses fat.  Lakhani, again, August 5, 2020 conference, Evolve is able to trim fat.  Not so, not approved.

During all that time, again, years before the approval, in public filings with the SEC, Mizrahy and Malca signed that -- as needed with Morpheus 8V, that they received 510(k) clearance for the current treatments for

22

which we offer our products.  That was a complete lie.  That approval did not come, and the language for the approval in Evolve is very clear until October 2023.  The public filings where they lied to the SEC or to the investors appear at paragraphs 130, 31 of the complaint for that -- that was -- those statements were made February 18, '20, and then the others were -- I don't have the paragraph numbers, but they were made in February 10, 2021, February 10, 2022, and February 14, 2023, all way before the approval.

Let's see.  CW1 also and CW4 both said that they were trained to market evolve beyond the FDA approvals to melt the fat.  The same with Evoke, your Honor.  There was -- there was no approval for that.  Defendants -- and let's -- again, it's very important to understand this -- this document, and I'm looking at Defendants' Exhibit 11.  The -- they cite to EmFace device.  That's the -- the Evolve device, and the approval is very clear that it's only for the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm and temporary improvement of local blood circulation.

Now, Defendants try to confuse the Court by directing you to the device description that says that EmFace is designed to deliver nonthermal RF energy to the skin and subdermal fats.  But what the Court needs to understand is that under FDA regulations, that approval is

23

limited on its face to the -- to page one of one, which is the indications for use, which are limited to, again, temporary improvement of local blood circulation, muscle aches and pain and temporary relief of muscle spasm. They did not market those for those users. They -- they marketed for other users, and I just want to give a few examples so the Court is aware of them and the record -- and they're in the record.

Okay. So, Evolve, they're saying that it's -- I'm sorry. This is Evolve. Yes, fat treatment -- I'm sorry. This was for Evolve, yes. FDA cleared for -- for the -- for the face and subdermal area on the -- only -- only device that's able to do facial reshaping, paragraph 81 and 38 -- 138. Lakhani also says it's useful treating skin laxity on the face, pages 81 and 137, and, again, that there are some people that want to handle that lower one-third of the face, paragraph 132, and Theodorou was the -- who is the chief medical officer, also lying that it's not just the face vitamin device but you can actually remodel the fat and position the fats the way you want it, again, completely -- completely not -- beyond the scope of the approval. Those -- those are at paragraphs 82 and 141 of the complaint. And, again, in public filings for the SEC, they claimed that they had received approval for the current treatments for which they were offering the products, another lie.

24

THE COURT:  Thank you.  I think we're going to have to wrap up, Counsel.  I trust you didn't have anything to add with respect to the injury reports issue?

MS. GILMORE:  For -- for me?

THE COURT:  Yes.

MS. GILMORE:  No.  I -- I did want to -- I did want to talk about the targeting of U.S. market.  You know, obviously, as your Honor has found with the Morpheus 8V statement in public filings with the SEC, that's not -- there was no question they were targeting the U.S. market -- the U.S. market.

Mr. Lakhani is the north president -- is the vice president -- is the president of the North American Division.  Obviously his statements are clearly targeted to the U.S. market.

And one other important thing, your Honor, is loss causation.  The test, again, is one of plausibility, and there is no question that the Ninth Circuit -- and I can send you the language -- recognizes other theories, which specifically is the one that we pointed here, and I -- I will give you the case so that you have it.  <u>Mineworkers Pension v. First Solar</u>, 881 F.3d 750 at 754, Ninth Circuit 2018.  The Ninth Circuit specifically instructs that a Plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss.

25

This is very similar to what we allege here.  We allege here a revisement of a new guidance for the second -- for the -- for the last December article.  So, again, the -- this -- this theory, again, the second -- the Ninth Circuit is clear that there are infinite ways of proving loss causation and that a corrected disclosure is simply one of many other ways.  So, this theory is completely allowed.  The theory we pled here is completely allowed by the Second Circuit -- by the Ninth Circuit.

THE COURT:  Thank you, Counsel.

MR. VANZURA:  Your Honor, may I have one moment?

THE COURT:  Yes.  Make it very brief, please.  Thank you.

MR. VANZURA:  I will -- I will make it brief.

With respect to Mr. Mizrahy being in the room -- this is paragraphs 94 to 96 of the complaint -- that was in February of 2023.  So, even if we accept that he learned that off label marketing was occurring during that meeting, he made no statements about off label marketing after that time period allegedly.  By the way, those comments weren't about off label marketing, but even if we assume they were, he did learn from that.

VTone I want to address again.  It is in the 519(k).  The confidential witnesses, NVIDIA stands for the proposition -- in that case, the CEO was determined to not

only have had access to the data room but also accessed the specific data at issue.  Scienter was pled.  The CFO had access.  No allegation that he accessed the actual data. Scienter was not pled according to the Ninth Circuit.

Here there's not a single allegation by a single confidential witness that says they accessed information about discounting.  It's all smoke and mirrors.  If they could have said it, they would have said it.  They don't say it anywhere in the complaint.  And then, lastly, with respect to the final point on loss causation and earnings miss, that is not the standard that any earnings miss automatically meets loss causation.  If that were the case, every earnings miss in this District or in this Circuit would be pled as loss causation.  There must be a causal connection also pled in addition to the earnings miss. That's missing here.  The Court got that in the tentative, and I thank you for that.

THE COURT:  Thank you.  Well, I do want to thank the parties for the briefing and the argument, which was extremely helpful in clarifying the briefing, and -- and for your efficiency and -- and for your patience in doing this hearing so late today.  Trust that the Court will consider everything that the parties have shared and take this matter under submission and issue an opinion accordingly.

Thank you.

27

MR. VANZURA:  Thank you for your time, your Honor.

THE COURT:  Thank you.  Court is adjourned.

(Proceedings adjourned.)

28

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                    8/16/2025
Transcriber                              Date


FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.