UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Cement Masons and Plasterers Local No. 502 Pension Fund, *et al.*,<br><br>                              Plaintiffs,<br><br>               v.<br><br><br>InMode Ltd., Moshe Mizrahy, Yair Malca, Shakil Lakhani, Spero Theodorou, and Michael Kreindel,<br><br>                              Defendants. | Case No.: 2:24-cv-01219-MEMF-MBK<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS [ECF NO. 77] AND GRANTING REQUEST FOR JUDICIAL NOTICE [ECF NO. 78]** |

Before the Court is the Motion to Dismiss filed by Defendants InMode Ltd., Moshe Mizrahy, Yair Malca, Shakil Lakhani, Spero Theodorou, and Michael Kreindel (collectively, "Defendants"). ECF No. 77. Defendants also filed a Request for Judicial Notice. ECF No. 78. For the reasons discussed below, the Court GRANTS IN PART the Motion to Dismiss and GRANTS the Request for Judicial Notice.

/ / /

/ / /

1

## BACKGROUND

I. **Factual Allegations**[1]

A. **The Parties**[2]

Meitav Provident and Pension Funds Ltd. ("Meitav Provident") and Meitav Mutual Funds Ltd. ("Meitav Mutual"; together with Meitav Provident, the "Meitav Funds"), and Kranot Hishtalmut Le Morim Tichoniim Morey Seminarim Ve Mefakhim Hevra Menahelet Ltd. and Kranot Hishtalmut Le Morim Ve Gananot Hevra Menahelet Ltd. (collectively, the "Teachers Funds"; together with the Meitav Funds, the "Funds" or "Plaintiffs") are the Lead Plaintiffs in this action. *See* 1AC at 1; ECF No. 61 (Order appointing Plaintiffs as Lead Plaintiffs).

Defendant InMode Ltd. ("InMode") is a global provider of aesthetic medical devices and technologies. 1AC ¶ 17. InMode is an Israeli corporation and maintains its U.S. headquarters in California. *Id*. InMode's common stock trades are on the NASDAQ under the ticker symbol "INMD." *Id*. As of December 31, 2023, InMode had approximately 84 million shares of common stock outstanding, owned by at least hundreds or thousands of investors. *Id*. Founded in 2008 and going public in 2019, InMode develops, manufactures, and markets energy-based devices, such as laser and primarily radio-frequency ("RF") based devices that are designed to aid in non-invasive and minimally-invasive surgical procedures and treatments. *Id*. ¶ 35.

Defendant Moshe Mizrahy ("Mizrahy") co-founded InMode and has served as the Chief Executive Officer and on the Board of Directors since the company's founding in 2008. *Id*. ¶ 18. He was Chairman of the Board of Directors until July 2024. *Id*.

Defendant Yair Malca ("Malca") has served as the Chief Financial Officer of InMode since 2017. *Id*. ¶ 19.

---

[1] The following factual background is derived from the allegations in Plaintiffs' Amended Complaint, ECF No. 64 ("1AC"), except where otherwise indicated. For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they are true.

[2] Plaintiffs list eleven "Confidential Witnesses" and allege based on their observations and recollections throughout the 1AC. *See* 1AC ¶¶ 24–34. For simplicity, the Court will not reference each confidential witness in the instant Factual Allegations section and treat their observations and recollections as Plaintiffs' allegations based on information and belief.

Defendant Shakil Lakhani ("Lakhani") served as the President of InMode's North America division from 2017 until October 2024. *Id.* ¶ 20.

Defendant Spero Theodorou ("Theodorou") was InMode's Chief Medical Officer from 2017 until June 2024. *Id.* ¶ 21.

Defendant Michael Kreindel ("Kreindel"; together with Mizrahy, Malca, Lakhani, and Theodorou, "Individual Defendants") co-founded InMode and has served as the Chief Technology Officer since the company's founding in 2008. *Id.* ¶ 22. He has also been on the Board of Directors since August 2019. *Id.*

### B. InMode's Discounts During the Class Period

Between February 18, 2020, and December 6, 2023, inclusive ("Class Period"), InMode's executives repeatedly told investors that InMode's competitive edge stemmed at least partly from its ability to sell its devices at full prices. *Id.* ¶ 37. Malca emphasized that what differentiated InMode from its competitors was its ability to command a full price: "what we do differently is we charge [customers] the full price on the device . . . ." *Id.* Mizrahy also boasted that "[w]e do not sell the system for less . . . ." *Id.*

Throughout the Class Period, however, InMode discounted almost every product it sold, with discounts routinely granted anywhere between 16% and 40% off of the "list price." *Id.* ¶ 38. For instance, InMode's compensation plan for its sales representatives' commissions lists "tiers" at which a sales representative can sell a product and corresponding commissions, and the lowest tier begins tens of thousands of dollars below the "list price." *Id.* ¶¶ 39, 180; *see id.* ¶¶ 49 (Lakhani was aware of the commissions offered), 63 (steeper discounts required approval by officers such as Lakhani and Malca). To illustrate, the list price for InMode's Morpheus8 product was about $150,000 but the average purchase price for the device was roughly $100,000. *Id.* ¶¶ 43, 46. Similarly, the target price for InMode's Envision was between $179,000 and $200,000, but the device's average sales price was between $135,000 and $145,000—and sometimes as low as $105,000. *Id.* ¶ 44. The Optima platform was priced at $300,000 but was discounted to around $200,000. *Id.* ¶ 46. In this way, all units were generally discounted. *Id.* ¶ 44.

Defendants knew but concealed from investors that InMode routinely discounted their systems. *Id*. ¶ 65. Brandon Nye, InMode's Vice President of Sales for the western U.S. region who reports to Lakhani and Mizrahy, promoted selling products at discount prices along with creating "a sense of urgency." *Id*. ¶¶ 44, 47, 48 (Mizrahy roleplayed these sales tactics at a national sales conference in the Bahamas in the early 2024), 60 (at another conference in January 2019, Mizrahy asked a sales representative to sell InMode's products at a discount and to "throw in a Morpheus for free to close the deal quickly"). Nye often approved discounts of more than 30%, an amount that Nye said "would not go unnoticed by Mizrahy, Malca, and Lakhani." *Id*. ¶ 56. Moreover, all discounts were documented in InMode's Salesforce system, *id*. ¶ 55, which Mizrahy, Malca, and Lakhani reviewed, *id*. ¶¶ 57, 64.

### C.  Improper Marketing of InMode's Products for Off-Label Uses

During the Class Period, Defendants promoted several of InMode's key devices for medical uses beyond those approved by the Food and Drug Administration ("FDA"). *Id*. ¶ 66. The FDA must approve these medical devices before they are sold in the United States. *Id*. ¶ 67. The FDA gives devices a specific "indication for use" ("IFU"), which outlines the approved uses for the device. *Id*. InMode is limited by FDA regulations to market and promote its products only for the indications the FDA has approved. *Id*.

In multiple company filings with the Securities and Exchange Commission ("SEC"), InMode told investors that "[u]nder FDA regulations, for each of our products we must only use labeling, including advertising and promotional materials, that is consistent with the specific indication(s) for use included in the FDA exemption regulation, clearance, or approval, that is applicable to the specific product." *Id*. ¶ 68. InMode understood that "[t]he use, misuse or off-label use of our products may harm our reputation or the image of our products in the marketplace, result in injuries that lead to product liability suits, which could be costly to our business, or result in legal sanctions if we are deemed or alleged to have engaged in off-label promotion." *Id*.

Mizrahy openly acknowledged in calls with investors and analysts that InMode cannot market its products without approval for the specific medical indications requested. *Id*. ¶ 69. He told the market:

> [W]e are not launching any product before we complete a full study to prove safety and efficacy, before we file submission with the FDA and the Conformité Européenne ("CE") in Europe in order to get clearance. This is a medical equipment. We cannot market them without approval for the specific medical indication that we request. Sometime [sic] it takes a little bit longer than what we estimate in the beginning because the FDA might have more question [sic] or they ask us to do a little bit more clinical work in order to ensure that this is safe and efficacy—high efficacy for what we want to claim.

*Id.*

InMode received approval to sell some of its devices through the FDA's 510(k) process, which permits companies to quickly bring to market devices showing a substantial equivalence to a previously approved medical device. *Id.* ¶ 70. A 510(k) application requires an IFU for the device, which specifically describes the approved uses for the device. *Id.* However, during the Class Period, Defendants marketed key devices as providing treatments far beyond those approved by the FDA, and told investors in public filings with the SEC that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products." *Id.* ¶ 71.

### 1. Evolve

InMode had secured 501(k) approval for its Evolve platform to market and use the device for relaxation of muscle spasms, increased blood circulation, and pain treatment as either an electrical muscle stimulator ("EMS") or a transcutaneous electrical nerve stimulator ("TENS") device. *Id.* ¶ 72. During the Class Period, however, Defendants repeatedly marketed Evolve beyond the FDA clearance, including for the stimulation of new skin cell development (referred to as "neocollagenesis") and melting fat cells. *Id.* Brochures for Evolve treatments widely distributed in the market during the Class Period also represented the device's ability to treat fat and transform the skin. *Id.* ¶ 73.

Additionally, InMode's marketing for Evolve directly contradicted the language in the IFU of its 510(k) application, which states that "the RF treatment mode and EMS/TENS mode should not be used in combination or sequentially." *Id.* ¶ 74. Yet, InMode claimed Evolve's combination of RF heat and EMS contributed to a more effective treatment. *Id.* These or similar representations were also made by the Individual Defendants during earnings calls with market analysts. *Id.* ¶ 77. For

example, during an earnings call to discuss InMode's results for the fourth quarter of 2019, Mizrahy spoke about the advantages of Evolve, with its "three modalities" over competitors, which offered "single-function platforms" for fat freezing. *Id*. Likewise, at an earnings call to discuss InMode's results for the first quarter of 2020, Lakhani touted Evolve as "the only hands-free device for the treatment of skin, subdermal fat and muscle toning," while Mizrahy underscored that "it is the only device that addresses skin, it addresses fat, and then it tones the muscle, all-in-one device." *Id*.

### 2. Evoke

InMode had received 510(k) approval to market and sell its Evoke device "for the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm, and temporary improvement of local blood circulation." *Id*. ¶ 79. But during the Class Period, Defendants marketed the device as a "facial remodeling device cleared by the FDA" that provides uniform and volumetric heating to the face in order to create new skin cells and remodel fat. *Id*. While presenting InMode's results for the first quarter of 2020, Lakhani stated that "Evoke is the first Hands-Free device for treating skin laxity on both the face and the submental area." *Id*. ¶ 81. Mizrahy repeated that point, telling investors that Evoke "is the only device as I mentioned earlier that's able to do facial reshaping but from a hands-free standpoint." *Id*. Defendants doubled down on those claims during InMode's second quarter 2020 call with investors, with Lakhani emphasizing that Evoke is "one of a kind, there's nothing really else out there for it, and there are some people that want to handle that lower 1/3 of the face." *Id*. ¶ 82. Theodorou similarly remarked that Evoke "is not just a face tightening device" as "you can actually remodel the fat and position it the way you want," which he claimed was a "big, big deal differentiator" from competition. *Id*.

### 3. Morpheus8 and Morpheus8V

On July 17, 2024, InMode announced that Morpheus8 received 510(k) clearance for "contraction of soft tissue," which includes connective tissue. *Id*. ¶ 86. The press release quoted Mizrahy stating that "[t]he new indication for soft tissue contraction enhances the product's intended use, helping Morpheus8 practitioners expand their patient base." *Id*. But the pre-release brochures publicly depicted apparent reductions of fat and cellulite and claimed that the device's "triple action

of fat coagulation, connective tissue contraction, and sub-necrotic bulk heating provides practices with maximum results - minimal downtime procedures." *Id*. ¶¶ 84, 85.

During the Class Period, InMode promoted another device, Morpheus8V, for vaginal rejuvenation and tightening, as well as for urinary incontinence, without FDA approval. *Id*. ¶ 87. As InMode announced in its 2019 annual report filed publicly with the SEC on February 18, 2020, it had received a letter from the FDA in 2018 "seeking information as to the regulatory bases for marketing of our FormaV and FractoraV handpieces based on our promotion and labeling of these devices for use in certain women's health conditions and procedures."[3] *Id*. FractoraV was the precursor to Morpheus and was only approved by the FDA for "use in dermatologic and General Surgical procedures for Electrocoagulation and Hemostasis" on the face and torso rather than the vaginal canal. *Id*. FormaV was only approved for "the temporary relief of minor muscle aches and pain, temporary relief of muscle spasm, and temporary improvement of local blood circulation." *Id*. Responding to the 2018 FDA letter, InMode claimed that both the FormaV and FractoraV devices had 510(k) clearance but agreed to "remove statements using the terms 'sexual dysfunction,' 'vaginal rejuvenation,' or 'urinary stress incontinence'" from its marketing of the devices. *Id*. ¶ 90. But three years later, in 2021, InMode started promoting Morpheus8V for "urinary incontinence," "intravaginal remodeling," and "vaginal lubrication." *Id*. ¶ 91. Meanwhile, in public filings with the SEC, Defendants insisted that "[w]e have obtained 510(k) clearance for the current treatments for which we offer our products." *Id*. ¶ 92. And in earnings calls with analysts, Theodorou assured the market that "instead of running for the gates" after receiving the 2018 FDA letter, "Moshe [Mizrahy] and the whole team doubled down on their studies" to prove that their products (i.e., Morpheus8V) benefitted women's health. *Id*.

Sales representatives were trained to market Morpheus8V for "stress urinary incontinence in women" and as "FDA-cleared." *Id*. ¶ 93. In a February 2023 audio recording, Theodorou is heard telling the representatives to sell Morpheus8V for stress urinary incontinence to OBGYNs. *Id*. ¶ 94.

---

[3] The 2018 letter was part of a campaign by the FDA to deter "bad actors" from making unsupported and dangerous marketing claims about the supposed benefits of laser or energy-based devices for "vaginal rejuvenation" or "urinary stress incontinence." 1AC ¶ 88.

At a February 2023 sales meeting, Mizrahy and Theodorou acknowledged that InMode lacked FDA approval to market Morpheus8V for stress urinary incontinence but that they were in the process of getting one. *Id*. ¶ 96.

### 4. Defendants' Knowledge

Mizrahy signed Truthful and Accuracy Statements in connection with InMode's 510(k) submissions to the FDA. *Id*. ¶100. In connection with InMode's 510(k) submission for the InMode System with the Morpheus8 Applicators for electrocoagulation and hemostasis, Mizrahy executed a Premarket Notification Truthful and Accuracy Statement, as required by 21 C.F.R. 807.87(k). *Id*. The Statement signed by Mizrahy read: "I certify that, in my capacity as CEO of InMode MD Ltd., I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted." *Id*.

At a national sales conference in Mexico in 2020, Theodorou described Evoke as a non-invasive device used for skin tightening that could reach temperatures that obliterate fat. *Id*. ¶ 101. Similarly, at a sales event in Chicago, InMode's senior management, especially Theodorou, used the terms "tightens skin" and "melts fat" when talking about InMode's products. *Id*. ¶ 102. The marketing language for InMode's devices came directly from Mizrahy and Theodorou. *Id*. ¶ 107.

When the FDA audited InMode in late 2021, InMode made all the brochures referencing non-approved uses "disappear," including materials for the Morpheus device. *Id*. ¶ 104.

### D. InMode's Luminary Program

At a Barclays Global Healthcare Conference held in 2022, Malca remarked that "the way we market to the doctor is, first of all, we engage with key opinion leaders and luminaries in the space. These are some of the big names in aesthetics, plastic surgeons in the U.S. So, we engage with them, they publish many clinical studies in the most prestige [sic] journals and magazines in the medical field. And that, we believe, helps us selling [sic] to doctor better than any brochure or any marketing activities. Clinically [sic] studies usually [are] much more effective in this regard." *Id*. ¶ 108.

But *The Capitol Forum*[4] obtained a Luminary agreement from 2015 detailing the payments InMode offered to the participating doctors and the doctors' responsibilities in return. *Id*. ¶ 109. Luminaries were also given a cut from sales. *Id*. ¶ 110. Luminaries included Dr. Stephen Mulholland, who owns roughly 10% of InMode and co-developed some of the technology. *Id*. ¶ 111. At seminars, InMode's Luminaries were able to discuss off-label uses for InMode's devices, as long as the discussion originated from the audience. *Id*. ¶ 112.

### E. InMode's Failure to Report Injuries to the FDA

InMode failed to report injuries caused by its devices to the FDA. *Id*. ¶ 114. InMode is required by law to submit a medical device report ("MDR") to the FDA's Manufacturer and User Facility Device Experience's ("MAUDE") database within 30 days of becoming aware that its device "may have caused or contributed to a . . . serious injury, or has malfunctioned . . . ." *Id*. InMode knew of this requirement. *Id*. ¶ 115.

InMode's Luminaries themselves pushed aggressive power settings, such as 40 degrees and 70 degrees Celsius temperatures for the outer and inner layers of the skin, to supposedly increase results. *Id*. ¶ 117. In an email dated October 30, 2017, Janet Handley, InMode's Vice President of Clinical Operations, wrote to Lakhani, Kreindel, and Malca that "[p]hysicians who received training from [Luminary] doctor Mulholland . . . were taught to use temp cutoffs of 40/70C. The company protocol was to use lower energies. Dr. Mulholland also teaches all doctors to use Stamping technique and we train them to reserve Stamping until they are experienced." *Id*. A customer also reported being badly burned by the Evolve system in 2020. *Id*. ¶ 116.

InMode had an Enterprise Resource Planning system that tracked equipment malfunctions. *Id*. ¶ 118. The system was called QAD, and it contained monthly reports of equipment malfunction to which employees from different departments had access and could add their own updates and notes. *Id*. The logistics team created these monthly reports, which were provided to Ron Cohen, the Director of Supply Chain, who then presented them up the chain to InMode's executives. *Id*.

---

[4] *The Capitol Forum* published investigation reports about InMode in 2023. *See* Section I.G, *infra*.

Reports of "adverse events," such as burns, were transmitted to InMode's clinical department. *Id.* ¶ 120. Mizrahy had knowledge of all serious incidents related to the use of InMode's products defects. *Id.*

Every Thursday, Nye held a Zoom call with the sales force team. *Id.* ¶ 119. These meetings included reports of patients being burned and directed salespeople to say, in response to these reports, "it was the users' fault, or they cranked it too high." *Id.*

InMode failed to submit any reports to the FDA before February 2023. *Id.* ¶ 123. Thereafter, InMode submitted seven MDRs to the FDA between February 15 and February 20, 2023. *Id.* InMode's submissions show that it learned of at least three of the seven reports in 2021, more than a year before reporting them. *Id.* Moreover, before February 2023, MAUDE had 27 reports for InMode products, none of which were reported by InMode. *Id.* ¶ 124. *The Capitol Forum*'s investigation uncovered that InMode knew of dozens more serious injuries it failed to report, including unwanted permanent fat loss, changes in face structure, and face indentations requiring surgical repair; facial nerve damage resulting in sagging mouth and other deformities; nerve damage causing facial paralysis; burns and tissue necrosis; and scarring. *Id.* ¶ 126.

### F. Individual Defendants' Sale of InMode Stocks

Mizrahy's holdings decreased, from 10,170,656 shares shortly before the Class Period at year-end 2019, to 2,005,208 shares shortly after the Class Period at year-end 2023. *Id.* ¶ 170. Thus, Mizrahy sold as much as 80% of his InMode common stock during the Class Period, for total proceeds of approximately $455,050,069. *Id.*

Malca's holdings decreased, from 147,038 shares at year-end 2020, to 30,314 shares shortly after the Class Period at year-end 2023. *Id.* ¶ 171. Thus, Malca sold 79% of his InMode common stock during the Class Period, for total proceeds of approximately $6,703,493. *Id.*

Kreindel's holdings decreased, from 10,376,200 shares shortly before the Class Period at year-end 2019, to 3,114,762 shares shortly after the Class Period at year-end 2023. *Id.* ¶ 172. Thus, Kreindel sold as much as 70% of his InMode common stock during the Class Period, for total proceeds of approximately $309,632,368. *Id.*

Lakhani's holdings also decreased, from 20,360 shares at year-end 2022, to zero shares shortly after the Class Period at year-end 2023. *Id.* ¶ 173. Thus, Lakhani disposed of 100% of his InMode common stock during the Class Period, for total proceeds of approximately $665,976. *Id.*

**G. Capitol Forum's Investigative Publications and Subsequent Stock Price Decreases**

According to *The Capitol Forum*'s investigation report dated February 17, 2023, InMode offered to replace defective products on the condition that customers sign confidentiality agreements with non-disparagement clauses. *Id.* ¶ 175. The report also included accounts of onerous high interest loans and patients injured by InMode's products. *Id.* On this news, the price of InMode common stock declined $2.67 per share, or 6.73%, from a closing price of $39.69 per share on February 16, 2023, to a closing price of $37.02 per share on February 17, 2023. *Id.* ¶ 176.

On March 10, 2023, before the market opened, *The Capitol Forum* reported that InMode had not been submitting mandatory reports to the FDA regarding injuries and malfunctions stemming from the use of its devices. *Id.* ¶ 177. On this news, the price of InMode common stock declined $1.40 per share, or 4.31%, from a closing price of $32.51 per share on March 9, 2023, to a closing price of $31.11 per share on March 10, 2023. *Id.* ¶ 178.

On October 12, 2023, before the market closed, *The Capitol Forum* published an investigative report titled "InMode: Pricing Flexibility of Products Raises Questions Regarding Statements to Investors and Margin Consistency." *Id.* ¶ 180. The publication revealed that InMode significantly discounted the prices of its devices on a routine basis throughout the Class Period. *Id.* The report disclosed that "far from charging full price for its products, InMode heavily discounts almost every device it sells and expects sales representatives to discount devices anywhere between 16% and 40% off of the 'list price[].'" *Id.* On this news, the price of InMode common stock declined $7.24 per share over two trading days, or nearly 26% from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023. *Id.* ¶ 184.

On October 12, 2023, before the market opened, InMode lowered its full-year revenue guidance, which the company blamed on constraints in financing of medical equipment, marked by higher interest rates, tighter leasing approval standards, and bottlenecks in loan processing. *Id.* ¶ 179.

The company stated: "Revenue for the full year of 2023 to be in the range of $500 million to $510 million vs. previous estimates of revenue between $530 million and $540 million." *Id.*

On December 6, 2023, before the market opened, InMode again lowered its revenue guidance, stating the revision was "primarily due to stronger-than-expected headwinds from the current macroeconomic environment, resulting in a slowdown in platform sales, mainly in North America." *Id.* ¶ 185. InMode guided revenue for the full year 2023 to be in the range of $485 million to $495 million, as compared to the prior estimated range of $500 million to $510 million. *Id.* On this news, the price of InMode common stock declined $2.87 per share over two trading days, or 12.15%, from a closing price of $23.62 per share on December 5, 2023, to a closing price of $20.75 per share on December 7, 2023. *Id.* ¶ 187.

## II.    **Procedural History**

On February 14, 2024, Plaintiff Cement Masons' and Plasterers' Local No. 502 Pension Fund ("Cement Mason") filed suit, alleging (1) violation of Section 10(b) of the Exchange Act of SEC Rule 10b-5 against InMode, Mizrahy, Malca, Lakhani, and Theodorou; and (2) violation of Section 20(a) of the Exchange Act against Mizrahy, Malca, Lakhani, and Theodorou. *See generally* ECF No. 1.

On April 15, 2024, Gregory N Zec, individually and as Trustee of the Gregory N Zec Revocable Trust ("Movant"), filed a Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel. ECF No. 14. Several other movants filed such motions. *See* ECF Nos. 17 (Eugene Lieberstein), 21 (Connie Zhou), 25 (Kenneth Downing, Carey Efferson), 29 (the Funds). On October 24, 2024, the Court issued an order finding that the Funds are the presumptive lead plaintiff in this action. *See* ECF No. 56 at 12. Subsequently, on December 4, 2024, the Court appointed the Funds as Lead Plaintiffs and appointed Pomerantz as Lead Counsel. *See* ECF No. 61.

On January 31, 2025, Plaintiffs filed the 1AC, adding Michael Kreindel as another defendant. *See generally* 1AC. Similarly to the initial Complaint, Plaintiffs allege (1) violation of Section 10(b) of the Exchange Act of SEC Rule 10b-5 against all Defendants; and (2) violation of Section 20(a) of the Exchange Act against Individual Defendants. *See generally id.* The 1AC defines the Class as "all persons and entities who purchased or otherwise acquired the publicly traded common stock of

InMode during the period between February 18, 2020 and December 6, 2023, inclusive, and were damaged thereby." *Id.* ¶ 197. Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; InMode's subsidiaries and affiliates; any person who is or was an officer or director of InMode or any of InMode's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity. *Id.*

On April 11, 2025, Defendants filed the instant Motion to Dismiss. ECF No. 77 ("Motion" or "Mot."). On June 20, 2025, Plaintiffs filed their Opposition to the Motion. ECF No. 82 ("Opposition" or "Opp'n"). On July 21, 2025, Defendants filed their Reply. ECF No. 83 ("Reply").

Defendants also filed a Request for Judicial Notice on April 11, 2025. ECF No. 78 ("RJN"). Plaintiffs did not oppose the RJN.

On August 14, 2025, the Court held a hearing on the Motion.

## **REQUESTS FOR JUDICIAL NOTICE (ECF NO. 78)**

### I.    **Applicable Law**

A court may judicially notice facts that: "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under this standard, courts may judicially notice "undisputed matters of public record," but generally may not notice "disputed facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).

On a motion to dismiss, courts are generally prohibited from "consider[ing] any material beyond the pleadings." *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (quoting *Lee*, 250 F.3d at 688). Courts generally only consider the complaint and other materials "submitted with and attached to the Complaint." *Id.* at 999. Documents not attached to the complaint—including documents that might otherwise be subject to judicial notice—may only be considered if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* (citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006)).

The judicially created "incorporation by reference" doctrine provides another avenue through which a defendant may request a court treat "certain documents as though they are of the complaint itself" for a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "[A] defendant may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document or the document forms the basis for the plaintiff's claim." *Id.* (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)) (cleaned up). Although a court "may assume an incorporated document's contents are true for purposes of a motion to dismiss . . . it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003 (cleaned up).

Courts may take judicial notice of public-facing websites whose accuracy and authenticity are "not subject to dispute." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145–46 (N.D. Cal. 2020) (taking judicial notice of "screenshots and printouts" of the parties' websites). Publicly available documents, including websites, are judicially noticeable "for the fact that they exist" and not for the truth of the matter asserted therein. *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010).

## II.    **Discussion**

In support of their Motion, Defendants request that the Court judicially notice Exhibits Nos. 1 to 39 in connection with Defendants' Motion.[5] RJN at 2. Plaintiffs do not oppose the RJN.

The Court finds that Exhibit Nos. 1 to 5 (Form 20-F) and 36 to 39 (Form 6-K) regarding InMode's SEC filings are judicially noticeable because they are incorporated by reference into the 1AC. The 1AC alleges stock fraud and incorporates those filings through reference. *E.g.*, 1AC ¶¶ 68, 71, 92, 115, 135, 145, 153, 157. Thus, the SEC filings are judicially noticeable.

The Court also finds that Exhibit Nos. 6 to 15 relating to InMode's 510(k) approvals, No. 17 relating to the FDA Letter, and No. 18 relating to the FDA Statement are judicially noticeable

---

[5] Defendants ask the Court to judicially notice the Exhibits attached to the Motion. ECF Nos. 77-2–77-40. These exhibits are not attached to the RJN.

14

because they are also incorporated by reference into the 1AC. *E.g.*, 1AC ¶¶ 70, 71, 72, 74, 79, 86, 90, 92, 100, 112.

The Court will also judicially notice Exhibit Nos. 19 to 29, which are transcripts of InMode's quarterly earnings calls and public conferences, because they, too, are incorporated by reference into the 1AC. The 1AC challenges Defendants' statements during these earnings calls. *E.g.*, 1AC ¶¶ 69 n.7, 77, 92, 133–34, 137–39, 159–61. The statements made at the conferences also form the basis for Plaintiffs' allegations. *Id.* ¶¶ 147 (Jefferies Healthcare Conference, Exhibit No. 22), 151 (Canaccord Genuity MedTech, Diagnostics and Digital Health & Services Forum, Exhibit No. 24), 168 (UBS MedTech, Tools and Genomics Summit, Exhibit No. 29).

The Court will also judicially notice Exhibit Nos. 32 to 34, which are *The Capitol Forum*'s articles published online on February 17, 2023, March 10, 2023, and October 12, 2023, respectively, because they are incorporated by reference into the 1AC. The 1AC cites to these articles extensively. *E.g.*, 1AC ¶¶ 6, 7, 97, 98, 109, 123, 126, 175, 177, 180.

Finally, the Court will judicially notice Exhibit Nos. 30, 31, and 35, which are screenshots of publicly available YouTube videos and InMode's website, because they are incorporated by reference into the 1AC. The 1AC expressly references these "[v]ideos posted to YouTube," provides screenshots of the videos, and even includes hyperlinks to "YouTube.com." *E.g.*, 1AC ¶¶ 72, 74–76, 79. The 1AC also references information "posted by InMode on the company's website" and "posted on InMode's official website." *Id.* ¶¶ 73, 76. Plaintiffs do not question these screenshots' authenticity or accuracy.

In sum, the Court GRANTS the RJN and judicially notices Exhibit Nos. 1 to 39. Since there was no opposition filed to the RJN disputing the truth of the content subject to judicial notice, the Court will take judicial notice of the exhibits and of the content contained within the exhibits.

## MOTION TO DISMISS (ECF NO. 77)

### I.    Applicable Law

Defendants bring their Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6). Federal Rule of Civil Procedure 12(b)(6) allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a

15

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Labels, conclusions, and "formulaic recitation of a cause of action's elements" are insufficient. *Twombly*, 550 U.S. at 545.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee*, 250 F.3d at 679. But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Plaintiffs bring claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. 1AC ¶¶ 203–11. In order to plead a claim under Section 10(B) and SEC Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). Additionally, under Federal Rule of Civil Procedure 9(b), alleging fraud requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Securities fraud claims must satisfy both the requirements under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 308 (2007) (internal citations omitted); *see Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). Even

in a securities fraud case, the Court shall accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiffs. *Curry*, 875 F.3d at 1224.

### A. Material Misrepresentation

To plead falsity, a complaint must "specify each statement alleged to have been misleading, the reason or reason(s) why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009). A statement is considered misleading if it "directly contradicts what the defendant knew at the time, or it omits material information." *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024). The context in which the alleged misleading statement is made also matters in determining the falsity of said statements. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 837.

Furthermore, statements that are equivalent to "puffery," which involves expressing an opinion that is not capable of being objectively verified, are non-actionable. *See Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097 (9th Cir. 2022). Opinion statements that are not puffery are not actionable unless (1) the speaker did not hold the belief they expressed and the belief is objectively untrue or (2) the opinion contains materially misleading statements of fact and the supporting fact the speaker supplies is untrue. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017).

Additionally, the PSLRA provides safe harbor provisions which exempt forward-looking statements as being classified as materially misleading. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Id*. The safe harbor applies if the forward-looking statement is identified as a forward-looking statement accompanied by cautionary statements that identify factors that could change the outcome from the forward-looking statement. *Id*. If a statement is not identified as forward-looking and is not accompanied by cautionary language, it is still protected as safe harbor unless the statement was made "with actual knowledge . . . that the statement was false or misleading." *Id*.

17

**B. Scienter**

To establish scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For an inference to be considered "strong" under the PSLRA requirements, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The court then collects all of the facts alleged, collectively, to see if they give rise to a strong inference of scienter, not just whether any individual allegation meets the standard. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Scienter can be established via intent, knowledge or deliberate or conscious recklessness. *Id.* at 702. It requires that the defendant acted with the scienter that the defendant had an intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976). Deliberate recklessness requires a showing of "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991. Misleading statements are ones that "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).

i. Confidential Witnesses

Additionally, if relying on the statements of confidential witnesses, the PSLRA imposes two requirements for the testimony to qualify as valid evidence of scienter: (1) the confidential witnesses, whose statements are introduced, must be described with sufficient particularity to establish their reliability and personal knowledge and (2) those statements must themselves be indicative of scienter. *See In re Quality Sys., Inc. Sec. Litig*, 865 F.3d 1130, 1145 (9th Cir. 2017).

ii. Stock Sales

When using stock sales to establish scienter, inside stock sales are not inherently suspicious. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002). To determine the suspiciousness of stock sales, three factors are considered: "(1) the amount and percentage of shares

sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

### C. Loss Causation

In order to prove loss causation, a plaintiff must be able to demonstrate "a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Curry*, 875 F.3d at 1225. Plaintiffs argue that the 1AC properly pleads two different theories of loss causation: (1) the three *Capitol Forum* articles were corrective disclosures revealing the truth about InMode's challenged statements (price discounting, FDA compliance, and off-label marketing), and (2) the guidance revisions of InMode's yearly earnings were materializations of the risk related to the challenged statements. 1AC ¶¶ 174–87.

### i.    Corrective Disclosure

To prove loss causation with corrective disclosures, a plaintiff must show that "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate. At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020). A corrective disclosure must provide new information to the market in a way that the market would "reasonably perceive[] these posts as revealing the falsity of [the defendant's] prior misstatements." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 840. The complaint should specify which of the defendant's statements were made untrue by the disclosure. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).

### ii.    Materialization of risk theory

The Court agrees with Defendants that the Ninth Circuit has never expressly adopted a materialization of the risk or zone of risk theory of loss causation. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th at 838 n.6 ("Our court has never expressly adopted that theory, though other circuits have . . . . We have continued to require securities fraud plaintiffs to allege that the defendant lied about the very facts causing the plaintiffs' losses, and it is unclear in any event that courts employing

the zone of risk theory require any lesser showing.") (internal quotations omitted). Since this circuit has not adopted it, the Court will not analyze Plaintiffs' materialization of risk arguments.

## II. **Discussion**

Defendants move to dismiss on the grounds that the 1AC fails to properly plead the required PLSRA elements with respect to any of the purportedly actionable statements. For ease of reference, the Court sets forth in the attached Appendix a list of all of the purportedly actionable statements set forth in paragraphs 129-169 of the 1AC—which broadly fall into the following three categories: (1) statements regarding InMode's pricing model; (2) statements regarding FDA clearance for InMode's products; and (3) statements regarding the safety and efficacy of InMode's products. Defendants assert that the 1AC fails to properly allege (a) that these statements are material representations; (b) that if the statements were false or misleading, they were made with scienter; and (c) loss causation, namely, that if the statements were false or misleading and made with scienter, they caused any injury. Mot. at 9.

First, the Court finds that, with respect to the alleged statements regarding InMode's pricing model, that the Plaintiffs have properly pleaded that these statements were misleading, that they were made with scienter, and that they caused injury.

Second, the Court finds that, with respect to the alleged statements regarding FDA clearance, that the Plaintiffs have properly pleaded that these statements were false, that they were made with scienter, and that they caused injury.

Third, the Court finds that, with respect to almost all of the alleged statements regarding safety and efficacy, the Plaintiffs have properly pleaded that these statements were misleading, that they were made with scienter, and that they caused injury.

> A. **Plaintiffs have properly pleaded falsity, scienter, and loss causation with respect to the alleged statements about InMode's pricing model (Statements 11, 13, 17, 21, and 24).**
>
> > i. Plaintiffs have properly pleaded that the alleged statements about InMode's pricing model constitute material misrepresentations.

Plaintiffs allege that several InMode statements about its pricing model—Statements 11, 13, 17, 21, and 24—constitute material misrepresentations; the Court finds that they have been properly pleaded as such.

Plaintiffs point to several statements in which Defendants tell investors that InMode sells its devices for full price, unlike other companies, thereby giving InMode a competitive edge. 1AC ¶ 37. According to Plaintiffs, the statements of various confidential witnesses and the *Capitol Forum* articles show that in fact InMode deeply discounts its products, thereby rendering its statements to the contrary false. 1AC ¶ 3. Defendants argue that they did not say that they never discount, only that they do not use a "razorblade" model. 1AC ¶ 37; Reply at 12. However, when drawing inferences in the light most favorable to Plaintiffs, telling investors that Defendants do not use a "razorblade" model—understood as a model where a platform is sold cheaply and consumable attachments are sold steeply—when in fact they do heavily discount their main device platform is misleading. Plaintiffs' allegation is plausible because they have plausibly alleged to the requisite degree of specificity that InMode *does* in fact heavily discount its main device platforms. Thus, the statement that InMode does not discount, even when taken in its full context, is a material misrepresentation of InMode's true pricing model.

> ii.  Plaintiffs have properly pleaded the requisite facts showing a strong inference of scienter.

The Court finds that the Plaintiffs have properly pleaded scienter with respect to the statements concerning InMode's pricing model. As alleged in the 1AC, the senior officials who made these statements had access to—and, indeed, did access—the Salesforce data showing the discounts. Accordingly, if the 1AC is to be believed, they were well aware of the significant discounts and their statements to the contrary were made—at the very least—recklessly. For example, Paragraph 64 alleges that Mizrahy and Malca monitored the deals in Salesforce and that Mizrahy, Malka, and Lakhani all made notes in Salesforce about particular deals. Paragraph 62 alleges that senior leadership personally participated in negotiating discounts with doctors at weekend events. Paragraph 60 alleges that Mizrahy personally encouraged CW11 to sell the product at a discount. These allegations alone show actual access and knowledge, in contrast to the authority

cited by the Defendants. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 941 (9th Cir. 2023) (no strong inference of scienter where confidential witnesses alleged that defendant was authorized to access the sales database and could ask that they be forwarded because that only showed availability, not personal access).

The Defendants' other arguments are unavailing. The allegations regarding the confidential Wwitnesses establish either that they were in a position to know the pricing model, that they worked closely with senior leadership, and/or that they personally observed senior leadership's knowledge and encouragement of the pricing model. This distinguishes these allegations from the ones in the cases that Defendants cite. *See Zucco*, 552 F.3d at 996 (finding the statements of two confidential witnesses do not satisfy the PSLRA requirements because they involved only secondhand information, not personal knowledge, and witnesses were not in a position in the company to know such information).

In light of the Court's finding that the scienter is properly shown from the allegations concerning the confidential witnesses, the Court need not reach the issue of whether the stock sales provide the strong inference.

        iii. <u>Plaintiffs properly pleaded that the statements regarding the pricing model caused injury under a theory of loss causation through corrective disclosures.</u>

Finally, the Court finds that the Plaintiffs have properly pleaded loss causation by pointing to several corrective disclosures regarding InMode's pricing model.

Defendants first argue that the *Capitol Forum* articles should not be accepted as a proper forum for corrective disclosure because they are anonymous; according to Defendants, Plaintiffs must meet a higher burden when relying on anonymous articles to demonstrate corrective disclosure. Mot. at 9–10. But a "corrective disclosure can . . . come from any source, including knowledgeable third parties such as . . . investigative reporters." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 790. There is therefore no support in the caselaw for rejecting the *Capitol Forum* articles as corrective disclosures on this ground.

The Court finds that the articles constitute corrective disclosures regarding InMode's statements about its pricing model and—in particular—that it does not discount its products. For

instance, the October 12, 2023, *Capitol Forum* article states that InMode "had routinely and significantly discounted the prices of its devices throughout the Class Period," 1AC ¶ 180, thereby meeting the requirement that the Plaintiffs plausibly plead that the corrective disclosure reveals the falsity of the prior statements. And on October 13, 2023, one day after the *Capitol Forum* article was published, "the price of InMode common stock declined $7.24 per share over two trading days, or nearly 26%, from a closing price of $27.99 per share on October 11, 2023, to a closing price of $20.75 per share on October 13, 2023," *id.* ¶ 184, thereby meeting the requirement that the Plaintiffs plausibly plead that the corrective disclosure caused the stock price to decline and the inflation attributable to the misstatements to dissipate. Loss causation has therefore been properly pleaded.

Accordingly, the Defendants' Motion to Dismiss is DENIED with respect to the pricing model statements on this ground. The statements the Court has found actionable were not made by Lakhani, Theodorou, or Kreindel, nor were they made in statements signed by these individuals. Theodorou and Kreindel clearly do not meet the requirements for control liability with respect to the pricing model statements. Given the allegations regarding Lakhani's control over the pricing discounts, the Court finds that the Plaintiffs have properly pleaded his control liability with respect to these statements.

**B. Plaintiffs have properly pleaded falsity and scienter but not loss causation with respect to InMode's statements regarding FDA Clearance (Statements 1, 2, 3, 4, 5, and 15).**

i.   Plaintiffs have properly pleaded that the statements concerning FDA clearance are material misstatements.

Plaintiffs allege that several InMode statements about FDA clearance for certain indications of its products (namely, Statements 1, 2, 3, 4, 5, and 15) are material misstatements because in fact the products were not FDA-cleared for those indications at the time. The Court finds these allegations properly pleaded. Although Defendants describe these as "generic statements," the Court finds otherwise. At the very least, Plaintiffs have properly alleged that these statements are material misstatements because they have plausibly alleged that InMode was offering its products for treatments for which it had NOT received FDA clearance.

23

In public filings with the SEC, Defendants claimed that they "have obtained 510(k) clearance for the current treatments for which [they] offer [their] products." 1AC ¶ 92. But Plaintiffs properly alleged that during the Class Period in 2021, InMode marketed Morpheus8V for "intravaginal remodeling" and "vaginal lubrication," despite lacking FDA approval for those purposes. *Id*. ¶¶ 87–91. They also marketed it for "SUI [stress urinary incontinence], vaginal contraction. . . ." *Id*. ¶ 160. In fact, Defendant Theodorou, in 2023, "expressly acknowledged that InMode lacked FDA approval to market the Morpheus8V for stress urinary incontinence." *Id*. ¶ 96. Confidential Witnesses 1 and 4, who were both territory managers during the Class Period in the U.S., also recalled that they were trained to advertise Morpheus8V for stress urinary incontinence in women and to market it as "FDA-cleared." *Id*. ¶ 93. While Defendants try to argue that the alleged advertising was not misleading because the EmpowerRF platform was approved for urinary incontinence in women and vTone was approved as a "vaginal applicator," the FDA did not approve vTone for "vaginal contraction," "intravaginal remodeling," and "vaginal lubrication"—uses that Defendants were touting, and the FDA did not approve vTone for use with the EmpowerRF platform. *Id*. ¶¶ 91, 160; Opp'n at 13. Since Defendants advertised uses for the vTone and Morpheus attachments that were not FDA-approved, the Court finds their statements that InMode was *only* marketing approved purposes to be material misrepresentations.

ii.    Plaintiffs have properly pleaded that the statements concerning FDA clearance were made with scienter.

The statements that InMode was only marketing its products for approved uses were properly alleged to have been made with scienter. The alleged off-label marketing of Morpheus8V for intravaginal remodeling, vaginal lubrication, and urinary incontinence is a salient example. In a recording of a sales meeting in February of 2023 during which Mizrahy and Theodorou were present, Theodorou was heard encouraging the InMode sales representatives to advertise and sell the Morpheus8V for stress urinary incontinence. Opp'n at 23; 1AC ¶ 94. Theodorou expressly acknowledged in February of 2023 that InMode lacked FDA approval to market Morpheus8V for stress urinary incontinence. *Id*. Given the context in which the other statements were made, and the

24

heavy reliance on this purported use as a competitive advantage, this provides the required strong showing for scienter.

        iii.    <u>Plaintiffs have not properly pleaded that the statements concerning FDA clearance caused injury under a theory of loss causation.</u>

Plaintiffs point to the February and March *Capitol Forum* articles—which discuss injuries from InMode products—as the allegations underlying their loss causation theory. But those articles do not discuss *off-label marketing* of InMode products—or explicitly state that the injuries described were from purportedly *off-label uses*—and therefore cannot constitute corrective disclosures.

Plaintiffs speculate that the injuries "stemmed from unapproved uses" of InMode devices but do not allege specific facts about whether those uses were related to the off-label marketing. Opp'n at 22. The only information given in the 1AC is that the February *Capitol Forum* article revealed that InMode customers were threatened with legal action after filing complaints about InMode's devices being "defective," but nowhere in the 1AC does it say that these issues, defects, or injuries stemmed from unapproved uses of the devices. 1AC ¶¶ 7, 54. Additionally, the Opposition only specifies that the February *Capitol Forum* article mentions complaints that the products "rarely worked" or that they "burned" patients. Opp'n at 29. Again, Plaintiffs do not specify that these complaints and injuries arose particularly from unapproved uses of these devices, just that these injuries occurred while using these devices. Therefore, there is no "truth" revealed by these articles that could correct any misstatement, because the statements in the article do not contradict any statement about the safety of the devices themselves. The March *Capitol Forum* article fails for similar reasons, because it only revealed that InMode had not been submitting the mandatory injury reports and malfunctions from the devices to the FDA and did not specify that the injuries or reports resulted from any kind of unapproved use of the devices.

Accordingly, Defendants' Motion to Dismiss is GRANTED with respect to the FDA Clearance statements on this ground.

/

**C. Plaintiffs have not properly pleaded their allegations regarding InMode's statements concerning the Safety and Efficacy of its products (Statements 6-10, 12, 14, 16, 18-20, 22, and 23).**

    i.    <u>Plaintiffs have properly pleaded that some—but not all—of the statements concerning safety and efficacy are material misrepresentations.</u>

Plaintiffs allege that several InMode statements about the safety and efficacy of its products are—at the very least—misleading because they omit that the products do not have FDA clearance for the uses discussed, that InMode has no scientific studies to support the uses, that InMode only has biased scientific studies to support these uses, and/or that these uses are harming patients. Plaintiffs make these claims about Statements 6-10, 12, 14, 16, 18-20, 22, and 23.

The Court finds that two of these statements are so unverifiable that they are properly characterized as puffery and are therefore not actionable: Statements 18 and 22.

But the remaining statements, even when read in context, would be misleading if in fact, as Plaintiffs allege, they omit the true facts regarding safety and efficacy.

InMode essentially responds that silence about the absence of FDA approval or scientific studies does not render these statements misleading as a matter of law. It relies on *Sorrento* for the proposition that promises of safety are mere puffery and not materially misleading. The Ninth Circuit decision does not say that and it actually seems facially implausible that investors would *not* rely on promises of safety.[6] Stating that a product is safe and/or effective implies that there is some

---

[6] It appears that InMode is relying on the following from *Sorrento*:

> The district court found the assertion of a cure and a solution that works 100% to be "a statement of corporate optimism"—in other words, mere "puffery" which "cannot state an actionable material misstatement of fact under federal securities law." *See Glen Holly Ent. Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003).

*In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 639 (9th Cir. 2024). First of all, this is a description of the district court's finding, not the Circuit's holding. But more importantly, it contains a *characterization* of the challenged statement. The actual challenged statement was that the company's antibody "demonstrated 100% inhibition of SARS-CoV-2 virus infection in an *in vitro* virus infection experiment at a very low antibody concentration." *Id.* at 641. And, according to the Ninth Circuit, this was not misleading because "all of the articles reveal that [the product] development was at the stage of an in vitro virus infection experiment, i.e., it had only been tested in a laboratory." *Id.* at 641. The defendant therefore had not stated or implied a "100% cure." *Id.* at 641–42.

basis upon which that representation is made—either FDA clearance or reliable scientific studies—and the absence of this makes the statements misleading. This is how the Ninth Circuit described the question that this Court must answer:

> An omission is materially misleading if there is a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments. So, once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.

*In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836 (9th Cir. 2022) (citations and internal quotation marks omitted). To the extent that InMode can show that Plaintiffs' allegations regarding the absence of FDA clearance, the absence of reliable studies, and the presence of adverse events are untrue, it can do so at the summary judgment stage.

The Court addresses the various categories of statements in turn.

1. *The use of MorpheusV8 for intravaginal remodeling, vaginal lubrication, and urinary incontinence (Statements 19-20).*

First, the Court addresses Statements 19 and 20, which concern the use of MorpheusV8 for intravaginal remodeling, vaginal lubrication, and urinary incontinence The Court finds that these statements are properly alleged as misleading in light of the allegations that MorpheusV8 was not FDA-cleared for these uses.

As discussed above, Plaintiffs properly alleged that Morpheus8V was not FDA-cleared for any of these uses. 1AC ¶¶ 87-91, 160. Since the vTone and Morpheus attachments were not FDA-approved for these uses, InMode's statements about these uses—which omitted reference to the absence of approval—were materially misleading.

2. *The use of Evoke and Evolve to tighten skin, melt fat, and tone muscle (Statements 7-10 and 12).*

---

Accurately stating the results of laboratory testing and expressing aspirational goals about what that might mean for the real world is a far cry from stating a product is safe and effective when there is either nothing in the way of clearance or reliable studies to back it up or, worse, there is data showing harm to patients.

Next, the Court addresses Statements 7-10 and 12 which generally concern the use of the Evoke and Evolve platforms to tighten skin, melt fat, and tone muscle.

Plaintiffs allege that statements such as claiming that Evolve is the "only device that addresses skin, it addresses fat, and then it tones the muscle," are misstatements because Evolve did not receive FDA approval for those uses and the statements did not address this lack of approval. 1AC ¶¶ 138, 139.

But it appears that the provided FDA approval clearly states that Evolve with the Transform Applicator is intended for "[n]on-invasive lipolysis (breakdown of fat) of the abdomen," and the EmFace device can be used to "deliver non-thermal RF energy to the skin." Ex. No. 10, 11. Furthermore, although Plaintiffs allege that the IFU application said that "[t]he RF treatment mode and EMS/TENS mode should not be used in combination or sequentially," that statement is only true for the Evolve with the T3 Applicator, and therefore does not make general statements about the use of Evolve misleading. Ex. No. 9. In fact, other devices are indeed approved for sequential use of the RF and EMS modes, as indicated by the approved 510(k) application for the Evolve System with Transform Applicator, which indicates use of the "Transform Applicator in sequential RF/EMS mode." Ex. No. 10. Thus, the Court does not find the statements made regarding these uses misleading.

Plaintiffs also allege that InMode's statements about these uses are misleading because these uses are not safe. But the evidence that Plaintiffs point to—namely the Luminaries applying aggressive settings and modalities—is insufficient to make the statements regarding safety misleading. The Luminaries that were hired by InMode to market InMode's devices were trained by Dr. Mullholland, who cofounded InMode, to use temperature cutoffs of 40 degrees and 70 degrees Celsius. 1AC ¶ 117. These "improper applications resulted in injuries." *Id*. Nevertheless, the claim that the products themselves are "safe" is not misleading, as the allegations set forth in the 1AC only state that the *practices used by the Luminaries* were unsafe and *the off-label advertising* was unsafe, not that the *devices themselves* were generally unsafe. Thus, the Court does not find the statement of calling the devices "safe" materially misleading because Plaintiffs do not plead particular evidence that the devices themselves are unsafe.

3. *General Statements about the safety and efficacy of InMode's products (Statements 6, 14, 16, and 23).*

Finally, the Court addresses Statements 6, 14, 16, and 23, which are more general statements about the safety and efficacy of the products.

Statement 6 was made by Lakhani on the Form 6-K filed on May 6, 2020, and signed by Mizrahy. It states:

> We believe that our breakthrough devices, Evolve and Evoke, are well-positioned to attract both physicians and patients post-crisis, as the demand for minimally invasive and hands-free alternatives will grow, opposed to historic post-crisis declines seen with invasive surgical procedures. Therefore, we believe that **these technologies will be significant growth drivers in the future and will become the standard of care for facial and body reshaping in the future**[.]

1AC ¶ 135 (emphasis added). Given the general nature of these statements, and given that InMode did indeed have FDA clearance for uses of these platforms that can properly be described as "facial and body reshaping," the Court finds that this statement is not misleading and is therefore is not actionable.

Furthermore, InMode calling its devices "breakthrough devices," and stating that its devices "will become the standard of care . . . in the future," 1AC ¶ 136, are not actionable. Plaintiffs argue that these statements are misleading because the devices were being marketed for "improper uses," and thus could not have been "the standard of care" because they were allegedly harming patients. *Id.*

Regarding the challenged statements in InMode's Form 6-K disclosures and Individual Defendants' statements described in the Motion, the Court finds that they are either puffery or forward-looking statements protected by the PSLRA safe harbor provisions. Several statements are puffery as they amount to corporate optimism that is not objectively verifiable, such as the statement calling the devices "breakthrough devices." Reply at 10; *see Macomb*, 39 F.4th at 1099. The statements also fall under the forward-looking provisions, in that they discuss "plans and objectives of management for future operations," such as InMode's "inten[t] on building momentum" and belief that its technology "will become the standard of care . . . in the future." *Police Ret. Sys.*, 759 F.3d at 1058; Mot. at 26–27. The forward-looking statements are also accompanied by cautionary

29

language in the Form 6-K disclosure that is virtually identical to similar cautionary language that was deemed sufficient to satisfy the safe harbor provision. *See Police Ret. Sys.*, 759 F.3d at 1060 ("Because the cautionary language was sufficient, the forward-looking statements are exempt under the PSLRA's safe harbor provision."). Overall, the Court finds that the statements made in the Form 6-K disclosure and by Individual Defendants are either forward-looking or amount to puffery, and thus are not actionable misstatements.

Statement 14 was made by Mizrahy regarding the launch of the Empower platform—on which the Morpheus8V was placed—on October 26, 2021, during a conference call attended by Mizrahy, Lakhani, Theodorou, and Malca. The statement asserts:

> [T]his gynecology market is new to us and just because we want to be very careful with what we claim and indication to the doctors. And this is according to what Spero [Theodorou] said, **we're spending a lot of money on studies and all kind of checking for every indication that we claim**. By the way, this is the only system on the market that has a **very broad indication approval from the FDA**.

1AC ¶ 149. As discussed above, Plaintiffs have properly pleaded that InMode was claiming a use for Morpheus V8 (on the Empower platform) that was not FDA-approved. Therefore, this statement is properly pleaded—at the very least—as misleading.

Statement 16 was made by Theodorou on the Form 6-K filed on February 10, 2022, and signed by Mizrahy, regarding EmpowerRF for use in "the women's health space." It states: "We diligently invest resources in developing our clinical studies and are encouraged by the **growing number of peer review publications supporting our strong scientific data and achievements**." 1AC ¶ 153 (emphasis added). Plaintiffs have failed to properly plead this statement as misleading given its general nature and the fact that they have not alleged that there were peer review publications supporting InMode's data and achievements.

Statement 23 was made by Mizrahy on May 2, 2023 during a conference call with analysts. The statement asserts:

> I would like to take the moment to recognize that 15 years ago, we started this company with a small investment of just $3.5 million and in an idea that with bipolar RF technology, our expertise and knowledge of the aesthetic industry, we can disrupt the industry and help close the treatment gap. **We have been accomplishing this by providing patient, remarkable and lasting results. We are working closely with**

**leading plastic surgeons that have been endorse[ph] our safe FDA approved technology**.

1AC ¶ 166. Given that Plaintiffs have failed to properly alleged that *none* of InMode's technology is FDA-approved, this statement is not—in context—misleading, as it is talking in terms that are either too general to be actionable, constitute puffery ("providing patient, remarkable and lasting results"), or are not untrue (working with surgeons who endorse the FDA-approved technology, of which there is some).

Accordingly, Defendants' Motion to Dismiss is GRANTED with respect to Statements 6-10, 12, 16, 18, 22, and 23 on this ground.

ii.     Scienter is properly pleaded with respect to the misleading statements.

In light of the facts as alleged above regarding the off-label marketing of MorpheusV8 for intravaginal remodeling, vaginal lubrication, and urinary incontinence, the Court finds that scienter has been properly pleaded with respect to the statements which assert safe and effective use for urinary incontinence—namely Statements 19 and 20. These same allegations establish the required showing of scienter with respect to Statement 14.

iii.     Loss causation is not shown through corrective disclosures.

The Court finds that the February and March *Capitol Forum* articles do not serve as bases for Plaintiffs to plead with particularity that the injuries reported in those articles are due to off-label uses of the products, and thus Plaintiffs do not adequately plead loss causation. Plaintiffs speculate that the injuries "stemmed from unapproved uses" of InMode devices but do not allege specific facts about whether those uses were related to the off-label marketing. Opp'n at 22. The only information given in the 1AC is that the February *Capitol Forum* article revealed that InMode customers were threatened with legal action after filing complaints about InMode's devices being "defective," but nowhere in the 1AC does it say that these issues, defects, or injuries stemmed from unapproved uses of the devices. 1AC ¶¶ 7, 54. Additionally, the Opposition only specifies that the February *Capitol Forum* article mentions complaints that the products "rarely worked" or that they "burned" patients. Opp'n at 29. Again, Plaintiffs do not specify that these complaints and injuries arose particularly from *unapproved uses* of these devices, just that these injuries occurred while using these devices.

Therefore, there is no "truth" revealed by these articles that could correct any misstatement, because the statements in the article do not contradict any statement about the safety of the devices themselves. The March *Capitol Forum* article fails for similar reasons, because it only revealed that InMode had not been submitting the mandatory injury reports and malfunctions from the devices to the FDA and did not specify that the injuries or reports resulted from any kind of unapproved use of the devices.

Accordingly, the Defendants' Motion to Dismiss is GRANTED with respect to all of the Safety and Efficacy statements, namely Statements 6-10, 12, 14, 16, 18-20, 22, 23.

***

The Court DISMISSES the claims concerning all of the FDA Clearance statements (Statements 1, 2, 3, 4, 5, and 15), and some of the Safety and Efficacy statements (Statements 14, 19, and 20) WITH LEAVE TO AMEND because it appears that Plaintiffs may be able to cure the defects noted concerning loss causation. The Court also DISMISSES the control liability claims concerning Theodorou and Kreindel WITH LEAVE TO AMEND because it appears Plaintiffs may be able to cure the defects noted concerning their control over pricing. In addition, should Plaintiffs successfully amend the claims concerning the FDA Clearance statements and the Safety and Efficacy statements, it may be that Plaintiffs can successfully plead control liability for those defendants with respect to those claims, given their roles and responsibilities.

**CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS as follows:

1.  The Request for Judicial Notice is GRANTED;

2.  The Motion to Dismiss is DENIED with respect to the claims concerning the Pricing Model statements (Statements 11, 13, 17, 21, and 24);

3.  The Motion to Dismiss is GRANTED with respect to control liability for Theodorou and Kreindel regarding the Pricing Model statements (Statements 11, 13, 17, 21l and 24);

4.  The Motion to Dismiss is GRANTED WITH LEAVE TO AMEND with respect to the claims concerning the FDA Clearance statements (Statements 1, 2, 3, 4, 5, and 15);

32

5. The Motion to Dismiss is GRANTED WITH LEAVE TO AMEND with respect to the claims concerning some of the Safety and Efficacy statements (Statements 14, 19, and 20);

6. The Motion to Dismiss is GRANTED WITHOUT LEAVE TO AMEND with respect to the claims concerning the remaining Safety and Efficacy statements (Statements 6-10, 12, 16, 18, 22, and 23); and

7. Plaintiffs are GRANTED LEAVE TO AMEND their claims for securities fraud as detailed above within thirty (30) days of this Order. Failure to amend any dismissed claim will result in the complaint moving forward without that claim.

IT IS SO ORDERED.

Dated: September 12, 2025

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

**Appendix A**

***(Court's Order Granting in Part Defendants' Motion to Dismiss [ECF No. 77] And Granting Request For Judicial Notice [ECF No. 78])***

In the First Amended Complaint, ECF No. 64, the Plaintiffs allege the following false or misleading statements or omissions:

1. Statement by InMode, Mizrahy, and Malca in 2019 Form 20-F, which contained SOX Certifications by Defendants Mizrahy and Malca:

   "We have obtained 510(K) clearance for the current treatments for which we offer our products." 1AC ¶ 130.

2. Statement by InMode, Mizrahy, and Malca in 2020 Form 20-F, which contained SOX Certifications by Defendants Mizrahy and Malca:

   "We have obtained 510(K) clearance for the current treatments for which we offer our products." 1AC ¶ 131 (i).

3. Statement by InMode, Mizrahy, and Malca in 2021 Form 20-F, which contained SOX Certifications by Defendants Mizrahy and Malca:

   "We have obtained 510(K) clearance for the current treatments for which we offer our products." 1AC ¶ 131 (ii).

4. Statement by InMode, Mizrahy, and Malca in 2022 Form 20-F, which contained SOX Certifications by Defendants Mizrahy and Malca:

   "We have obtained 510(K) clearance for the current treatments for which we offer our products." 1AC ¶ 131 (iii).

5. Statements by Mizrahy about Evolve and Evoke in February 18, 2020 earnings call:

   Evolve and Evoke were "expected to be [part of] the main growth engine for InMode in the coming year and to position InMode as [sic] the front and as leading innovative aesthetic company."

   "InMode has developed two FDA-cleared unique hands-free platforms; the Evolve for body and the Evoke for face . . . Utilizing this Bipolar RF [radiofrequency]

1

technology for delivering RF energy and electromagnetic pulses made Evolve as the only device for treatment of skin, subdermal fat and muscle tone improvement, while Evoke is the first hands-free device for the face and submental area."

"We have -- we have basically two platforms. The Evoke, which is for the face, we don't have any competition because there is not even one platform similar to that in the market today. Okay. On the Evolve side, there are some companies who are offering hands-free devices like Zeltiq with the fat freezing and like BTL with the EMS and some others with EMS. But these are single-function platforms. The beauty of Evolve is that Evolve has three modalities. It can compete with BTL and all the other EMS because we have one of the modality is EMS, it's [sic] can compete with Zeltiq and all the CoolSculpture from Cynosure and others on the (inaudible) and but also we have additional modality, which is the thigh for skin tightening. Also, the three modality in the Evolve is doing a fat treatment but also skin tightening." 1AC ¶ 133.

6. Statement by Lakhani in InMode May 6, 2020, Form 6-K, signed by Defendant Mizrahy: "We believe that our breakthrough devices, Evolve and Evoke, are well-positioned to attract both physicians and patients post-crisis, as the demand for minimally invasive and hands-free alternatives will grow, opposed to historic post-crisis declines seen with invasive surgical procedures. Therefore, we believe that these technologies will be significant growth drivers in the future and will become the standard of care for facial and body reshaping in the future[.]" 1AC ¶ 135.

7. Statement by Lakhani on May 6, 2020 earnings call, in which Kreindel, Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode: Evolve is "the only hands-free device for the treatment of skin, subdermal fat and muscle toning. While Evoke is the first Hands-Free device for treating skin laxity on both the face and the submental area." 1AC ¶ 137.

2

8. Statement by Mizrahy on May 6, 2020 earnings call, in which Kreindel, Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode:

"So EVOLVE, we obviously launched last year in the latter part of 2019 and we had some tremendous success. As I mentioned earlier, it is the only device that addresses skin, it addresses fat, and then it tones the muscle, all-in-one device." "With EVOKE, EVOKE is the only device as I mentioned earlier that's able to do facial reshaping but from a hands-free standpoint." 1AC ¶ 138.

9. Statement by Lakhani on August 5, 2020 analyst call, in which Kreindel, Mizrahy, Lakhani, Theodorou and Malca participated on behalf of InMode:

"when it comes to the Evolve where we've seen a lot of traction as well as because we're able to trim, tighten and tone all on one modality rather than a physician having to go out and spend $300,000, $500,000 on multiple pieces of equipment . . . ." 1AC ¶ 140.

10. Statement by Theodorou regarding Evoke on August 5, 2020 analyst call:

"this is not just a face tightening device. Depending on your specialty, whether you're plastic surgeon or dermatologist or hard res if you want to get, you can actually remodel the fat and position it the way you want. So in the lower 1/3 of the face depending on the number of treatments, you're able to remodel that fat, remove the fat and tightening the skin, that's something that CoolSculpting has not been able to do. So that's like a big, big deal differentiator . . . So this is not a one-size fits all, and that's a big differentiator when it comes to the competition and what's been in the past. So you can melt that, you can tighten skin, you can preserve fat, you can tighten skin, depending on what you're trying to do." 1AC ¶ 141.

11. Statement by Mizrahy on August 5, 2020 analyst call:

"We decided not to market these two platforms [Evoke and Evolve] outside U.S. to spa market, but only to doctors to keep it in a high-price and with high value. And that's exactly what we will do in the next six months and also '21."

\* \* \*

"Just -- for example, in China, one of the procedures which are very attractive to doctors is to do drug delivery, and we're developing procedures like using Fractora to create some tunnels into the epidermis and to deliver drug into it, dry device combination. It's not a very expensive to produce machine, but there was a big market for it in China for whitening the skin and et cetera. And therefore, I don't – I'm not afraid that the gross margin will go down, because we will not sell our – we'll not sell our product[s] in a cheap price. There are many cheap product[s] in China . . ." 1AC ¶ 143.

12. Statement by Kreindel in February 10, 2021 Form 6K signed by Mizrahy:

"Our innovative hands-free and minimally invasive technology gained significant traction this year, driven by new product launches such as Evolve, Evoke and Morpheus8[.]" "These unique platforms offer effective full-body and facial aesthetic solutions for patients who want to avoid hospitalization and invasive procedures, which are required for traditional plastic surgery." 1AC ¶ 145.

13. Statement by Malca on June 4, 2021 at Jeffries Healthcare Conference:

InMode was "not a razor and razorblade company. When we do have consumables on many of our products, we don't discount our platforms just to jack up the price of the consumables. We set our platform for full price and sell our consumable for very reasonable pricing." 1AC ¶ 147.

14. Statement by Mizrahy regarding the launch of the Empower platform—on which the Morpheus8V was place—on October 26, 2021 conference call attended by Mizrahy, Lakhani, Theodorou, and Malca:

"this gynecology market is new to us and just because we want to be very careful with what we claim and indication to the doctors. And this is according to what Spero [Theodorou] said, we're spending a lot of money on studies and all kind of checking

4

for every indication that we claim. By the way, this is the only system on the market that has a very broad indication approval from the FDA." 1AC ¶ 149.

15. Statement by Mizrahy in response to an analyst question regarding InMode's return to the women's health market on November 18, 2021 at Canaccord Genuity MedTech, Diagnostics and Digital Health & Services Forum:

"We're riding on the learning curve. We've trained the doctor properly. We don't want to [make] the same mistakes as happened [in 2018] because we don't want the FDA to jump on us. All the applicators and all the modalities are FDA approved already, so we do it step by step." 1AC ¶ 151.

16. Statement by Theodorou regarding EmpowerRF for use in "the women's health space" in February 10, 2022 Form 6K signed by Mizrahy:

"We diligently invest resources in developing our clinical studies and are encouraged by the growing number of peer review publications supporting our strong scientific data and achievements." 1AC ¶ 153.

17. Statement by Mizrahy on February 10, 2022 analyst conference call:

"But again, I would like to say it again, we are not razor and razorblade company. We do not sell the system for less or would [sic] do not give the system for free, just to charge high price for disposable. We know that some companies in the medical esthetic [sic] did in the past and they failed. And therefore, we charge for the system, and we price the disposable in a reasonable price in order to encourage doctor [sic] to use more and more, and to have more treatment." 1AC ¶ 155.

18. Statement by Theodorou in October 27, 2022 Form 6-K signed by Mizrahy:

"We've seen growing adoption of our EmpowerRF platform by an increased number of women's health and wellness physicians across the U.S. and Canada. The success in improving women's quality of life is meaningful to InMode, and we intend building on its momentum as we capture more share in this important market." 1AC ¶ 157.

5

19. Statement by Theodorou regarding Empower—to which the Morpheus 8V applicator attached—on October 27, 2022 earnings call with analysts attended by Mizrahy, Lakhani, Theodorou, and Malca:

"Here's how we look at Empower, when we enter these practices, for example, gynecologists, right, they're not used to marketing. They don't know how to do cash-based procedures. So going to these practices with a solution that's within their scope of practice, such as stress urinary incontinence and mixed urinary incontinence and so forth is very, very important, because at that point, we're able to tell gynecologist, look, you already have these patients in your office. They're already coming in. The solutions out there are not great, so we have solution for these patients that you don't have to go out there and market. These are existing patient population." 1AC ¶ 159.

20. Statement by Mizrahy in October 27, 2022 earnings call with analysts, attended by Mizrahy, Lakhani, Theodorou, and Malca:

"The only platforms today that enable us to get into the [medical] wellness and improve quality of life is [sic] the Empower, because the Empower is not pure aesthetic. It's some aesthetic, of course, an aesthetic gynecology, but also treatment which are like treating SUI, vaginal contraction, OBA, OEB, et cetera." 1AC ¶ 160.

21. Statement by Malca on March 15, 2023 at Barclays Global Healthcare Conference:

"[Physicians] don't like the razor-razorblade model. They tend to forget pretty quickly what they paid for the original device. So, even if you discounted or heavily discounted, as many of the companies do . . . And what we do differently is we charge them the full price on the device and charge a very reasonable price on the consumable." 1AC ¶ 162.

22. Statement by Theodorou on March 15, 2023 at Barclays Global Healthcare Conference:

"We have a very large training force, and we have a lot of things in place to be able to

educate and train these practitioners so we keep things safe, which is also a big deal, right?" 1AC ¶ 164.

23. Statement by Mizrahy on May 2, 2023 conference call with analysts:

"I would like to take the moment to recognize that 15 years ago, we started this company with a small investment of just $3.5 million and in an idea that with bipolar RF technology, our expertise and knowledge of the aesthetic industry, we can disrupt the industry and help close the treatment gap. We have been accomplishing this by providing patient, remarkable and lasting results. We are working closely with leading plastic surgeons that have been endorse[ph] our safe FDA approved technology." 1AC ¶ 166.

24. Statement by Malca on August 15, 2023 at UBS MedTech, Tools and Genomics Summit:

"What would he feel more comfortable to recommend, and they tend to forget that for our product platforms, they paid full price, and the competitor, maybe they get a discount because they have the razor blade model. So they tend to forget what was the initial cost for them, but they just look at this procedure. And then they don't like the fact they see it like the greedy manufacturer and this is his patient. This is his – he's doing the walk. And then again, the manufacturer is coming, putting his hand into his pocket and like take yourself or sometimes even half of what they're able to charge and physicians don't like it." 1AC ¶ 168.

7